# Exhibit E

**Written Action**
**relating to the**
**Wells Fargo & Company Health Plan**

Pursuant to authority delegated to the undersigned in accordance with Section 8.1 of the Wells Fargo & Company Health Plan, the undersigned hereby takes the following actions:

1.  Effective December 31, 2009, the Wachovia Corporation Health and Welfare Plan shall be merged into the Wells Fargo & Company Health Plan.

2.  The Wells Fargo & Company Health Plan is amended and restated in its entirety effective January 1, 2010 to read as set forth in the document titled "Wells Fargo & Company Health Plan (Amended and Restated Effective January 1, 2010)," a copy of which shall be filed with this certificate in the Company's records.

Dated:  December 30, 2009                    WELLS FARGO & COMPANY

                                             By _____
                                                Hope A. Hardison
                                                Executive Vice President, Director of
                                                Compensation & Benefits

**WELLS FARGO & COMPANY
HEALTH PLAN**

**Amended and Restated
Effective January 1, 2010**

1

## Table of Contents

| CONTENT | PAGE |
|---|---|
| **Section 1 : Introduction**<br>   1.  History of Plan<br>   2.  Rules of Interpretation | **5-6** |
| **Section 2 : Definitions**<br>   1.  Administrator<br>   2.  Affiliate<br>   3.  Beneficiary<br>   4.  Benefit Program<br>   5.  Claims Administrator<br>   6.  Code<br>   7.  Common Control<br>   8.  Company<br>   9.  Component Program(s)<br>   10. Coverage Period<br>   11. Dependent<br>   12. Effective Date<br>   13. Employee<br>   14. Employer<br>   15. Enrollment Process<br>   16. Enrollment Period<br>   17. ERISA<br>   18. HIPAA<br>   19. Health Maintenance Organizations<br>   20. Insurance Policy or Policies<br>   21. Insured Health Program<br>   22. Insurer<br>   23. Participant<br>   24. Participating Employer<br>   25. Plan<br>   26. Plan Statement<br>   27. Plan Year<br>   28. Predecessor Employer<br>   29. Premium Payment Rules<br>   30. Principal Sponsor<br>   31. Retiree<br>   32. SCHIP<br>   33. Self-Insured Health Program<br>   34. Summary Plan Description<br>   35. Trust<br>   36. Wachovia Retiree<br>   37. Wachovia Trust | **6-11** |
| **Section 3 : Eligibility and Participation**<br>   1.  General Eligibility for Benefits<br>   2.  Enrollment<br>   3.  Modifications of Coverage | **11-16** |

|  |  |
|---|---|
| 4. Discrimination<br>5. Special Rules Regarding Eligibility for Mental Health and Substance Abuse Program.<br>6. Adopted Children<br>7. Medical Child Support Orders<br>8. Medicare Part D Notice of Creditable Coverage |  |
| **Section 4 : Benefits**<br>1. Schedule of Benefits<br>2. Post-Mastectomy Reconstructive Surgery<br>3. Coordination of Health Benefits<br>4. HIPAA Privacy and Security | **16-21** |
| **Section 5 : Funding and Contributions**<br>1. Funding Policy of Trust<br>2. Benefit Funding<br>3. Participant Contributions<br>4. Employer Contributions<br>5. Employer Obligation<br>6. Mistaken Contributions<br>7. Recovery of Improperly Paid Benefits<br>8. Right to Suspend Employer Contributions<br>9. Lost Participants | **21-23** |
| **Section 6 : Amendment and Termination**<br>1. Administration<br>2. Rules and Regulations<br>3. Method of Executing Instruments<br>4. Facility of Payment<br>5. Information Furnished by Participants<br>6. Indemnity<br>7. Service of Legal Process<br>8. Third Party Liability | **23-26** |
| **Section 7 : Claims and Appeals**<br>1. Definitions<br>2. The Claim Process<br>3. Appeal of Adverse Decision<br>4. Participant's Right to Information | **26-32** |
| **Section 8 : Amendment and Termination**<br>1. Amendment<br>2. Termination of the Plan | **32** |
| **Section 9 : Miscellaneous**<br>1. Principal Sponsor<br>2. Limitation and Authority<br>3. Fiduciary Principles<br>4. Conflict of Interest<br>5. Dual Capacity<br>6. Named Fiduciaries<br>7. Spendthrift Provision<br>8. Construed as a Whole<br>9. Plan Identification Number | **32-34** |

3

| | |
|---|---|
| **Section 10 : Disclaimers**<br>　1. No Employment Rights<br>　2. No Guarantee<br>　3. No Co-Responsibility | **34** |
| **EXHIBIT A : Component Programs** | **35-36** |
| **EXHIBIT B:  Wachovia Retiree Health And Welfare Benefits Program** | **36-114** |
| **EXHIBIT C:  Merger of the Wachovia Corporation Health and Welfare Plan for Certain Limited Purposes** | **115** |

**WELLS FARGO & COMPANY HEALTH PLAN**
**Amended and Restated Effective January 1, 2010**

## SECTION 1
## INTRODUCTION

The Wells Fargo & Company Health Plan (formerly known as the "Norwest Corporation Medical Plan", and then later known as the "Wells Fargo & Company Medical Plan") as amended and restated effective July 1, 1999 is hereby amended and restated effective January 1, 2010 (the "Plan"). This Plan Statement, together with the applicable Insurance Policies, Summary Plan Descriptions, and rules and regulations of the Administrator shall constitute the written plan document for the Plan. Capitalized terms as used in this document shall have the meanings defined in this Plan Statement.

**1.1     History of the Plan.** The self-insured Norwest Corporation Medical Plan, effective January 1, 1979, was amended and restated effective January 1, 1991. On November 2, 1998, Wells Fargo & Company merged into WFC Holdings Corporation, a wholly-owned subsidiary of Norwest Corporation, and Norwest Corporation changed its name to Wells Fargo & Company. During the period beginning November 2, 1998 through June 30, 1999, Wells Fargo & Company continued to administer its existing medical plans for employees and retirees of the former Norwest Corporation and its affiliates and WFC Holdings Corporation continued to administer its medical plan for employees and retirees of the former Wells Fargo & Company and its affiliates (collectively referred to as the "Former Medical Plans"). Effective July 1, 1999, the Former Medical Plans were merged into this amended and restated Plan. The Plan was amended, renamed and restated again effective January 1, 2009 to, among other things, broaden the Component Programs (as defined in this document) to include dental benefits and vision benefits previously provided under the Wells Fargo & Company Dental Plan and the Wells Fargo & Company Vision Plan, at which time the plan was renamed the Wells Fargo & Company Health Plan. On December 31, 2008, Wachovia Corporation merged into Wells Fargo & Company. During the period January 1, 2009 through December 31, 2009, Wachovia continues to administer its health and welfare plans for employees of the former Wachovia Corporation and the Wachovia Corporation Retiree Health & Welfare Benefits Program and Wells Fargo & Company continues to administer its medical, dental and vision plans for employees and retirees. Effective January 1, 2010, the Wachovia Corporation Retiree Health & Welfare Benefits Program is merged into this amended and restated Plan; which is attached as Exhibit B. Effective January 1, 2010, the Wachovia Corporation Health and Welfare Plan is merged into this amended and restated Plan for purposes of claims run-out. The Plan is amended, restated and effective January 1, 2010.

**1.2     Rules of Interpretation.**

    **(a)**     An individual shall be considered to have attained a given age on the individual's birthday for that age (and not on the day before).

    **(b)**     The birthday of any individual born on a February 29 shall be deemed to be February 28 in any year that is not a leap year.

    **(c)**     Whenever appropriate, words used herein in the singular may be read in the plural, or words used herein in the plural may be read in the singular; the masculine may include the feminine; and the words hereof, herein or hereunder or other similar compounds of the word here

5

shall mean and refer to the entire Plan Statement and not to any particular paragraph or section of the Plan Statement unless the context clearly indicates to the contrary.

(d)     The titles given to the various sections of the Plan Statement are inserted for convenience of reference only and are not part of the Plan Statement, and they shall not be considered in determining the purpose, meaning or intent of any provision hereof.

(e)     Any reference in the Plan Statement to a statute or regulation shall be considered also to mean and refer to any subsequent amendment or replacement of that statute or regulation.

(f)     In the event of any inconsistency or conflict in the provisions of this Plan Statement, the Summary Plan Description(s) (for the Self-Insured Health Programs) and/or the Insurance Policies (for the Insured Health Programs), the order of precedence shall be the terms and conditions of this Plan Statement, then the Summary Plan Description(s) and then the Insurance Policy(ies).

(g)     To the extent any provision of this Plan Statement is determined to be inconsistent with section 105 of the Code, when applicable, such provision is modified accordingly and if such provision cannot be modified, then the provision is void.

(h)     This document has been executed and delivered in the State of Minnesota and has been drawn in conformity to the laws of that State and shall, except to the extent that federal law is controlling, be construed and enforced in accordance with the laws of the State of Minnesota.

**SECTION 2**
**DEFINITIONS**

When the following terms are used with initial capital letters they shall have the following meanings:

**2.1     Administrator.** The "Administrator" of the Plan for purposes of ERISA §3(16)(A) shall be the Principal Sponsor or such other person as may be appointed by the Principal Sponsor from time to time pursuant to Section 6.1.

**2.2     Affiliate.** An "Affiliate" means any trade or business entity under Common Control with a Participating Employer or under Common Control with a Predecessor Employer while it is such.

**2.3     Beneficiary.** A "Beneficiary" is a person other than a Participant who is designated by a Participant, or by the terms of the Plan, as an individual who may become entitled to benefits under the Plan.

**2.4     Benefit Program.** A "Benefit Program" is a program of medical, dental or vision benefits provided by the Employer (through a third party Claims Administrator for the Self-Insured Health Programs), an Insurer or an HMO.

**2.5     Claims Administrator.** The "Claims Administrator" is (i) the third-party organization or individual to which the Plan Administrator has delegated the duty to first process and review claims for benefits for the Self-Insured Health Programs or (ii) the Insurer for the Insurance

6

Policies under the Insured portions of the Plan including HMOs, and shall include any Claims Administrator appointed by the Plan Administrator in accordance with the provisions of Section 6.1 of this Plan Statement.

**2.6** **Code**. The "Code" is the Internal Revenue Code of 1986, including applicable regulations for the specified section of the Code. Any reference in this Plan Statement to a section of the Code, including the applicable regulation, shall be considered also to mean and refer to any subsequent amendment or replacement of that section or regulation.

**2.7** **Common Control.** A trade or business entity (whether corporation, partnership, sole proprietorship or otherwise) is under "Common Control" with another trade or business entity (i) if both entities are corporations which are members of a controlled group of corporations as defined in §414(b) of the Code, (ii) if both entities are trades or businesses (whether or not incorporated) which are under common control as defined in §414(c) of said Code, (iii) if both entities are members of an affiliated service group as defined in §414(m) of the Code, or (iv) if both entities are required to be aggregated pursuant to regulations under §414(o) of the Code.

**2.8** **Company**. The "Company" is Wells Fargo & Company, and any successor thereof.

**2.9** **Component Program(s)**. The "Component Program" or "Component Programs" are the various types or classes of benefits provided under the Plan determined by reference to the Benefit Program, the various financing arrangements for those programs and arrangements to administer claims in place for each such program. At the adoption of this amended and restated Plan Statement, these Component Programs are identified in Exhibit A. The Component Programs listed in Exhibit A, are hereby incorporated into and made a part of this Plan Statement.

**2.10** **Coverage Period**. The "Coverage Period" is generally the Plan Year, unless the Administrator designates a different Coverage Period.

**2.11** **Dependent**. A "Dependent" is any person who is receiving coverage as a dependent of an Employee, Retiree or Wachovia Retiree under the terms of the Plan. A "Dependent" shall mean any individual who meets the requirements of a dependent in the Summary Plan Descriptions.

**2.12** **Effective Date**. The "Effective Date" of this amended and restated Plan is January 1, 2010.

**2.13** **Employee**. An "Employee" is any employee of the Employer who is on the Employer's U.S. payroll, subject to the following: (1) An employee who is classified by the Employer as a "flexible" employee is not an Employee during the period while so classified; (2) An employee is not an Employee prior to the date his or her employer becomes an Employer; (3) A nonresident alien while not receiving earned income (within the meaning of section 911(d)(2) of the Code) from Employer which constitutes income from sources within the United States (within the meaning of section 861(a)(3) of the Code) is not an Employee; (4) an individual shall be deemed to be an Employee during a period of absence from active service which does not result in a termination of employment with Employer for a period up to twenty-four continuous months (unless otherwise authorized by Employer), provided the employee was an Employee at the commencement of such period of absence, (5) Eligibility of employees in a collective bargaining unit to participate in the Plan shall be subject to negotiations with the representative of that business unit and a decision to expressly provide coverage under the Plan to such employees; and (6) an individual who, during any period during which the individual is classified by the Employer as an independent contractor

or any other status in which the person is not treated as a common law employee of Employer for purposes of federal withholding of taxes, or is treated as an employee of another entity who is leased to Employer, regardless of the correct legal status of the individual. (Subsection (6) applies to all periods of service of an individual who is subsequently reclassified as an employee whether the reclassification is retroactive or prospective.)

**2.14   Employer**. The "Employer" is the Principal Sponsor, any Participating Employer, and any successor thereof that adopts the Plan.

**2.15   Enrollment Process**. The "Enrollment Process" is the process, as determined by the Administrator, entered into by an individual eligible to become a Participant as a condition of participation in the Plan.

**2.16   Enrollment Period**. The "Enrollment Period" is the election period for enrolling in or changing benefits coverage. The Principal Sponsor generally holds an annual enrollment period for the Plan in the fall.

**2.17   ERISA**. "ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, including applicable regulations for the specified section of ERISA. Any reference in this Plan Statement to a section of ERISA, including the applicable regulation, shall be considered also to mean and refer to any subsequent amendment or replacement of that section or regulation.

**2.18   HIPAA**. "HIPAA" means the Health Insurance Portability and Accountability Act of 1996 (HIPAA), including applicable regulations. Any reference in this Plan Statement to a section of HIPAA, including the applicable regulation, shall be considered also to mean and refer to any subsequent amendment or replacement of that section or regulation.

**2.19   Health Maintenance Organizations**. "Health Maintenance Organizations" or "HMOs" are organizations that provide insured health benefits and most medical services on a pre-paid basis through their network of doctors and facilities.

**2.20   Insurance Policy or Policies**. An "Insurance Policy" or "Insurance Policies" are the insurance policy or policies, including HMO agreements and any side letters or supplemental agreements between the Principal Sponsor and the Insurer/HMO, providing health or other benefits incorporated herein by this reference. Insurance Policy or Policies include any benefit schedules or other agreements with health maintenance organizations, preferred provider organizations or other managed care providers. The Insurance Policies, listed with the other Component Programs in Exhibit A, are hereby incorporated into and made a part of this Plan Statement. Should there be any inconsistencies or conflicts between the Insurance Policies and this Plan Statement, the Plan Statement shall govern as set forth in the Rules of Interpretation described in Section 1 of this document.

**2.21   Insured Health Program**. An "Insured Health Program" is a program of benefits where the Employer's covered Employees, Retirees, Wachovia Retirees and Dependents are insured by the Principal Sponsor in consideration of a flat premium paid to an Insurer pursuant to an Insurance Policy. The Insurer bears the risk of paying benefits provided under the program.

**2.22   Insurer**. An "Insurer" is the entity or entities issuing the Insurance Policy or Policies.

**2.23**   **Participant**.  A "Participant" is an Employee, Retiree, Wachovia Retiree or a Dependent who becomes a Participant in the Plan in accordance with the provisions of Section 3 of this Plan Statement.  An Employee, Retiree, Wachovia Retiree and/or Dependent who becomes a Participant in the Plan shall be considered to continue as a Participant until the Participant's coverage is terminated in accordance with Section 3.3 of this Plan Statement.

**2.24**   **Participating Employer.**  A "Participating Employer" is the Company and each of the participating subsidiaries or Affiliates of the Company that are designated as a Participating Employer for purposes of this Plan by Wells Fargo & Company (by written actions of the Chairman, President, Director of Human Resources, or Director of Compensation and Benefits).

**2.25**   **Plan**.  The "Plan" is the plan maintained by the Plan Sponsor for the purpose of providing health and other similar benefits to covered Employees, Retirees, Wachovia Retirees and Dependents known as the Wells Fargo & Company Health Plan. It is intended that this Plan is an employee welfare benefit plan within the meaning of ERISA.

**2.26**   **Plan Statement**.  The "Plan Statement" is this written document entitled the "Wells Fargo & Company Health Plan" as amended and restated effective as of January 1, 2010, as the same may be amended from time to time.  (The Plan Statement is only one of several documents pursuant to which the Plan is maintained.  These other documents include the Summary Plan Descriptions for the Self-Insured Health Programs and the Insurance Policies for the Insured Health Programs (including the HMOs)

**2.27**   **Plan Year**.  The "Plan Year" is the twelve (12) consecutive month period beginning January 1 and ending December 31.

**2.28**   **Predecessor Employer.**  A "Predecessor Employer" is any corporation, partnership, firm, or individual (referred to in this definition as an "entity") if a substantial part of the assets and employees of the entity are acquired by a Participating Employer, an Affiliate, or another Predecessor Employer and if the entity is so designated by the Administrator or its delegate.  Any other employer shall be a Predecessor Employer if so required by regulations prescribed by the Secretary of the Treasury.

**2.29**   **Premium Payment Rules**.  The "Premium Payment Rules" are the rules established by the Principal Sponsor in connection with the benefit arrangements for covered Participants.

   **(a)**      For Employees and their Dependents (excluding domestic partners and same sex spouses as defined in the Insurance Policies (for the Insured Health Programs) and/or the Summary Plan Descriptions (for the Self-Insured Health Programs) who do not qualify as a "dependent" of the Participant under the Code)), such rules are established pursuant to Code §125 for the purpose of (i) paying the Participant's share of premiums or other costs, (ii) receiving or making contributions to the Participant's Health Savings Account, if applicable, and (iii) defining the rules under which such Employees and their Dependents may change their premium or contribution elections at a time other than the designated Enrollment Period due to a qualified change in status.  The Premium Payment Rules are set forth in the Wells Fargo & Company Spending Accounts Plan, which rules are, by reference, incorporated herein.

9

(b)     For domestic partners and same sex spouses who do not qualify as a "dependent" of the Participant under the Internal Revenue Code, the Participant will pay the Participant's share of premiums on an after-tax basis and the amount of the Participating Employer's contribution toward the domestic partner's or same sex spouse's coverage will be imputed as income to the Participant under federal tax laws.  If the Participant is enrolled in family coverage under an applicable Self-Insured Health Program, the amount of the Participating Employer's contribution toward the domestic partner's or same-sex spouse's coverage will be imputed as income to the Participant under federal tax laws.

(c)     For Retirees and Wachovia Retirees, the Participant will pay the Participant's share of the premiums on an after-tax basis by check, money order, through direct debit of their personal bank accounts, or deduction from their Wells Fargo sponsored pension payments.

**2.30    Principal Sponsor.**  The "Principal Sponsor" is Wells Fargo & Company, a Delaware corporation, and any successor thereto.

**2.31    Retiree.**  A "Retiree" is any Employee who, upon termination of employment with the Employer, is designated by the Employer as eligible for retiree medical, dental, vision and/or life insurance benefits under the Plan.  Wachovia Retirees are specifically excluded from the definition of "Retiree".

**2.32    SCHIP.**  "SCHIP" means a State Children's Health Insurance Program under titles XIX and XXI of the Social Security Act.

**2.33    Self-Insured Health Program.**  A "Self-Insured Health Program" is a program of benefits where the Employer's covered Employees, Retirees, Wachovia Retirees and Dependents are self-insured by the Principal Sponsor.  The Principal Sponsor bears the primary risk of paying benefits for covered Employees, Retirees, Wachovia Retirees and Dependents as provided under the program.

**2.34    Summary Plan Description.**  A "Summary Plan Description" is a written summary of the Participant's benefits and rights under a Self-Insured Health Program.  Every attempt is made to make the Summary Plan Descriptions which are incorporated in, and made a part of, the Plan easy to understand, informative and as accurate as possible; however, should there be any inconsistencies or conflicts between the Summary Plan Descriptions and this Plan Statement, the Plan Statement shall govern as set forth in the Rules of Interpretation described in Section 1.2 of this document.

**2.35    Trust.**  The "Trust" is an agreement between the Principal Sponsor and Wells Fargo Bank, N.A. (the "Trustee") (hereinafter referred to as the "Trust Agreement") to provide for the holding, investment and administration of the funds of the Plan.  The Trustee shall administer the Trust funds in accordance with the terms and provisions of the Trust Agreement and the Plan Statement.  If the provisions of the Plan Statement and the Trust Agreement are inconsistent or otherwise in conflict with the rights, duties or obligations of the Trustee, the provisions of the Plan Statement control.

**2.36    Wachovia Retiree.**  A "Wachovia Retiree" is an individual eligible for coverage under the Wachovia Corporation Retiree Health & Welfare Benefits Program of Exhibit B.

**2.37    Wachovia Trust.**  The "Wachovia Trust" is the Wachovia Corporation Health and Welfare Plan Trust, as amended and restated effective January 1, 2009.  Wachovia Bank, NA is the trustee

10

of the Wachovia Trust. Payments from the Wachovia Trust are limited to expenses (i) incurred on or before December 31, 2009, and (ii) that are eligible for coverage under the Wachovia Corporation Health and Welfare Plan, as amended and restated effective January 1, 2009 and subsequently amended.

## SECTION 3
## ELIGIBILITY AND PARTICIPATION

**3.1     General Eligibility For Benefits**.

     **(a)     Employees**.  To the extent there is an inconsistency between an Insurance Policy and the Summary Plan Descriptions, the eligibility requirements of the Summary Plan Descriptions shall govern.  Provisions in the Insurance Policies that conflict with the Summary Plan Description shall be the responsibility of the Insurer.  Each person who is an Employee shall become a Participant on the first day after he or she has satisfied the applicable eligibility requirements of the Plan, provided that such person makes all contributions required under Section 5.3 of this Plan Statement, at the time and in the manner specified by the Administrator.  Any Employee receiving any one or more of such benefits shall be a Participant in this Plan but shall be entitled to receive only the specific benefits for which such person has qualified.

     **(b)     Retirees**.  To the extent there is an inconsistency between an Insurance Policy and the Summary Plan Descriptions, the eligibility requirements of the Summary Plan Descriptions shall govern.  Provisions in the Insurance Policies that conflict with the Summary Plan Description shall be the responsibility of the Insurer.   Each Retiree shall become a Participant on the first day after he or she has satisfied the applicable eligibility requirements for retiree coverage under the Plan, provided that the Retiree makes all contributions required under Section 5.3 of this Plan Statement, at the time and in the manner specified by the Administrator. Any Retiree receiving any one or more of such benefits shall be a Participant in this Plan but shall be entitled to receive only the specific benefits for which such person has qualified. Subject to Section 3.3(c), if a Retiree fails to elect benefits under one of the Benefit Programs when first eligible, the Retiree and the Retiree's dependents shall not be eligible to enroll in the Plan at a future date.  The provisions of this Section 3.1(b) do not apply to Wachovia Retirees.  The eligibility requirements for coverage as a Wachovia Retiree are set forth in Exhibit B of the Plan Statement.

**(c)     Dependents**.  To the extent there is an inconsistency between an Insurance Policy and the Summary Plan Description for the Component Programs, the eligibility requirements of the Summary Plan Description shall govern.  Provisions in the Insurance Policies that conflict with the Summary Plan Description shall be the responsibility of the Insurer.  Each Dependent shall become a Participant on the first day after he or she has satisfied the applicable eligibility requirements for dependent coverage under the Plan, provided that the Employee, Retiree or Wachovia Retiree makes all contributions required under Section 5.3 of this Plan Statement, at the time and in the manner specified by the Administrator.   Any Dependent receiving any one or more of such benefits shall be a Participant in this Plan but shall be entitled to receive only the specific benefits for which such person has qualified.

**3.2     Enrollment**.  Each Employee, Retiree, Wachovia Retiree and Dependent who is or will become eligible to become a Participant as provided in Section 3.1 and who desires to enroll as a Participant shall, as a condition of participation in the Plan, complete the enrollment process as communicated by the Company.

**3.3     Modifications of Coverage.** The coverage of a Participant may only be modified as provided in this Section 3.3.

      **(a)     Change in Coverage.** A Participant may change his or her coverage under the Plan in accordance with the applicable terms and conditions of the Plan subject, however, to the applicable provisions of the Premium Payment Rules. Such terms and conditions are set forth in the Insurance Policies and/or the Summary Plan Descriptions for the Plan and are hereby incorporated into and made a part of this Plan Statement.

      **(b)     Special Enrollment Rights.** HIPAA provides Employees, Retirees and Wachovia Retirees with the following special enrollment rights in addition to the Enrollment Period.

      **(1)** If the Employee previously declined Plan coverage for himself and his Dependents, because the Employee had other health coverage, the Employee may enroll himself/herself or his or her Dependents if that coverage has been lost due to one of the following reasons:

      **(A)** Loss of eligibility,

      **(B)** Termination of the Employee's spouse's coverage through the spouse's employer,

      **(C)** Exhaustion of COBRA coverage, or

      **(D)** Such other events as would allow a special enrollment right under HIPAA (e.g., exhaustion of lifetime benefits).

      **(2)** If an Employee previously declined Plan coverage for himself and his Dependents, the Employee may enroll himself any newly eligible Dependents the Employee gains due to marriage or a child's birth, adoption or placement for adoption.

      **(3)** If a Retiree or Wachovia Retiree has a newly eligible Dependent as a result of marriage, birth, adoption or placement for adoption, the Retiree or Wachovia Retiree may enroll any newly eligible Dependents if the Retiree or Wachovia Retiree is a Participant in the Plan.

      **(c)     Special Enrollment in the Event of Loss of Medicaid or SCHIP Coverage or Eligibility for Group Health Plan Premium Assistance Through Medicaid or SCHIP.** If an Employee waives coverage under this Plan for himself or his eligible Dependents because they have other medical coverage under Medicaid or SCHIP, special rules apply. The Employee may subsequently enroll (or enroll his eligible but unenrolled Dependent(s)) in the Plan if the following conditions are met:

      **(1)** The Employee's or his or her Dependents' Medicaid or SCHIP coverage terminates; **or** the Employee or his or her Dependent(s) are determined to be eligible for group health plan premium assistance through Medicaid or SCHIP; **and**

      **(2)** The Employee requests to enroll himself and his Dependents (whose Medicaid or SCHIP coverage terminated or who was determined eligible for group health plan

premium assistance through Medicaid or SCHIP) in this Plan within 60 days of the date coverage terminates under Medicaid or SCHIP or within 60 days after the individual is determined to be eligible for group health plan premium assistance through Medicaid or SCHIP.

(d) **Termination of Coverage.** A Participant's participation in this Plan shall terminate at such time as such Participant (1) is no longer eligible to receive the benefits described in the Plan Statement, (2) experiences a qualifying change in status as referred to in the Premium Payment Rules thereby allowing the Participant to drop coverage, (3) experiences an event described in the Summary Plan Description allowing the Participant to drop a domestic partner's or same-sex spouse's coverage or a Retiree or Wachovia Retiree to drop a Dependent's coverage, (4) fails to comply with the Premium Payment Rules, or (4) chooses to drop coverage during the Enrollment Period.

(1) **COBRA Continuation Coverage.** Upon termination of any medical coverage under the Plan, continuation coverage will be administered pursuant to the rules set out in the Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA, HIPAA, Part 6 of Title 1 of ERISA, and Code section 4980B, including applicable regulations).

(2) **HIPAA Portability Certificates.** Upon termination of any health coverage under the Plan, portability certificates evidencing the Participant's period of Plan coverage will be provided pursuant to the requirements of HIPAA. (HIPAA, Part 7 of Title 1 of ERISA, and Subtitle K of the Code, including applicable regulations).

## 3.4 Discrimination.

(a) **Eligibility for Plan Benefits.** Notwithstanding any other provision in this Plan Statement to the contrary:

(1) the requirements for eligibility to receive such benefits under the Self-Insured Health Programs shall not discriminate (within the meaning of Code section 105(h)) in favor of highly compensated individuals (as defined in Code section 105(h)(5)),

(2) the provision of benefits under the Self-Insured Health Programs shall not discriminate in favor of highly compensated individuals (as defined in Code section 105(h)(5)). Benefits will be considered to not discriminate in favor of highly compensated individuals if all the benefits provided highly compensated individuals eligible to receive such benefits are provided for all other Employees eligible to receive such benefits, and

(3) health status-related factors as defined by HIPAA shall not be considered in determining the applicable waiting period for coverage to become effective, applying any special rules for late enrollment or special enrollment, and determining any affiliation periods for HMO or other Insured coverage. Similarly, a Participant's health status-related factors shall not be considered in determining a Participant's premiums or other amounts charged the Participant for initial or continued coverage.

(b) **Benefits Subject to Code Section 125.** Each of the separate and distinct benefits provided under this Plan pursuant to a funding method subject to Code section 125 shall not discriminate:

13

**(1)** within the meaning of Code section 125(b)(1)(A) as to eligibility to participate in favor of highly compensated individuals (as defined in Code section 125(e)(2)), or

**(2)** within the meaning of Code section 125(b)(1)(B) as to contributions and benefits in favor of highly compensated participants (as defined in section 125(e)(1) of the Code), nor shall benefits for key employees (as defined in Code section 416(i)(1)) exceed twenty-five percent (25%) of the benefits for all Participants.

**(c) Affiliates.** Employees who are employed by a business entity that is an Affiliate of the Employer shall be considered in making the determinations in this Section 3.4.

**(d) Remedial Action.** The Employer shall restrict eligibility or enrollments, or both, in such manner as the Employer shall determine, in order to comply with the requirements of this Section 3.4.

**3.5 Special Rules Regarding Eligibility for Mental Health and Substance Abuse Program.** All Plan Participants, including those Participants enrolled in an Insured Health Program, shall be eligible for the mental health and substance abuse benefits as set forth in the Summary Plan Description. The mental health and substance abuse benefits offered under the Plan are intended to comply with the requirements of the Mental Health Parity and Addiction Equity Act of 2008.

**3.6 Adopted Children.** Children Placed with Participants for Adoption shall be eligible under the same terms and conditions as apply in the case of Dependent Children who are natural Children of Participants under the Plan, irrespective of whether the adoption has become final. For purposes of this Section 3.6, the following capitalized terms shall have the following meanings:

**(a) Child or Children** - an individual who has not turned age nineteen (19) years as of the date of any adoption or placement for adoption of such individual.

**(b) Placed for Adoption** - in connection with any placement for adoption of total or partial support of a Child in anticipation of adoption of such Child. The Child's placement with such person terminates upon the termination of such legal obligation.

**3.7 Medical Child Support Orders.** Consistent with the provisions of ERISA Section 609(a) as adopted in the Omnibus Budget Reconciliation Act of 1993 and effective at the date hereof, the Plan shall provide benefits in accordance with the applicable requirements of a Qualified Medical Child Support Order ("QMCSO"). For purposes of this Section 3.7, the following capitalized terms shall have the following meanings:

**(a) Alternate Recipient** - any child of a Participant who is recognized under a Medical Child Support Order as having a right to enrollment under a group health plan with respect to such Participant. Each Alternate Recipient shall be permitted to designate a representative for receipt of copies of notices that are sent to the Alternate Recipient with respect to a Medical Child Support Order. A person who is an Alternate Recipient under a QMCSO shall be considered a Participant under the Plan for purposes of the reporting and disclosure rules under ERISA and as a beneficiary (as that term is defined in ERISA) for all other purposes under the Plan.

14

**(b)** **Medical Child Support Order** - any judgment, decree, or order (including approval of a settlement agreement) issued by a court of competent jurisdiction or through an administrative process established under applicable state law which has the force and effect of law which:

**(1)** provides for child support with respect to a child of a Participant under the Plan or provides for health benefit coverage to such a child, is made pursuant to a State domestic relations law (including a community property law) and relates to benefits under the Plan, or

**(2)** enforces a law relating to medical child support described in section 1908 of the Social Security Act (as added by the Omnibus Budget Reconciliation Act of 1993) with respect to the Plan.

**(c)** **Qualified Medical Child Support Order** - a Medical Child Support Order which creates or recognizes the existence of an Alternate Recipient's right to, or assigns to an Alternate Recipient the right to, receive medical benefits for which a Participant or Beneficiary is eligible under the Plan and which satisfies all of the following requirements:

**(1)** **Names and Addresses**. The Medical Child Support Order must clearly specify the name and last known mailing address (if any) of the Participant and the name and mailing address of each Alternate Recipient covered by the Medical Child Support Order.

**(2)** **Type of Coverage**. The Medical Child Support Order must clearly specify a reasonable description of the type of coverage to be provided by the Plan to each Alternate Recipient, or the manner in which such type of coverage is to be determined.

**(3)** **Coverage Period**. The Medical Child Support Order must clearly specify the period to which the order applies.

**(4)** **Plan Identity**. The Medical Child Support Order must clearly specify each Plan to which it applies.

**(5)** **Restrictions**. The Medical Child Support Order may not require the Plan to provide any type or form of benefit, or any option not otherwise provided under the Plan, except to the extent necessary to meet the requirements of a law relating to medical child support described in section 1908 of the Social Security Act (as added by the Omnibus Budget Reconciliation Act of1993). If the Alternate Recipient cannot access the same coverage as the Participant, the Participant's Benefit Program will be changed to a Benefit Program that provides access for both Participant and Alternate Recipient.

**(6)** The Administrator shall prescribe procedures for determining the qualifications of Medical Child Support Orders received consistent with the requirements of ERISA Section 609(a). Such procedures are set forth in the Summary Plan Descriptions for the Self-Insured Health Programs.

**3.8** **Medicare Part D Notice of Creditable Coverage.** Pursuant to the Medicare Modernization Act of 2003 (MMA), the Plan must disclose to all Medicare eligible Participants with prescription drug coverage under the Plan whether such coverage is creditable (as defined by the MMA). This is referred to as the Notice of Creditable Coverage.

15

     **(a)**     The Notice of Creditable Coverage must be provided to all affected Participants (i.e., Participants with Medicare due to age or due to disability) by at a minimum:

     **(1)**     within the 12-month period prior to the Participant's initial enrollment period for the Medicare prescription drug benefit;

     **(2)**     within the 12-month period prior to the effective date of enrolling in the Plan;

     **(3)**     upon any change in the Plan coverage that affects whether the coverage is creditable prescription drug coverage (renewal) as defined by the MMA;

     **(4)**     within the 12-month period prior to the commencement of annual election period that is coordinated with Medicare beginning on November 15 of each year; and

     **(5)**     upon the Participant's request.

If the Notice of Creditable Coverage is provided to all Plan Participants, items 1 and 2 are deemed to be met.

     **(b)**     The Summary Plan Description includes the Notice of Creditable Coverage and additional information about Medicare Part D.

## SECTION 4
## BENEFITS

     **4.1**     **Schedule of Benefits**. The applicable schedules of benefits provided under the Plan are set forth in the Insurance Policies and/or the Summary Plan Descriptions for the Plan and are hereby incorporated into and made a part of this Plan Statement.

     **4.2**     **Post-Mastectomy Reconstructive Surgery.** The Women's Health and Cancer Rights Act of 1998 provides benefits for mastectomy-related services including reconstruction and surgery to achieve symmetry between the breasts, prostheses, and complications resulting from a mastectomy (including lymphedema) The Plan covers reconstructive surgery when medically necessary and will continue to cover the cost of post-mastectomy reconstructive surgery that is performed on Participants in a manner determined in consultation with the attending physician and patient for:

     **(a)**     Reconstruction of the breast on which the mastectomy was performed;

     **(b)**     Surgery and reconstruction of the other breast to produce a symmetrical appearance; and

     **(c)**     Prostheses and treatment of physical complications at all stages of the mastectomy, including lymphedemas.

16

**4.3     Coordination of Health Benefits.**

(a)     **Coordination with other Health Plans.**  The applicable coordination of benefits provisions for the Plan are set forth in the Insurance Policies and/or the Summary Plan Descriptions for the Plan and are hereby incorporated into and made a part of this Plan Statement.

(b)     **Compliance with Assignment of Rights.**  Payment for benefits under the Plan will be made in accordance with any assignment of rights made by or on behalf of a Participant or Beneficiary to the extent required by a state plan for medical assistance approved under title XIX of the Social Security Act ("Grants to States for Medical Assistance Programs") pursuant to section1912 (a)(1)(A) of such Act (as in effect on August 1, 1993).

(c)     **Enrollment and Provision of Benefits.**  The fact that an individual is eligible for or is provided medical assistance under a state plan for medical assistance approved under title XIX of the Social Security Act ("Grants to States for Medical Assistance Programs") will not be taken into account by the Plan in enrolling an individual as a Participant or Beneficiary or in determining or making payments for benefits of an individual as a Participant or Beneficiary.

(d)     **Acquisition by States of Rights of Third Parties.**  To the extent that payment has been made under a state plan for medical assistance approved under title XIX of the Social Security Act ("Grants to States for Medical Assistance Programs"), payment for benefits under the Plan will be made in accordance with any state law which provides that the state has acquired the rights with respect to a Participant to such payment for such items or services in any case where the Plan has a legal liability to make payments for items or services constituting such assistance.

(e)     **Coordination with Medicare.**  Medicare Parts A and B benefits will be primary to the extent permitted under applicable law, and this Plan shall be primary to Medicare Parts A and B only to the extent required by applicable law.  Prescription drug coverage under the Plan shall not be coordinated with Medicare Part D.

(f)     **Coordination with TRICARE, SCHIP and other Governmental Program.**  TRICARE benefits will be primary to the extent permitted under applicable law.  This Plan shall be primary to benefits provided under TRICARE only to the extent required by applicable law.  This Plan will be primary to SCHIP to the extent required by applicable law.  If a Participant is covered by a governmental program other than Medicare or TRICARE, that program will be primary, except as otherwise required by applicable law.  This Plan shall be primary to SCHIP to the extent required by applicable law.

**4.4     HIPAA Privacy and Security.**  The provisions of this section 4.4 subject to the Privacy Rule became effective on April 14, 2003 and the provisions subject to the Security Rule became effective on April 21, 2005.

(a)     **Definitions.**  For purposes of this section 4.4, the following terms shall have the meaning set forth below:

(1)     <u>Business Associate.</u>  Business Associate shall be defined as the term "business associate" in 45 C.F.R. §164.501.

17

(2)   HIPAA. "HIPAA" shall be defined as the Health Insurance Portability and Accountability Act of 1996. HIPAA regulations are contained in the Privacy Rule and Security Rule.

(3)   Individual. "Individual" means the person who is the subject of PHI. Individual will also include that person's Personal Representative as defined by 45 C.F.R. §164.502(g)(1).

(4)   Plan Sponsor. Plan Sponsor is Wells Fargo & Company or it's designate.

(5)   Privacy Rule. The Privacy Rule shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Parts §160 and 164.

(6)   Protected Health Information/PHI. "PHI" shall be defined as Protected Health Information according to 45 C.F.R. §164.501. It includes information that is created by a health care provider, health plan, or health care clearinghouse, and relates to the past, present, or future payment for the provision of health care to an Individual; or the past present, or future payment for the provision of health care to an Individual; and the information either identifies the Individual; or there is a reasonable basis to believe the information can be used to identify the Individual. This information may be maintained or transmitted either electronically (i.e., Electronic Protected Health Information or EPHI) or in any other form or medium. For purposes of this section 4.4, PHI shall include EPHI.

(7)   Security Rule. The Security Rule shall mean the Standards for Security of Electronic Protected Health Information at 45 C.F.R. Parts 160 and 164, subparts A and C.

(b)   The Plan may disclose summary health information to the Plan Sponsor if the Plan Sponsor requests summary health information for the purpose of obtaining premium bids for coverage under the Plan, or modifying, amending, or terminating the Plan.

(c)   **Permitted Uses and Disclosures of PHI.**   The Plan may disclose or authorize disclosure of PHI to the Plan Sponsor and/or to the Plan Administrator for Plan administration which includes activities related to Payment or Health Care Operations.

(1)   Payment. Payment means activities undertaken by the Plan to meet its responsibility for coverage and to provide benefits. Payment activities include:
- Determining eligibility or coverage;
- Adjudicating benefit claims;
- Underwriting;
- Billing and collection; and
- Reviewing utilization.

(2)   Health Care Operations. Health Care Operations means any of the following activities to the extent that they are related to the Plan's functions:
- Conducting quality assessment and improvement activities; activities related to health improvement, reduction of health care costs, case management, care coordination; and contacting health care providers and patients regarding treatment alternatives;

18

- Reviewing the competence or qualifications of health care providers, and evaluating provider and Plan performance;
- Conducting or arranging for medical reviews, legal services and auditing functions, including fraud and abuse detection and compliance programs;
- Business planning and development, such as cost-management and planning-related analyses related to managing and operating the health plan, and development or improvement of coverage policies; and
- Business management and general administrative activities.

(3)     In addition to Payment and Health Care Operations, the Plan may disclose PHI to certain government and law enforcement officials, as follows:
- To prevent or lessen a serious, imminent threat to public health or safety;
- If the Participant is a victim of abuse, neglect, or domestic violence;
- For disease-prevention activities, or to medical examiners or coroners to help identify someone who has died;
- In accordance with certain court orders or subpoenas;
- For certain activities related to national security; or
- For certain law enforcement activities such as criminal investigations.

(4)     Other permitted uses and disclosures include:
- Health oversight;
- Research, if meets the requirements of HIPAA;
- Judicial/administrative proceedings;
- Workers' Comp adjudication;
- Public health;
- Personal Representative's of the Individual;
- Medical examiners and coroners with respect to a decedent; or
- As required by law; or
- As authorized or required by the Individual, or
- To enforce HIPAA.

(5)     Disclosure of PHI by the Plan to the Plan Sponsor shall only be permitted upon receipt of a certification from the Plan Sponsor that the Plan Sponsor agrees to:
- Not use or further disclose the information other than as permitted or required by the Plan or as required by law;
- Ensure that any agents, including subcontractors and Business Associates, to whom it provides PHI received from the Plan agree to the same restrictions and conditions that apply to the Plan Sponsor with respect to such information;
- Not use or disclose the information for employment-related actions and decisions or in connection with any other benefit or employee benefit plan of the Plan Sponsor;
- Report to the Plan any use or disclosure of the information that is inconsistent with the uses or disclosures provided for of which it becomes aware;
- Make available PHI in accordance with 45 C.F.R. §164.524;

19

- Make available PHI for amendment and incorporate any amendments to PHI in accordance with 45 C.F.R. §164.528;
- Make its internal practices, books, and records relating to the use and disclosure of PHI received from the Plan available to the Secretary for purposes of determining compliance by the Plan with 45 C.F.R. §164.504(f)(2)(ii);
- If feasible, return or destroy all PHI received from the Plan that the Plan Sponsor still maintains in any form and retain no copies of such information when no longer needed for the purpose for which disclosure was made, except that, if such return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible; and
- Ensure that the adequate separation required in 45 C.F.R. §164.504(f)(2)(iii) is established.

**(d)  Business Associates.** The Plan may also disclose or authorize disclosure of PHI to Business Associates of the Plan provided there is an executed agreement between the Plan and the Business Associate whereby the Business Associate agrees to maintain the privacy and security of the PHI as described in the Privacy Rule and the Security Rule.

**(e)  Firewalls.** As a condition precedent to the use and/or disclosure of PHI as set forth in paragraph (b) above, firewalls have been set up to maintain the confidentiality of PHI.

**(1)** Certain classes of employees of the Plan Sponsor are authorized to have access to PHI in order to perform Plan Administrative functions. The Plan Administrator shall designate the classes of employees who have access to PHI but the classes of employees shall include:

- The Plan Administrator;
- Employees in Wells Fargo's Corporate Benefits Department;
- Human Resources Representatives working in Wells Fargo's Human Resources Service Center;
- Employees working in Wells Fargo's Corporate Human Resources Information Systems Department;
- Employees working in Wells Fargo's Corporate Human Resources Accounting and Finance Departments;
- Employees working in Wells Fargo's Corporate Employee Assistance Consulting Department; and
- Employees working in Wells Fargo's Law Department.

**(2)** Any and all uses and/or disclosures of PHI by these classes of employees are subject to a minimum necessary rule whereby the amount of information that is used or disclosed should be the minimum necessary to accomplish the purpose taking into consideration practical and technological limitations. The only exception to this rule shall occur when the use or disclosure of the information is authorized or mandatory under law.

**(3)** The Plan and Plan Sponsor shall utilize certain safeguards (administrative, technical, and physical) to insure that PHI is protected from those who are not authorized to use and/or disclose PHI.

20

**(f)** **Compliance.**

**(1)** The designated Privacy Officer shall be appointed by resolution executed by the Director of Compensation and Benefits. The Privacy Officer will implement formal policies and procedures to insure the Plan complies with the Privacy Regulations and HIPAA including distribution of a HIPAA Privacy Notice in such form as determined by the Privacy Officer from time to time, as well as the policies and procedures for addressing and documenting complaints (including possible sanctions).

**(2)** The process for filing a complaint against the Plan or an employee of the Plan Sponsor for noncompliance is described in the Summary Plan Description and the Privacy Notice distributed by the Plan from time to time, which are both hereby incorporated into and made a part of this amendment.

- To the extent possible, the Plan shall take appropriate action to mitigate known harmful affects of inappropriate use or disclosure of PHI.
- Complainants shall not be subject to intimidation, threats, coercion or retaliation as a result of filing a complaint.
- No Individual will be required to waive his/her rights under HIPAA as a condition of treatment, payment, enrollment in a health plan or eligibility for benefits.

**SECTION 5**
**FUNDING AND CONTRIBUTIONS**

**5.1** **Funding Policy of Trust.** The Principal Sponsor, from time to time, shall establish a funding policy and method for the Plan that is consistent with the objectives of the Plan. This funding policy and method, as established and amended from time to time, shall be stated to any person or entity responsible for the investment of any portion of the Trust funds, so that such person or entity may coordinate investment policies of the Trust with such funding policy and method.

**5.2** **Benefit Funding.** Plan benefits shall be funded as follows:

**(a)** **Self-Insured Health Programs.** The Employer shall pay benefits and premiums under the Self-Insured Health Programs from the Trust, Wachovia Trust or the Employer's general assets.

**(b)** **Insured Health Programs.** The Insurers or HMOs shall pay benefits under the Insured Health Programs (including benefits from an HMO) in accordance with the terms of the Insurance Policies. The Employer shall pay premiums for Insured Health Programs from the Trust or the Employer's general assets.

**5.3** **Participant Contributions.**

**(a)** **Employed Participants.** Participants employed by Employer shall be responsible for payment of such contributions to the Plan as may be specified from time to time as determined by the Principal Sponsor and the Premium Payment Rules. Participant contributions shall be paid

21

to the Trust as soon as administratively feasible within a reasonable time (not to exceed 90 days) following receipt by the Employer.

**(b)     Retirees and Wachovia Retirees**.  Retirees and Wachovia Retirees shall be responsible for payment of such contributions to the Plan as may be specified from time to time as determined by the Principal Sponsor and the Premium Payment Rules.  Contributions from Retirees and Wachovia Retirees shall be paid to the Trust as soon as administratively feasible within a reasonable time (not to exceed 90 days) following receipt by the Principal Sponsor.   Retirees and Wachovia Retirees are afforded a one-time grace period if the Retirees or Wachovia Retirees fail to timely remit the required premiums for Plan coverage.  If a Retirees or Wachovia Retirees fails to timely remit the required premiums after the grace period, coverage under the Plan for the Retirees and Wachovia Retirees and his/her Dependents is terminated without a right of reinstatement.

**5.4     Employer Contributions**. The Employer shall pay such contributions to the Plan as may be determined from time to time by the Principal Sponsor to be necessary to pay benefits for Participants in the Self-Insured Health Programs and, where applicable, premiums for Participants in the Self-Insured and Insured Health Programs.  All such contributions shall be paid to the Trust within such time as may be determined by the Principal Sponsor.

**5.5     Employer Obligation**.  All contributions, including contributions by Participants, shall be paid to the Insurers and HMOs at such time or times as shall be required to maintain the coverage in effect under the Insurance Policies. The liability of the Employer shall be limited to the payment of such premiums, and no Employee, Retiree, Wachovia Retiree or Beneficiary shall have any claim or cause of action against the Employer on account of the failure of an Insurer or HMO to pay benefits under the Insurance Policies.

**5.6     Mistaken Contributions**.  To the extent that a contribution is made by a Participant pursuant to a mistake in fact or administrative error, the Employer may repay or collect from the Participant the amount necessary to correct such mistaken contribution, provided, however, that in no event shall such a correction be made more than 12 months following the mistake in fact.

**5.7     Recovery of Improperly Paid Benefits.**

**(a)     Errors and Mistakes**.  The Administrator reserves the right to recover amounts from a Participant that have been improperly paid, directly or indirectly, to or on behalf of a Participant as a result of an error or mistake.  To the extent such amounts are to be recovered from a third-party, the Participant is required to cooperate and assist the Administrator in recovering such amounts from the third-party.  To the extent the Participant does not cooperate or the amount recovered is incomplete or unsatisfactory to the Administrator, the Administrator has the right to offset the Participant's future benefits under the Plan to recover the amounts that were improperly paid in the past to or on behalf of the Participant.  The Administrator reserves the right to perform audits and other investigations to determine whether a Participant, or someone or entity on the Participant's behalf, has been accidentally overpaid engaged and may require the Participant to cooperate in the audit or investigation as a condition for continued participation in the Plan provided such action is permitted by ERISA or other applicable law.

**(b)     Misrepresentation, False Claims, or Fraudulent Activity**.  The Administrator reserves the right to recover amounts from a Participant that have been improperly paid, directly or indirectly, to or on behalf of a Participant as a result of misrepresentation, false claims, or fraudulent

activity by the Participant and/or the Participant's health care provider. The Administrator reserves the right to (i) recoup all of the payments of benefits to the Participant or the Participant's health care provider; (ii) impose sanctions against a Participant (including termination of Plan coverage if permitted by ERISA or other applicable law and/or termination of the Participant's employment with Employer) if the Administrator determines that the Participant engaged in fraud or deceit against the Plan; (iii) perform audits and other investigations to determine whether a Participant has engaged in fraud or deceit; and (iv) require the Participant to cooperate in the audit or investigation as a condition for continued participation in the Plan provided such action is permitted by ERISA or other applicable law.

**5.8     Right to Suspend Employer Contributions**. It is the expectation of the Employer that it will continue contributions to the Plan, but such continuance is not assumed as a contractual obligation of the Employer, and the right is reserved by the Employer at any time and from time to time to reduce, suspend or discontinue any or all Employer contributions.

**5.9     Lost Participants.** If, after twelve months from the date a check is issued for reimbursement under the Plan, the Plan Administrator cannot locate a Participant who has an outstanding check representing payment for a claim under the Plan after a reasonable search at the Participant's last known address on the Plan Administrator's recordkeeping system, the Participant shall be deemed a "Lost Participant." If this should occur, the outstanding claim shall be considered forfeited and such amount may be used to offset any Company contributions or other benefits payable under the Plan. If such Participant subsequently presents the Plan Administrator with a valid claim for these benefits, such Participant shall be paid the amount that was treated as forfeited without interest.

**SECTION 6**
**ADMINISTRATION OF THE PLAN**

**6.1     Administration.**

(a)     **Self-Insured Health Programs.** The Administrator shall control and manage the operation and administration of the Self-Insured Health Programs and make all decisions and determinations thereto. The Administrator, and any Claims Administrator to whom such authority has been delegated pursuant to this Section 6, shall have the discretionary authority and responsibility to decide all factual and legal questions under the Self-Insured Health Programs, to interpret and administer the terms and conditions of the Self-Insured Health Programs, decide all questions concerning the eligibility of any persons to participate in the Self-Insured Health Programs, grant or deny benefits under the Self-Insured Health Programs, construe any ambiguous provision of the Self-Insured Health Programs' documents, correct any defect, supply any omission, or reconcile any inconsistency as the Administrator, in its discretion may determine. The Administrator may delegate its administrative duties to one or more officers or employees of the Principal Sponsor, or to individuals or entities independent of the Administrator. All interested parties may act and rely upon all information reported to them hereunder and need not inquire into the accuracy thereof, nor be charged with any notice to the contrary.

(b)     **Insured Health Programs**. The Insurers shall control and manage the operation and administration of their Insured Health Programs under the Plan and make all benefit decisions and determinations thereto. The Insurers shall have the discretionary authority and responsibility to

23

decide all factual and legal questions regarding benefits provided by their Insured Health Programs under the Plan, to interpret and administer the terms and conditions of the Insured Health Programs, construe any ambiguous provision of their Insured Health Programs' documents, correct any defect, supply any omission, or reconcile any inconsistency as the Insurer, in its discretion may determine on behalf of their Insurance Health Programs. Notwithstanding the above, the Administrator shall continue to decide all questions concerning the eligibility of any persons to participate in the Plan.

**6.2     Rules and Regulations**. The Administrator may adopt any rule not in conflict or at variance with the provisions of the Plan Statement. The rules, regulations, interpretations and determinations made by the Administrator or any authorized person shall, subject only to the Plan Statement's claims procedures, be final and binding on Plan Participants and beneficiaries. The validity of any such rules, regulations, interpretations, and construction of the terms of the Plan Statement and determination of Plan issues shall be given deferential review if challenged in court, by arbitration, or in any other forum, and shall be upheld unless clearly arbitrary or capricious.

**6.3     Method of Executing Instruments**. Information to be supplied or written notices to be made or consents to be given by the Plan Sponsor pursuant to any provision of the Plan Statement may be signed in the name of the Plan Sponsor by any officer or by any Employee who has been authorized to make such certification or to give such notices or consents.

**6.4     Facility of Payment.** In case of the legal disability, including minority age, of a Participant entitled to receive any direct payment under the Plan, payment shall be made, if the Claims Administrator shall be advised of the existence of such condition:

> **(a)**     to the duly appointed guardian, conservator or other legal representative of such Participant, or

> **(b)**     to a person or institution entrusted with the care or maintenance of the incompetent or disabled Participant, provided such person or institution has satisfied the Claims Administrator that the payment will be used for the best interest and assist in the care of such Participant, and provided further, that no prior claim for said payment has been made by a duly appointed guardian, conservator or other legal representative of such Participant.

Any payment made in accordance with the foregoing provisions of this Section shall constitute a complete discharge of any liability or obligation of the Principal Sponsor, the Administrator and the Plan therefore. In the event of the death of the Participant, claims for expenses incurred prior to the Participant's death may be presented by the personal representative of the Participant's estate and reimbursements not completed at death shall be made to the personal representative.

**6.5     Information Furnished by Participants**. Neither the Principal Sponsor, the Administrator or the Claims Administrators shall be liable or responsible for any error in the computation of the benefits of a Participant resulting from any misstatement of fact or law made by the Participant, directly or indirectly to the Principal Sponsor, Administrator or Claims Administrator and used by it in determining the Participant's benefits. The Principal Sponsor, the Administrator or the Claims Administrators shall not be obligated or required to increase the benefits of such Participant which, on discovery of the misstatement, is found to be understated as a result of such misstatement of the Participant. However, the benefits of any Participant which are overstated by reason of any such misstatement shall be reduced to the amount appropriate in view of the truth.

24

**6.6** **Indemnity.** Except as prohibited by applicable law, the Principal Sponsor shall indemnify, to the extent not covered by insurance, any director, officer or Employee of the corporation who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether under the terms of ERISA or otherwise, wherever brought, whether civil, criminal, administrative or investigative by reason of the fact that the individual is or was a fiduciary or administrator of this Plan or by reason of acting in any other capacity in connection with this Plan, against expenses, including attorneys' fees, judgments, fines and amounts paid in settlement, actually and reasonably incurred by the Individual in connection with such action, suit or proceeding if the individual acted in good faith, was not grossly negligent, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the individual's conduct was unlawful. In no event shall this indemnification apply to liability that arises from the individual's claim for his or her own benefit. The termination of any action, suit or proceeding by judgment. order, settlement, conviction or upon a plea of nolo contendere or its equivalent, shall not, of itself create a presumption that the person did not act in good faith, was grossly negligent and, with respect to any criminal action or proceeding, had reasonable cause to believe that the individual's conduct was unlawful. The indemnification provided by this resolution shall continue as to a person who has ceased to be a director, officer, Employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

**6.7** **Service of Legal Process.** The Corporate Secretary of the Principal Sponsor is designated as the appropriate agent for the receipt of service of legal process directed to the Plan in any legal proceeding, including arbitration, involving the Plan. Service of legal process may also be made upon the Administrator through the Company's Corporate Benefits Department.

**6.8** **Third Party Liability.** The Plan does not cover medical expenses a Participant incurs as a result of an injury or other medical condition caused by a third party, to the extent such expenses are covered by money the Participant receives through settlement, verdict, from an insurance company or otherwise for an injury or other medical condition caused by a third party and such expenses do not exceed the applicable limitations under the Plan. There are two methods the Plan may use to recover the value of the medical benefits paid for or provided to a Participant in the event the Participant has an injury or other medical condition caused by a third party.

**(a)** **Reimbursement.** As a condition of participation in a Self-Insured Health Programs, Participants must agree to reimburse the Plan any money the Participant receives through settlement, verdict, from an insurance company or otherwise for an injury or other medical condition caused by a third party. The Plan will not cover the value of the services to treat such an injury or medical condition, or the treatment of such an injury or medical condition, if a third party caused such condition. The Plan may, however, advance payment to the Participant for these medical expenses if the Participant or any person claiming through or on behalf of the Participant agrees:

**(1)** that the Plan has a first priority lien against any proceeds of any settlement, verdict, insurance proceeds or otherwise the Participant receives as a result of the third party's actions;

**(2)** that the lien constitutes a charge upon the proceeds of any recovery and the Plan is entitled to assert a security interest on the lien;

(3)      that by accepting benefits under the Plan, the Participant (or any person claiming through or on behalf of the Participant) will hold the proceeds of any settlement in trust for the benefit of the Plan to the extent of 100% of all benefits paid on the Participant's behalf; and

(4)      to assign to the Plan any benefits the Participant may receive under any automobile policy or other insurance coverage, to the full extent of the Plan's claim for reimbursement.

The Participant must sign and deliver to the Plan any documents needed to protect the lien or to effect the assignment of the Participant's benefits. The Participant must also agree not to take any action that is inconsistent with the Plan's right to reimbursement. The Plan may be reimbursed regardless of whether the Participant is fully compensated, and this right of recovery will not be defeated or reduced by the application of any so-called "Make Whole Doctrine" or such doctrine purporting to defeat the Plan's recovery rights by allocating proceeds exclusively to nonmedical damages. In addition, the Plan is entitled to recover the full amount regardless of any claim of fault on the part of the Participant, whether under comparative negligence or otherwise. The Plan is not responsible for bearing the costs of any legal fees the Participant may incur as a result of any action the Participant takes against the third party.

By allowing the Plan to advance and accepting the Plan's advance payment of benefits, the Participant agrees that the Participant will not make any settlement with a third party that specifically reduces or excludes or attempts to reduce or exclude the amount advanced by the Plan on the Participant's behalf. If the Participant refuses to fully reimburse the Plan after receipt of a settlement, verdict or insurance proceeds, the Plan will not pay any future medical expenses, whether anticipated or unanticipated, relating to the Participant's injury or medical condition. In addition, the Plan may seek legal action against the Participant to recover paid medical benefits related to the Participant's injury or medical condition caused by a third party.

      **(b)**      **Subrogation.** The Plan, or its agents, the Self-Insured Health Programs, or their agents, and the Insured Health Programs, or their agents, may assert rights against a third party through subrogation. The subrogation rights of the Insured Health Programs shall be specified in the Insurance Policies. The Plan may assert this right independently of the Participant. The Participant must (i) provide the Plan and the Self-Insured Health Programs, or their agents, any relevant information as requested, (ii) sign and deliver such documents as the Plan or Self-Insured Health Programs, or their agents, request to secure the subrogation claim, and (iii) obtain the Plan's or Self-Insured Health Program's consent, or their agent's consent, before releasing any third party from liability for payment of the Participant's medical expenses. If the Participant enters into litigation or settlement negotiations regarding the obligations of other parties, the Participant must not prejudice, in any way, the subrogation rights of the Plan or the Self-Insured Health Programs. Any costs incurred by the Plan or the Self-Insured Health Program in matters related to subrogation will be paid for by the Plan or Self-Insured Health Program. Neither the Plan nor the Self-Insured Health Program shall be responsible for the costs of the Participant's legal representation.

## SECTION 7
## CLAIMS AND APPEALS

**7.1**     **Definitions.** This Section 7 sets forth the general claims and appeals procedures for the Component Programs. Information contained in the Summary Plan Descriptions and Insurance

26

Policies are hereby incorporated in, and made a part of, the Plan Statement. For purposes of the claims and appeals procedures described in this Section 7, the following definitions shall apply:

(a) Claim: Any request for benefits made in accordance with the applicable Component Program's claims filing procedures, as described in the Summary Plan Description or Insured Policy for the Component Program in which the Participant is enrolled, including any request for a service that must be pre-approved.

(b) Urgent Care Claim: Any Pre-Service Claim for medical care or treatment that has to be decided more quickly because the normal timeframes for decision-making could seriously jeopardize the Participant's life or health or the Participant's ability to regain maximum function, or in the opinion of a physician with knowledge of the Participant's condition, could subject the Participant to severe pain that cannot be adequately managed without the care or treatment addressed in the Claim.

(c) Pre-Service Claim: Any claim for a Plan benefit — other than an Urgent Care Claim — that must be approved by the Component Program in which the Participant is enrolled in advance of receiving medical care (for example, requests to pre-certify a hospital stay or for pre-approval under a utilization review program) in order to receive benefits under the Plan.

(d) Post-Service Claim: Any Claim other than an Urgent Care Claim or a Pre-Service Claim.

(e) Concurrent Care Decision: Any decision in which the Claims Administrator of the applicable Component Program has previously approved an ongoing course of treatment provided over a period of time or a specific number of treatments and either:

- The Claims Administrator subsequently reduces or terminates coverage for the treatments or visits (other than by Plan amendment or termination) before the approved treatment or approved number of visits has been completed; or
- The Participant requests an extension of the course or treatment or number of visits beyond that which was previously approved (when Pre-Service approval is required).

(f) Adverse Decision or Adverse Decision on Appeal: A denial, reduction, or termination of, or a failure to provide or make, payment (in whole or in part) for a benefit under the Plan.

(g) Authorized Representative: An individual authorized to act on the Participant's behalf in pursuing a Claim or an appeal of a denied Claim in accordance with procedures established by the applicable Component Program. For Urgent Care Claims, a health care professional with knowledge of the Participant's medical condition may act as an Authorized Representative.

27

**7.2     The Claim Process.**

(a)     Filing the Claim.  The Participant must file a Claim for benefits in accordance with the claim procedures established by the applicable Component Program and within the time specified by the Component Program.

(b)     Insufficient Claims.

(1)     Improperly Filed Pre-Service Claims.  If a Pre-Service Claim is not filed according to the applicable Component Program's Claim procedures, the Participant will be notified as soon as possible, but no later than five days after the Claim is received by the Claims Administrator. If the Claim is an Urgent Care Claim, the Participant will be notified within 24 hours. Notice of an improperly filed Pre-Service Claim may be provided orally or in writing, if the Participant requests so. The notice will identify the proper procedures to be followed in filing the Claim.

(2)     Incomplete Pre-Service Claims.  If a properly filed Pre-Service Claim is missing information needed for a coverage decision, the Participant will be notified by the Claims Administrator as soon as possible, but no later than 15 days after the Claim has been received by the Claims Administrator. The Participant will be notified of the specific information necessary to complete the Pre-Service Claim. The Participant will have 45 days to provide the specific information. The Claims Administrator will then provide notice of the Pre-Service Claim decision within 15 days after receipt of the requested information. If the information is not provided, the claim will be considered denied.  If a properly filed Urgent Care Claim is missing information needed for a coverage decision, the Participant will be notified by the Claims Administrator as soon as possible, but no later than 24 hours after the Claim has been received by the Claims Administrator. The Participant will be notified of the specific information necessary to complete the Urgent Care Claim. The Participant will have a reasonable amount of time considering the circumstances (but not less than 48 hours) to provide the specific information. The Claims Administrator will then provide notice of the Urgent Care Claim decision as soon as possible, but no later than 48 hours after whichever is earlier:

- The date the Claims Administrator receives the specified information; or
- The end of the additional time period given for providing the information.

(c)     Notice of Benefit Determination

(1)     After the Participant's Claim is reviewed by the Claims Administrator, a notice of benefit determination will be issued to the Participant within the timeframes specified below. For Urgent Care Claims and Pre-Service Claims, including Concurrent Care Claims, the Participant will receive a notice of benefit determination whether or not the claims decision is an Adverse Decision. For Post-Service Claims the Participant is entitled to receive a notice of an adverse benefit determination of the Participant's Claim.

(2)     The timeframes for providing notice of a benefit determination generally start when a written Claim for benefits is received by the Claims Administrator and has been submitted per the terms of the Plan, as described in the individual Summary Plan Description or insured policy document for the respective Component Program in which the participant is enrolled. Notice of a

28

benefit determination may be provided in writing by in-hand, mail, or electronic delivery. However, in some Urgent Care Claim cases, the Participant may first be provided notice orally, which will be followed by written or electronic notice within three days. Note "days" means calendar (not business) days. The timeframes for providing a notice of benefit determination are as follows:

- Urgent Care Claims: As soon as possible considering the medical urgency, but no later than 72 hours after the Claims Administrator receives the Participant's Claim.
- Pre-Service Claims: Within a reasonable period of time appropriate to the medical circumstances, but no later than 15 days after the Claims Administrator receives the Participant's Claim. This timeframe may be extended for up to 15 days for matters beyond the Plan's control.
- Post-Service Claims: In the case of an Adverse Decision, within a reasonable period of time, but no later than 30 days after the Claims Administrator receives the Participant's claim. This timeframe may be extended for up to 15 days for matters beyond the Plan's control.
- Concurrent Care Decisions: If an ongoing course of treatment will be reduced or terminated, the Participant will be notified sufficiently in advance to provide an opportunity to appeal and obtain a decision on appeal before a benefit is reduced or terminated.

(3)    If the Participant requests an extension of ongoing treatment in an Concurrent Care Claim circumstance, the Participant will be notified as soon as possible given the medical urgency, but no later than 24 hours after the Claims Administrator receives the Claim — provided the Claim is submitted to the Claims Administrator at least 24 hours before the expiration of the previously approved prescribed time period or number of treatments.

(4)    If the Participant requests an extension of ongoing treatment in a Concurrent Care Claim less than 24 hours before the expiration of the previously approved prescribed time period or number of treatments, the request will be considered a new Claim and decided according to the Urgent Care Claim timeframes by the Claims Administrator.

(5)    For Pre-Service Claims and Post-Service Claims, the Plan may extend the timeframe for making a decision on the Participant's Claim in certain cases. If an extension is necessary, the Participant will be notified before the end of the initial timeframe (15 days for Pre-Service Claims; 30 days for Post-Service Claims) of the reasons for the delay. Further, if an extension is necessary because certain information was not submitted with the Claim, the notice will describe the required information that is missing, and the Participant will be given an additional period of at least 45 days from the date of the notice to furnish the information. The Claims Administrator will then notify the Participant of the benefit determination within 15 days after the additional requested information is received. If the requested information is not received within the 45 day time period, the claim will be denied.

**7.3** **Appeal of Adverse Decision.**

(a)    First-Level Appeals.

(1)    If the Participant disagrees with the decision on a Claim, the Participant (or an Authorized Representative) may file a written appeal with the Claims Administrator within 180 days after receipt of the notice of Adverse Decision, as described in the Summary Plan Description or insured policy document for the respective Component Program in which the participant is enrolled.

(2)    The Participant should include the reasons he or she believes the Claim was improperly denied, and all additional facts and documents the Participant considers relevant in support of the appeal. The decision on the Participant's appeal will consider all comments, documents, records, and other information submitted, even if they were not submitted or considered during the initial claim decision.

(3)    A new decision-maker will review the appeal.  (The appeal will not be conducted by the individual who denied the initial Claim or by that person's subordinate.) The new decision-maker will not give deference to the original decision on the Participant's Claim. That is, the reviewer will give the Claim a "fresh look" and make an independent decision about the Claim.

(4)    If the Participant's Claim was denied based on medical judgment, the reviewer will consult with a health care professional who has appropriate training and experience in the field of medicine involved in the Claim. The health care professional will not be the same person (and will not be a subordinate of the person) who was consulted on the initial decision. (A medical judgment includes whether a treatment, drug or other item is experimental, investigational or not medically necessary or appropriate or consistent with the Claims Administrator's policy guidelines.) The Plan will also identify any medical or other experts whose advice was obtained in considering the original decision on the Claim, whether or not the Component Program relied on their advice.

(5)    For appeals of Adverse Benefit Decisions involving Urgent Care Claims, the Claims Administrator will accept either oral or written requests for appeals for an expedited review. All necessary information may be transmitted between the Claims Administrator and the Participant or health plan providers by telephone, fax or other available expeditious methods.

(b)    Second Level of Appeals.

(1)    If a Participant is dissatisfied with an appeal decision on a Claim, he or she may have the right to file a second level appeal for Pre-Service or Post Service Claims in accordance with the procedures and time frames stated in the applicable Summary Plan Description or Insurance Policy for the respective Component Program in which the Participant is enrolled.

(2)    If a Participant does not agree with the final determination on review, he or she has the right to bring a civil action under Section 502(a) of ERISA, if applicable.

**(c)** Notice of Decision on Appeal.

**(1)** After the Participant's appeal is reviewed, a notice of decision on appeal will be issued to the Participant within the timeframes specified below. The Participant will receive a notice of decision on appeal whether or not the Plan makes an Adverse Decision on the appeal.

**(2)** The timeframes for providing a notice of decision on appeal generally start when a written appeal is received by the Claims Administrator (or by the Administrator when applicable). Notice of decision on appeal may be provided in writing through in-hand, mail, or electronic delivery. Urgent Care decisions may be delivered by telephone, fax, or other expeditious methods. Note "days" means calendar (not business) days. The timeframes for providing a notice of decision on appeal are as follows:

- Urgent Care Appeals: As soon as possible considering the medical urgency, no later than 72 hours after the receipt of the Participant's appeal.
- Pre-Service Appeals: Within a reasonable period of time appropriate to the medical circumstances, no later than 30 days after receipt of the Participant's appeal, (if two levels of appeal are offered, the decision will be made within 15 days for each the first and second level appeal reviews)
- Post-Service Appeals: Within a reasonable period of time appropriate to the medical circumstances, no later than 60 days after receipt of the Participant's appeal (if two levels of appeal are offered, the decision will be made within 30 days for each the first and second level appeal reviews).

**(3)** If the appeal has been filed in accordance with the established appeal procedures for the applicable Component Program, the Participant may provide written notice to the Claims Administrator to voluntarily extend the timeframe for the Claims Administrator to make a decision on the appeal.

## 7.4 Participant's Right to Information.

**(a)** Upon written request and free of charge, the Participant has a right to reasonable access to and copies of all documents, records, and other information relevant to the adverse decision of a Claim or appeal. Information is "relevant" information if it:

**(1)** Was relied upon in making the decision on the Participant's Claim;

**(2)** Was submitted to, considered by, or generated by the Component Program in considering the Participant's claim; or

**(3)** Demonstrates compliance with the Component Program's administrative processes for making claim or appeal decisions.

**(b)** The Participant is also entitled access to, and a copy of, any internal rule, guideline, protocol, or other similar criteria used as a basis for a decision on the Participant's denied claim upon request, free of charge. Similarly, if the Participant's Claim is denied based on a determination involving a medical judgment, the Participant is entitled to an explanation of the scientific or clinical reasons for that determination free of charge upon request. (A medical judgment includes

31

whether a treatment, drug or other item is experimental, investigational or not medically necessary or appropriate, or consistent with the Claims Administrator's policy guidelines.) In addition, if voluntary appeals or alternative dispute resolution options are available under the Component Program, the Participant is entitled to receive information about the procedures for using these alternatives.

      **(c)**     The Summary Plan Descriptions contain a section entitled, "Team Member Rights Under ERISA" which includes information on actions the Participant may take if the Participant feels his or her rights to a benefit have been improperly denied.

## SECTION 8
## AMENDMENT AND TERMINATION

**8.1**    **Amendment.** The Company, by action of the Board of Directors of the Company (the "Board"), by action of the Human Resources Committee of the Board, or by action of a person so authorized by resolution of the Board or the Human Resources Committee of the Board, may amend the Plan at any time and from time to time. In addition, the Director of Human Resources or the Senior Director of Compensation and Benefits may execute a written action amending the Plan in any of the following respects:

(a) To amend the Plan to comply with changes in applicable laws or regulations.

(b) To add or amend the Exhibits of the Plan.

(c) To make changes in administration or operation of the Plan to the extent that such changes constitute an amendment to the Plan, which do not materially increase the cost of the Plan to the Company.

All such amendments shall be binding on all Participating Employers.

**8.2**    **Termination of the Plan.** The Board of Directors of the Company may terminate the Plan at any time. In addition, the Company, by written action of its Chairman, President, the Executive Vice President and Director of Human Resources, or the Senior Vice President and Director of Compensation and Benefits may terminate at any time the Plan as it applies to the employees of another Participating Employer.

## SECTION 9
## MISCELLANEOUS

**9.1**    **Principal Sponsor.** Functions generally assigned to the Principal Sponsor shall be discharged by its officers or delegated and allocated as provided herein. The Principal Sponsor's Chairman, President, Chief Executive Officer, Director of Human Resources or Director of Compensation and Benefits may delegate or redelegate and allocate and reallocate to one or more persons or to a committee of persons jointly or severally, whether or not such persons are officers or Employees, such functions assigned to the Principal Sponsor hereunder as it may from time to time deem advisable.

32

**9.2    Limitation and Authority**. No action taken by any fiduciary, if authority to take such action has been delegated or redelegated to it hereunder, shall be the responsibility of any other fiduciary except as may be required by ERISA. Except to the extent imposed by ERISA, no fiduciary shall have the duty to question whether any other fiduciary is fulfilling all of the responsibility imposed upon such other fiduciary by the Plan Statement or by ERISA or by any regulations or rulings issued there under.

**9.3    Fiduciary Principles**. Each fiduciary hereunder, in the exercise of each and every power or discretion vested in them by the provisions of the Plan Statement, shall (subject to the applicable provisions of ERISA) discharge their duties with respect to the Plan solely in the interest of the Participants:

(a)    for the exclusive purpose of providing benefits to Participants;

(b)    with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; and

(c)    in accordance with the documents and instruments governing the Plan insofar as they are consistent with the provisions of ERISA.

**9.4    Conflict of Interest**. If any Employee or officer of the Principal Sponsor to whom authority has been delegated or redelegated hereunder shall also be a Participant in the Plan, the individual shall have no authority as such member, officer or Employee with respect to any matter specially affecting his or her individual interest hereunder (as distinguished from the interests of all Participants or a broad class of Participants), all such authority being reserved exclusively to the other members, officers or Employees, as the case may be, to the exclusion of such Participant, and such Participant shall act only in his or her individual capacity in connection with any such matter.

**9.5    Dual Capacity**. Individuals, firms, corporations or partnerships identified herein or delegated or allocated authority or responsibility hereunder may serve in more than one capacity.

**9.6    Named Fiduciaries**. The Principal Sponsor and any committee or individuals appointed by the Principal Sponsor hereunder shall be the named fiduciaries for the purpose of section 402(a) of ERISA.

**9.7    Spendthrift Provision**. No Participant shall have any transmissible interest in any benefit under the Plan nor shall any Participant have any power to anticipate, alienate, dispose of, pledge or encumber the same, nor shall the Employer recognize any assignment thereof, either in whole or in part, nor shall any benefit be subject to attachment, garnishment, execution following judgment or other legal process, provided that a Participant may authorize, to the extent anticipated by the applicable provisions of the Plan Statement, that benefits due or receivable under the Plan be made available to the facility or other provider furnishing services for which such benefits are payable.

**9.8    Construed as a Whole**. The provisions of the Plan shall be construed as a whole in such manner as to carry out the provisions thereof and shall not be construed separately without relation to the context.

**9.9    Plan Identification Number**.  The Plan Identification Number that has been assigned to the Plan is 504.

## SECTION 10
## DISCLAIMERS

**10.1    No Employment Rights**.  Neither the terms of the Plan Statement nor the benefits hereunder nor the continuance thereof shall be a term of the employment of any Employee, and the Employer shall not be obliged to continue the Plan.  The terms of the Plan Statement shall not give any Employee the right to be retained in the employment of the Employer, and it does not change any employment policies of the Employer.

**10.2    No Guarantee**.  Neither the members of any committee appointed by the Employer nor any of the Employer's officers in any way secure or guarantee the payment of any benefit or amount which may become due and payable hereunder to any Participant.  Each Participant entitled at any time to payments under one of the self-insured Benefit Programs of the Plan shall look solely to the assets of the Principal Sponsor for such payments.  Each Participant entitled at any time to payments under an Insured Health Program (including the HMOs) of the Plan shall look solely to such Insurance Policy, and not to the Principal Sponsor for the payment of such benefits.  Neither the members of any committee nor any of the Employer's officers shall be under any liability or responsibility (except to the extent that liability is imposed under ERISA) for failure to effect any of the objectives or purposes of the Plan by reason of the insolvency of the Principal Sponsor or any Insurer.

**10.3    No Co-Responsibility**.  Except as is otherwise provided in ERISA, no fiduciary shall be liable for an act or omission of another per-son with regard to a fiduciary responsibility that has been allocated to or delegated in the Plan Statement or pursuant to procedures set forth in the Plan Statement.

**EXHIBIT A**
**Component Programs**

At the adoption of this amended and revised Plan Statement, the Plan's Component Programs and the benefits they provide are:

| Component Program Coverage Option | Funding | Administration |
|---|---|---|
| UnitedHealthcare PPO Plan (also included Indemnity medical coverage) | Self-Insured Health Program | Third-Party Administrators and Principal Sponsor |
| UnitedHealthcare Medicare Supplement Plan | Self-Insured Health Program | Third-Party Administrators and Principal Sponsor |
| UnitedHealthcare Medicare Advantage Plan (Florida and North Carolina) | Self-Insured Health Program | Insurer – HMO |
| Anthem Blue Cross Blue Shield PPO Plan (medical coverage) | Self-Insured Health Program | Third-Party Administrator and Principal Sponsor |
| UnitedHealthcare Consumer Directed Health (CDH) Plan (Gold, Silver and Indemnity medical coverage) | Self-Insured Health Program | Third-Party Administrator and Principal Sponsor |
| Aetna Exclusive Provider Plan (medical coverage) | Self-Insured Health Program | Third-Party Administrator and Principal Sponsor |
| Aetna High Option Plan (legacy WB pre-Medicare retirees) (medical coverage) | Self-Insured Health Program | Third-Party Administrators and Principal Sponsor |
| Aetna Medicare Supplement Plans (legacy WB Medicare retirees) (medical coverage) (K91, RB72, RA78, SC64, J92, W83, RE76, RR56, RO58) | Self-Insured Health Program | Third-Party Administrators and Principal Sponsor |
| HealthPartners Distinctions II Plan (medical coverage) | Self-Insured Health Program | Third-Party Administrator and Principal Sponsor |
| HSA High Deductible Health Plan (medical coverage) | Self-Insured Health Program | Third-Party Administrator and Principal Sponsor |
| Medco Prescription Drug Program (prescription drug coverage) | Self-Insured Health Program | Third-Party Administrator and Principal Sponsor |
| CVS Caremark Prescription Drug Program (prescription drug coverage) | Self-Insured Health Program | Third-Party Administrators and Principal Sponsor |
| Mental Health and Substance Abuse Program (mental health and substance abuse coverage) | Self-Insured Health Program | Third-Party Administrator and Principal Sponsor |
| Wells Fargo Financial Medicare Supplemental Plan (medical coverage) | Self-Insured Health Program | Third-Party Administrator and Principal Sponsor |
| Coventry Health Care (Iowa) (medical coverage) | Insured Health Program | Insurer - HMO |
| Group Health Cooperative (medical coverage and includes Medicare Advantage) | Insured Health Program | Insurer – HMO |
| Health Alliance Medical Plan (medical coverage) | Insured Health Program | Insurer - HMO |

35

| | | |
|---|---|---|
| Health Net (California and Oregon) (medical coverage) | Insured Health Program | Insurer - HMO |
| Health Partners Freedom Plan (medical coverage) | Insured Health Program | Insurer – HMO |
| Health Plan of Nevada (medical coverage) | Insured Health Program | Insurer – HMO |
| Kaiser (California, Colorado, Hawaii, Mid-Atlantic and Northwest) (medical coverage) | Insured Health Program | Insurer – HMO |
| New West Health Plan (medical coverage) | Insured Health Program | Insurer – HMO |
| Aetna Medicare Advantage Plan (Pennsylvania, New York, New Jersey, Arizona) (medical coverage) | Insured Health Program | Insurer – HMO |
| | | |
| Presbyterian Health Plan (medical coverage) | Insured Health Program | Insurer - HMO |
| SelectHealth (medical coverage) | Insured Health Program | Insurer - HMO |
| Horizon Blue Cross Blue Shield Medicare Advantage Plan (medical coverage) | Insured Health Program | Insurer - HMO |
| Key Stone East Medicare Advantage Plan (medical coverage) | Insured Health Program | Insurer - HMO |
| Keystone Central (Medicare Advantage Plan (medical coverage) | Insured Health Program | Insurer - HMO |
| Health Net Seniority Plus (CA) (medical coverage) | Insured Health Program | Insurer - HMO |
| Kaiser Senior Advantage (CA, CO) (medical coverage) | Insured Health Program | Insurer - HMO |
| Kaiser Northwest Medicare Advantage Plan (OR, WA) (medical coverage) | Insured Health Program | Insurer - HMO |
| Wells Fargo Dental Plan (dental coverage) | Self-Insured Health Program | Third-Party Administrator and Principal Sponsor |
| Kaiser Permanente Northwest Dental Plan (dental coverage) | Insured Health Program | Insurer - HMO |
| Vision Service Plan (vision coverage) | Self-Insured Health Program | Third-Party Administrator and Principal Sponsor |
| EyeMed Vision Care | Insured Health Program | Insurer |
| UnitedHealthcare Vision | Insured Health Program | Insurer |

36

**EXHIBIT B**

**WACHOVIA RETIREE HEALTH & WELFARE BENEFITS PROGRAM**

**Purpose**

The Wachovia Retiree Health and Welfare Benefits Program (the "Program") has been established to provide health and welfare benefits as described herein for Eligible Retirees and their eligible Dependents pursuant to the election procedures set forth in the Program. The Employer intends that the health Benefits provided under the Program be eligible for exclusion from Participants' income for Federal income tax purposes under Code Sections 105 and 106 and intends that the Program qualify as an "accident and health" program within the meaning of Code Section 105(e). This Program is a component of, and incorporated by reference into the Wells Fargo & Company Health Plan (the "Plan" or "Plan Statement"). To the extent this Exhibit B conflicts with the provisions of the Plan Statement, this Exhibit B governs.

The Attachments hereto describe the cost-sharing provisions for Participants who retired from Legacy Wachovia and Legacy First Union as well as grandfathered service credit provisions for retirees who were former employees of companies acquired by Wachovia, Legacy Wachovia and Legacy First Union.

The Insurance Contract or Summary of Benefits of a medical option offered under the Program, the Insurance Contract of a life insurance option offered under the Program, the Plan Statement, this Exhibit B, Attachments to this Exhibit B, and the provisions of the most recent copies of the Summary Plan Description and Summary of Material Modifications (including any summary description of material reductions in covered services or benefits) of the Program that describe employee welfare benefits provided under the Program together form the plan document for the Program.

If any Benefit payable under the Program is determined to be "deferred compensation" within the meaning of Code section 409A, payment of such Benefit will be made in accordance with the applicable provisions of Code section 409A and the regulations thereunder.

**Part I**
**Definitions**

The definitions of terms defined in this Exhibit, but not defined in the Plan Statement are applicable only with respect to this Exhibit. To the extent a definition in this Exhibit B conflicts with a definition in the Plan Statement, the definition in this Exhibit B controls.

"Affiliate" means any corporation that is a member of a controlled group of corporations (as defined in Code Section 414(b)) which includes the Employer; any trade or business (whether or not incorporated) which is under common control (as defined in Code Section 414(c)) with the Employer; any organization (whether or not incorporated) which is a member of an affiliated service group (as defined in Code Section 414(m)) which includes the Employer; and any other entity required to be aggregated with the Employer pursuant to Treasury regulations under Code Section 414(o).

"Benefits" means payments or the provision of care, services or products in accordance with the provisions of the Program, the applicable Summary Plan Description or any applicable Insurance Contract of Summary of Benefits for the diagnosis, mitigation, care, prevention, cure, or other treatment of medical illnesses or injuries. Different levels or types of Benefits may be provided with respect to different groups or categories of Participants, COBRA Participants,

37

Survivors, or Dependents as described in the Attachments hereto and any applicable Insurance Contracts.

"Benefits Continuation Period" means the period during which an Eligible Employee is entitled to continue coverage under the Wachovia Group Medical Program (or successor thereto) pursuant to a Severance Agreement made in connection with the Wachovia Corporation Severance Pay Plan, the Wachovia Corporation Grandfathered Severance Pay Plan or the Golden West Financial Corporation Severance Pay Plan.

"Claimant" means a Covered Individual who has filed a claim for Benefits in accordance with the Program's claim review procedures set forth in Part VII of this Exhibit B and any representative of the Covered Individual to the extent such representative of the Covered Individual has been authorized to act on behalf of the Covered Individual in accordance with the Program's third party authorization procedures.

"Claims Administrator" means a third party designated by the Plan Administrator to review claims for Benefits.

"Claims Fiduciary" means an individual or entity appointed by the Plan Administrator to have final discretionary authority to interpret the terms of the Program and decide questions of fact necessary to make a determination as to whether such claims for Benefits presented to the Claims Fiduciary are payable, in whole or part, in accordance with the terms of the Program.

"COBRA Administrator" means a third party designated by the Plan Administrator to administer COBRA Continuation Coverage under the group health plans.

"COBRA Continuation Coverage" or "COBRA means the elective continuation of coverage pursuant to the provisions of Section 601 et seq. of ERISA, as amended, Code Section 4980B, and Article VI of this Plan.

"COBRA Participant" means an individual who has elected to continue coverage through COBRA under the one of the group health plans offered under the Program.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Contract" means an agreement with any Insurer, Health Maintenance Organization, Preferred Provider Organization, Claims Administrator, or Third Party Administrator relating to the provision of Benefits for one or more Participants and their Dependents.

"Covered Individual" is any Participant, COBRA Participant, Survivor, or Dependent who is eligible for Benefits under the Program.

"Dependent" means an individual who meets the requirements of a dependent in the Summary Plan Descriptions.

Except as otherwise provided in the applicable Insurance Contracts, "Domestic Partner" means an individual who meets the requirements of a Domestic Partner as described in the Summary Plan Description.

"Effective Date" of this amended and restated Program means January 1, 2010.

38

"Effective Time" means the Effective Time, as that term is defined in the Agreement and Plan of Merger, by and between Wachovia Corporation and Wells Fargo & Company dated as of October 3, 2008, as it may be amended from time to time.

Except as otherwise described in the Summary Plan Description, "Eligible Employee" means an Employee who prior to January 1, 2010 (i) was paid on the Wachovia Payroll, (ii) was paid on a U.S. payroll, and (iii) was regularly scheduled to work 20 or more hours each week. Except as otherwise described in the Summary Plan Description, "Eligible Employee" also means an Employee who prior to January 1, 2010 (i) was paid on the Wachovia Payroll, (ii) was paid on a U.S. payroll, and (iii) was coded as on Salary Continuation Leave on the Wachovia Benefit System and the Wachovia Payroll. The following individuals shall **not** be Eligible Employees:

(a)    leased employees, as defined in Code Section 414(n);

(b)    individuals classified by an Employer Company as (i) casual employees, (ii) cooperative education students, (iii) on-call employees, (iv) seasonal employees, (v) temporary employees, or (vi) zero-hour employees.;

(c)    individuals whose terms and conditions of employment are governed by a collective bargaining agreement, unless such collective bargaining agreement provides for participation in the Program;

(d)    individuals classified by an Employer Company as independent contractors with such individual's consent (including any person who later becomes reclassified as an employee by the Internal Revenue Service or a court of competent jurisdiction), regardless of whether the Employer Company is required to make Social Security contributions on behalf of such individual. For purposes of this subsection (d), any individual who pays or agrees to pay self-employment tax in lieu of withholding shall be deemed to have consented to his or her designation as an independent contractor;

(e)    individuals classified by an Employer Company as Leased Employees (including any person who later becomes reclassified as an employee by the Internal Revenue Service or a court of competent jurisdiction);

(f)    individuals who have waived participation in the Program through any means, including individuals whose employment is governed by a written agreement with an Employer Company (including an offer letter setting forth the terms and conditions of employment) that provides that the individual is not eligible to participate in the Program;

(g)    nonresident aliens with respect to the United States, unless the nonresident alien is an Employee whose transfer agreement provides for participation in the Program;

(h)    employees terminated with pay (after any benefits continuation period in an Employer-sponsored severance plan expires);

(i)    transferred individuals who are not U.S. citizens and do not have a transfer agreement providing for participation in the Program;

(j)    any individual who, after the Effective Time of the Wells Fargo Merger, is not paid on the Wachovia Payroll;

39

(k)     any individual who (a) receives severance pay or a severance type benefit under the Wachovia Corporation Salary Continuation Plan, and (b) is not coded as on a Salary Continuation Leave on the Wachovia Benefit System or Wachovia Payroll; and

(l)     expatriate employees of Wachovia Securities LLC Chile who were part of the Prudential Securities LLC (PSI) joint venture.

"Eligible Retiree" means an individual who was an Eligible Employee prior to January 1, 2010 and meets one of the following three requirements:

(i)     an individual with a Retirement Medical Account on December 31, 2009;
(ii)    an individual with Retirement Medical Benefits coverage on December 31, 2009;
(iii)   an individual who, as of December 31, 2009, has deferred his or her election of a Retirement Medical Account or Retirement Medical Benefits coverage;
(iv)    an individual with a PSI RMA as of December 31, 2009; or
(v)     an individual with retiree life insurance coverage from Wachovia Corporation or an entity that merged into or was acquired by Wachovia Corporation (or one of its predecessors) as of December 31, 2009.

"Employee" means an individual who is considered an employee of an Employer Company for the purposes of federal income tax withholding prior to January 1, 2010. Notwithstanding anything to the contrary included herein, on and after December 31, 2009, no individual shall be an Employee for purposes of the Program.

"Employer" means Wells Fargo & Company.

"Employer Company" means a Wachovia Affiliate. To the extent that a Wachovia Affiliate has Employees some of whom are paid on a U.S. payroll system and others paid on a non-U.S. payroll system, the Wachovia Affiliate, unless otherwise specifically excluded, is considered to be an Employer Company only with respect to those Employees paid on a U.S. payroll system.

"Enrolled Dependent" means each of the Dependents whom a Participant has elected to cover under the Program as his or her Dependent.

"Enrolled Person(s)" means a Participant and/or his Enrolled Dependents, whichever is applicable.

"Enrollment Period" means the initial enrollment period and the enrollment period designated by the Plan Administrator each Plan Year (as set forth in the annual enrollment materials) during which a Participant, Survivor, or COBRA Participant may make their Benefit elections for the succeeding Plan Year.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Hour of Service" shall mean:

40

(a) Each hour for which an Employee is paid, or entitled to payment, for the performance of duties for the Employer Company. These hours shall be credited to the Employee for the computation period in which the duties are performed; and

(b) Each hour for which an Employee is paid, or entitled to payment, by the Employer Company on account of a period of time during which no duties are performed (irrespective of whether the employment relationship has terminated) due to vacation, holiday, illness, incapacity (including disability), layoff, jury duty, military duty or leave of absence. No more than 501 Hours of Service shall be credited under this paragraph for any single continuous period (whether or not such period occurs in a single computation period). Hours under this paragraph shall be calculated and credited pursuant to Section 2530.200b-2 of the Department of Labor Regulations which are incorporated herein by this reference; and

(c) Each hour for which back pay, irrespective of mitigation of damages, is either awarded or agreed to by the Employer Company. The same Hours of Service shall not be credited both under subsection (a) or (b), as the case may be, and under this subsection (c). These hours shall be credited to the Employee for the computation period or periods to which the award or agreement pertains rather than the computation period in which the award, agreement or payment is made.

(d) Each hour for which an Employee is paid severance pay to the extent paid to a Participant in periodic payments. Effective February 1, 1998, severance pay taken into account in the preceding sentence shall be limited to amounts paid in the twelve week period beginning immediately after termination of employment; effective September 1, 2001, however, severance pay taken into account in the preceding sentence shall be limited to severance amounts paid during the Participant's benefits continuation period, not to exceed the three month period beginning immediately after termination of employment. Hours of Service shall not be granted for regular paid time off that is taken as a lump sum payment by a Participant following his termination of employment.

(e) Effective on or after August 5, 1993, Hours of Service shall be credited, without duplication, to the extent required by the Family and Medical Leave Act of 1993 and implementing federal regulations.

(f) Effective January 1, 1996, each Employee who is scheduled to work 40 hours per week shall be credited with 190 Hours of Service for each month for which he is credited with one Hour of Service; provided, however, that effective July 1, 1999 an Employee who would otherwise be credited with 190 Hours of Service under this provision shall be credited with actual Hours of Service for a month if greater than 190.

(g) For purposes of calculating Years of Service during any period that an Employee is considered to be totally disabled and is on the Employer's (or its designee's) disability database, an Employee who, immediately prior to such disability, was an Employee scheduled to work 40 hours per week shall be credited with 190 Hours of Service for each month and an Employee who, immediately prior to such disability, was an Employee scheduled to work less than 40 hours per week shall be credited with Hours of Service equal to his scheduled hours, provided, however that no service shall be credited under this subsection (g) during any period following the

41

date Employee retires or begins receiving benefits under the Wachovia Pension Plan and Trust (Including Cash Balance Plan).

(h)     Effective for displacement notifications on or after January 1, 2009, an Employee will earn an hour of service for each hour the employee is coded as on Salary Continuation Leave on the Wachovia Benefit System and Wachovia Payroll.

"Insurance Contract" means an agreement in which an Insurer agrees to pay Benefits pursuant to an insurance policy issued by the Insurer in accordance with applicable state law in consideration for the payment of premiums. For purposes of this Program, Insurance Contract shall also mean the insurance policy, the certificate of coverage issued by the Insurer, and any descriptive booklet, if any, issued by the Insurer.

"Insurer" means any insurance company or HMO licensed to do business in a state in accordance with applicable state law.

"Legacy First Union" means First Union Corporation prior to the merger with Wachovia Corporation.

"Legacy Wachovia" means Wachovia Corporation prior to the merger with First Union Corporation.

"Medicare" means hospital insurance and other health insurance provided in Part "A" and Part "B," respectively, of Title XVIII of the Social Security Act.

"Medicare Supplement Benefits" means Retirement Medical Benefits offered to Covered Individuals age 65 and over under a Medicare Supplement Plan as described in the Attachments and the Summary Plan Description.

"Merger and Acquisition Group Retiree" means a Participant as set forth in Section 4.4.

"Participant" means an Eligible Retiree who has become and continues to be a Participant under the Program as provided in Part II.

"Plan Administrator" means Wells Fargo & Company, which may delegate its duties and discretionary authority to accomplish those duties to certain designated personnel of Wells Fargo & Company, including, but not limited to, the Director of Human Resources and the Director of Compensation and Benefits of Wells Fargo & Company.

"Program" means the Wachovia Corporation Retiree Health and Welfare Benefits Program as set forth herein, together with any and all amendments, appendices, Contracts and supplements hereto.

"Retiree Medical Enrollment Materials" means the worksheet and instructions provided to each Eligible Retiree for the purpose of permitting the Eligible Retiree to elect his or her coverage under this Program.

"Retirement Date" means either the first of the month following the date of the Eligible Retiree's termination of employment with an Employer Company (if such Retiree has no Benefits Continuation Period) or the first of the month following the end of the Benefits Continuation Period.

42

"Retirement Medical Account" means a bookkeeping account established by the Employer for purposes of accounting for general assets available to fund claims for reimbursement of Covered Medical Expenses as described in Section 4.2.

"Retirement Medical Allowance" means the Employer provided subsidy provided to certain Eligible Retirees as set forth in Section 4.2.

"Retirement Medical Benefits" means Benefits (other than a Retirement Medical Allowance and Retirement Medical Account) provided through Contracts or Insurance Contracts for medical benefits as set forth in the Summary Plan Descriptions.

"Summary Plan Description" means the summary plan descriptions for the Program, including any summaries of material modifications and any summary description of material reductions in covered services or benefits issued with respect thereto describing medical benefits provided to Eligible Retirees by the Employer Company.

"Spouse" means a person who is legally married to a Participant under applicable state and federal law, but does not include an individual separated from the Participant under a legal separation decree.

"Summary of Benefits" means the summary of benefits established by a claims administrator of a welfare benefit program designated as part of the plan document by the Plan Administrator.

"Survivor" means a Dependent of a deceased individual who, at the time of death, was a Disabled Employee eligible for retirement or Retiree. Benefit eligibility (if any) for Survivors shall be as set forth in the applicable provisions of the applicable Attachment.

"Wachovia Affiliate" means any corporation that, immediately prior to the Effective Time of the Wells Fargo Merger, was a member of a controlled group of corporations (as defined in Code Section 414(b)) which included Wachovia Corporation; any trade or business (whether or not incorporated) which was under common control (as defined in Code Section 414(c)) with Wachovia Corporation; any organization (whether or not incorporated) which was a member of an affiliated service group (as defined in Code Section 414(m)) which included Wachovia Corporation; and any other entity required to be aggregated with Wachovia Corporation pursuant to Treasury regulations under Code Section 414(o). Wells Fargo & Company and affiliates of Wells Fargo & Company immediately prior to the Effective Time of the Wells Fargo Merger are expressly excluded from the definition of "Wachovia Affiliate".

"Wachovia Benefit System" means the benefit system maintained by Wachovia Corporation and Wachovia Participating Affiliates immediately prior to the Effective Time of the Wells Fargo Merger and which shall continue in effect following the Effective Time of the Wells Fargo Merger.

"Wachovia Payroll" means the payroll system maintained by Wachovia Corporation and Wachovia Affiliates immediately prior to the Effective Time of the Wells Fargo Merger and which shall continue in effect following the Effective Time of the Wells Fargo Merger.

"Wells Fargo Merger" means the transaction described in the Agreement and Plan of Merger, by and between Wachovia Corporation and Wells Fargo & Company, dated as of October 3, 2008, as it may be amended from time to time.

43

"Year of Service" means any 12-month computation period during which an Employee or a Participant completes at least 1,000 Hours of Service; provided, however, that (i) an Employee's or Participant's Years of Service before January 1, 1976 shall mean the period of continuous employment he or she had completed with an Employer Companies prior to January 1, 1976; and (ii) Years of Service will be frozen as of December 31, 2009.

The 12-month computation period shall be the Plan Year. A Participant who completes 1,000 or more Hours of Service during a Plan Year in which he is not employed for the entire year shall be credited with a Year of Service for that Plan Year. Except as provided otherwise in an Attachment attached hereto, in the case of an Employee who was employed by an organization at the time it was acquired by or became an affiliate company of an Employer Company, Years of Service shall also include service with such other organization from the Employee's most recent date of hire with such organization.

An individual who is a leased employee (as defined in Code section 414(n)) of an Employer Company and who subsequently becomes an Employee of an Employer Company shall receive credit for all Years of Service that he is deemed to have completed for the Employer Company.

Years of Service for an Employee who was involuntarily displaced or divested from employment with an Employer Company and is subsequently rehired by an Employer Company shall also include all Plan Years prior to his or her involuntary displacement or divestiture during which the Employee completed at least 1,000 Hours of Service with an Employer Company.

Years of Service for an Employee who voluntarily terminated employment and is rehired by an Employer Company within six months of termination of employment shall also include the Plan Years prior to termination of employment during which the Employee completed at least 1,000 Hours of Service with an Employer Company. Years of Service for an Employee who voluntarily terminated employment and is rehired by an Employer Company six months after termination of employment shall not include the Plan Years prior to the termination of employment during which the Employee completed at least 1,000 Hours of Service.

Effective September 24, 2008, notwithstanding any provision of the Program to the contrary, a "Conciliation Agreement Employee" (as defined below) who had not otherwise commenced service with an Employer Company prior to June 13, 2002, shall be considered to have commenced service with an Employer Company as of June 13, 2002 for purposes of determining the employee's Years of Service. For this purpose, a "Conciliation Agreement Employee" shall mean one of the 31 individuals included in the group identified as "qualified Class Members" in an agreement with a U.S. governmental agency dated September 24, 2008 who were hired by Wachovia Bank, N.A., provided that such individual was employed by Wachovia Bank, N.A. on September 24, 2008.

Effective for displacement notifications on or after January 1, 2009, the period of time an Employee is coded as on Salary Continuation Leave on the Wachovia Benefit System and Wachovia Payroll shall be included for purposes of determining the Employee's Years of Service.

**Part II**
**Participation**

2.1 Eligibility to Participate. Eligibility to participate in the Program while the Program remains in effect shall be determined as follows (subject to the Employer's reserved right to amend or terminate the Program):

(a) An Eligible Retiree who is receiving Retirement Medical Benefits under the Program on the date immediately preceding the Effective Date shall be eligible to continue as a Participant in the Program.

(b) An Eligible Retiree who has a Retirement Medical Account or PSI RMA established in his or her name on the date immediately preceding the Effective Date shall be eligible to continue as a Participant in the Program.

(c) An Eligible Retiree who elected to defer his or her retirement election on or after February 1, 2002 and whose election remains deferred immediately preceding the Effective Date shall be eligible to continue as a Participant in the Program.

(d) Disabled employees. Effective January 1, 2002, coverage for disabled employees who have accrued ten or more Years of Service commences on the first of the month following an election for coverage under this Program. For purposes of this Section 2.1(c), a disabled employee means a current or former Employee who has terminated employment with an Employer Company on account of disability and who is receiving benefits under an Employer Company sponsored long term disability plan.

(e) Notwithstanding anything herein to the contrary, an Eligible Retiree shall cease to be eligible to participate in the Program on the date on which he or she is found by the Employer to have participated in activities that caused termination of the Participant's employment (or would have caused termination of employment if the activities were discovered while the Participant was an Employee) with an Employer Company as a result of:

(i) any crime of moral turpitude or illegal or dishonest conduct of any kind,

(ii) any conduct which results in physical harm to the Employer, or an Affiliate, or materially damages the property, reputation, integrity or business of the Employer or an Affiliate, or

(iii) theft, embezzlement or misappropriation of Employer's, or an Affiliate's property.

2.2 Coverage. Except as otherwise set forth in an Attachment, the Summary Plan Description, or Insurance Contract, if a Participant is covered under this Program, the Participant's Dependents may also be covered as set forth in Section 2.5 and the Summary Plan Description. Coverage for Eligible Retirees and their Dependents shall commence on the effective date of his or her election of coverage as described in Section 2.4 or such other date as may be provided in the applicable Insurance Contract.

2.3 Agreement to Participate. An Eligible Retiree shall become or continue to be a Participant in this Program by enrolling in accordance with the enrollment procedures established by the Plan Administrator, or in such other manner as may be provided in the applicable enrollment materials provided by the Employer. By becoming a Participant, each Eligible Retiree shall for all

45

purposes be deemed conclusively to have assented to the provisions of the Program and all amendments thereto.

2.4     Election of Coverage for Eligible Retirees.  An Eligible Retiree may elect coverage under the Program by completing the required election forms or other information required by the Plan Administrator.

If the Eligible Retiree retires on or before December 31, 2009 and does not make an election by the date listed in the Retiree Medical Enrollment Materials, he or she will be deemed to have elected to defer his or her coverage under the Program.

If an Eligible Retiree elects a Retirement Medical Account, that election is irrevocable and no subsequent elections during annual enrollment for Retirement Medical Benefits will be permitted.

If an Eligible Retiree changes his or her place or residence to an address with a ZIP code in which the Eligible Retiree's Retirement Medical Benefits is no longer available, he or she may make a new election within 60 days of the date the individual notifies the Plan Administrator (or its designee) of the new address.  If the Eligible Retiree's Retirement Medical Benefits is not available in the ZIP code of the new address provided to the Plan Administrator (or its designee) and the Eligible Retiree does not make a new election by the deadline communicated to the Eligible Retiree, medical coverage will automatically be defaulted to either (i) the UnitedHealthcare Consumer Directed Health Plan - Gold Retirement Medical Benefits, if the Eligible Retiree is under age 65, or (ii) the UHC Medicare Supplement or an indemnity Retirement Medical Benefits, if the Eligible Retiree is eligible for Medicare.

An otherwise eligible Spouse, Domestic Partner, or newly acquired Dependent who seeks to enroll in a Retirement Medical Benefits as a result of the enrolled Retiree's acquisition of a new Dependent through marriage, birth, adoption or placement for adoption shall be a special enrollee hereunder if the Spouse, Domestic Partner or newly acquired Dependent is enrolled within 60 days of the acquisition of the new Dependent (or, in the event of a new Domestic Partner, within 60 days of the satisfaction of Domestic Partner requirements specified in Part I).  Coverage for such special enrollee shall begin as of the date of the adoption, birth, or placement for adoption provided the enrollment request is provided to the Plan Administrator within 60 days of the birth or adoption.  In the event a new Dependent is acquired through marriage, coverage shall begin prospectively following the date the request for special enrollment is received.

2.5     When Dependent Coverage Begins.

(a)     At the time of Retirement or Enrollment  If the Eligible Retiree elects coverage for his or eligible Dependents when he or she first enrolls for coverage, coverage for such Dependents will become effective on the same date as the Eligible Retiree's coverage begins, if the Plan Administrator is notified in writing or pursuant to other procedures established by the Plan Administrator as set forth in the enrollment materials, and the Participant has agreed to pay any required contribution for such coverage.

(b)     Qualified Event. A Participant may enroll his or her Dependents not enrolled when the Participant first became eligible for coverage only upon the occurrence of one of the qualified events communicated in the Summary Plan Description, and only if: (i) the Participant notifies the Plan Administrator in writing or pursuant to other procedures established by the Plan Administrator as set forth in the Summary Plan Description or enrollment materials within 60 days of such event; and (ii) the Participant has agreed to pay any required contribution for such coverage.

46

Coverage commences for such later enrolled Dependents on the later of the following dates:

(i)    The date the Participant enrolls his or her Dependent if the enrollment is within 60 days of the date the new Dependent is acquired and proof of the dependent status is furnished (if required).

(ii)    In the case of a newborn child or an adopted child, the date the child is born or placed with the Participant for adoption by a court of competent jurisdiction. For purposes of this Program, "placed for adoption" or "placement for adoption" means the assumption and retention by the Participant or Participant's Spouse/Domestic Partner of a legal obligation for total or partial support of such child in anticipation of a forthcoming adoption decree issued by a court of competent jurisdiction. The child's placement for adoption terminates upon the termination of such legal obligations, and in such event, the child's coverage shall cease after the last day of the month the placement is terminated unless coverage must be continued pursuant to a Qualified Medical Child Support Order ("QMCSO") as provided in Section 2.8, or continuation coverage is elected under Part III.

(c)    <u>Domestic Partners</u>: In the case of a Domestic Partner and a Domestic Partner's children, participation shall commence the later of the date the Domestic Partner satisfies all the conditions for domestic partner status.

(d)    <u>Dependent Coverage Not Available</u>: Dependents of Participants who retired from active employment with American Savings Bank, Southeast Bank of West Florida or Southeast Bank, N.A. are not eligible for coverage.

2.6    <u>Participants who are Rehired into a Benefits Eligible Position</u>. If a Participant returns to work with an Employer Company in a benefits-eligible position, coverage under this Program will end and he or she may not re-enroll in the Program upon his or her second retirement.

2.7    <u>Coverage for Survivors</u>.

(a)    Dependents covered under the Program at the time of the Participant's death are eligible for the following Benefits and cost-sharing provisions:

(i)    If the Participant was entitled to a Retirement Medical Allowance on the day preceding the Participant's death, the Survivor(s) are entitled to 100% of the deceased Participant's Retirement Medical Allowance to apply toward the cost of Retirement Medical Benefits or a Retirement Medical Account as follows:

(A)    If the Participant and Survivor(s) were enrolled in Retirement Medical Benefits on the date of the Participant's death, the Survivor may elect Retirement Medical Benefits or a Retirement Medical Account. If the Survivor elects coverage under a Retirement Medical Account, the Survivor is no longer eligible for Retirement Medical Benefits.

(B)    If the Participant elected coverage under a Retirement Medical Account, the Survivor(s) are entitled to submit claims for reimbursement under a Retirement Medical Account.

(ii)    If the Participant was not entitled to a Retirement Medical Allowance, but instead is entitled to an Employer provided subsidy or other cost-sharing

provision as set forth in an Attachment or the Employer's (or its designee's) database, the Survivor(s) are entitled to the same cost-sharing provisions that applied to the Participant under the Program to apply towards Retirement Medical Benefits.

    (iii)    If the Participant was not entitled to a Retirement Medical Allowance, Employer-provided subsidy or other cost-sharing provision set forth in an Attachment or the Employer's (or its designee's) database, the Survivor(s) may elect Retirement Medical Benefits.

    (iv)    A Survivor whose is eligible for coverage under this subsection 2.7(a) may not subsequently add any dependents not enrolled at the time of the Participant's death.

    (v)    The Plan Administrator in its sole discretion will determine and apportion any Retirement Medical Allowance or other Employer contribution or subsidy among Survivors.

(b)    Survivors of Eligible Retirees who elected to defer their election under Section 2.4 are eligible for the following Benefits and cost-sharing provisions:

    (i)    Only the Eligible Retiree's Spouse or Domestic Partner and Dependent children who were eligible for enrollment under the Program at the time of the Eligible Retiree's death are eligible for coverage under the Program.

    (ii)    The Survivor may elect to defer his or her election for Benefits.

    (iii)    If the Eligible Retiree was entitled to elect a Retirement Medical Allowance on the date of his or her death, the Survivor(s) are entitled to 100% of the deceased Eligible Retiree's Retirement Medical Allowance to apply towards Retirement Medical Benefits or for reimbursement under a Retirement Medical Account. If the Survivor elects coverage under a Retirement Medical Account, the Survivor is not eligible for Retirement Medical Benefits.

    (iv)    If the Eligible Retiree was not entitled to elect a Retirement Medical Allowance, but instead is entitled to an Employer provided subsidy or other cost-sharing provision as set forth in an Attachment or Employer's (or its designee's) database, the Survivor(s) are entitled to the same cost-sharing provisions that applied to the Eligible Retiree under the Program to apply towards Retirement Medical Benefits.

    (v)    If the Eligible Retiree was not entitled to a Retirement Medical Allowance, Employer-provided subsidy or other cost-sharing provision set forth in an Attachment or the Employer's (or its designee's) database, the Survivor(s) may elect Retirement Medical Benefits.

    (vi)    The Plan Administrator in its sole discretion will determine and apportion any Retirement Medical Allowance or other Employer contribution or subsidy among Survivors.

(c)    Survivors of Eligible Employees who on the date of death met the eligibility requirements in Section 2.1 for Benefits under the Program are eligible for Benefits as follows:

(i)     Only the Eligible Employee's Spouse or Domestic Partner and Dependent children who were eligible for enrollment under the Program at the time of the Eligible Employee's death are eligible for coverage under the Program.

(ii)    If the Eligible Employee was entitled to a Retirement Medical Allowance on the day preceding his or her death, the Survivor(s) are entitled to 100% of the deceased Eligible Employee's Retirement Medical Allowance to apply towards Retirement Medical Benefits or for reimbursement under a Retirement Medical Account. If the Survivor elects coverage under a Retirement Medical Account, the Survivor is not eligible for Retirement Medical Benefits.  The Plan Administrator in its sole discretion will determine and apportion any Retirement Medical Allowance among Survivors.

(iii)   If the Eligible Employee was not entitled to elect a Retirement Medical Allowance, but instead is entitled to an Employer provided subsidy or other cost-sharing provision as set forth in an Attachment or Employer's (or its designee's) database on the day preceding his or her death, the Survivor(s) are entitled to the same cost-sharing provisions that applied to the Eligible Employee under the Program to apply towards Retirement Medical Benefits.

(iv)    If the Eligible Employee was not entitled to a Retirement Medical Allowance, Employer-provided or other cost-sharing provision set forth in an Attachment or the Employer's (or its designee's) database on the day preceding his or her death, the Survivor(s) may elect Retirement Medical Benefits.

(d)     Effective Date of Coverage.  Coverage for Survivors under the Program is effective the first of the month following the date of death so long as the Survivor completes any election forms required by the Plan Administrator within 60 days of the date coverage becomes effective and pays any required contributions for such coverage. If the Survivor is enrolled under the Medical Program or this Program as a Dependent at the time of the death, Dependent coverage continues under the Plan until the end of the month in which the death occurred. If the Survivor elects to defer coverage under this Program, coverage begins on the date the Survivor elects coverage.

(e)     An election during any Enrollment Period by the Participant's surviving Spouse or Domestic Partner shall also be considered an election for any Dependent children under the age of 18 unless the Spouse or Domestic Partner is not the legal guardian of the Dependent children.  In such a case, the legal guardian of the Dependent child will make any elections for coverage under the Program.  The Plan Administrator in its sole discretion will determine and apportion any Retirement Medical Allowance or other Employer contribution or subsidy among Survivors.

2.8     Medical Child Support Orders.  In the event an Employer Company receives a medical child support order (within the meaning of section 609(a)(2)(B) of ERISA), the Employer or Plan Administrator shall notify the affected Participant and any alternate recipient identified in the order of the receipt of the order and the Program's procedures for determining whether such order is a qualified medical child support order within the meaning of section 609(a)(2)(A) of ERISA).  Within a reasonable period the Employer Company shall determine whether the order is a

49

qualified medical child support order and shall notify the Participant and alternate recipient of such determination.

      2.9    Cessation of Coverage for Participants. Subject to Section 2.12 and except as otherwise provided in the applicable Insurance Contract, coverage for an Eligible Retiree who has become a Participant will cease on the earliest of:

(a)    The date on which the Program is terminated or if earlier, the date the Plan is terminated;

(b)    The date as of which he or she elects to cease participation in this Program;

(c)    The last day of the month following the date he or she ceases to be eligible to participate in the Program under Section 2.1;

(d)    With respect to Benefits toward the cost of which the Participant is required to contribute, the date on which coverage is canceled by reason of the Participant's failure to make timely payment of his or her share of the cost of Benefit coverage in accordance with procedures established by the Employer or Plan Administrator;

(e)    The date on which such Participant becomes eligible for enrollment in a Company-sponsored group health plan as an active employee (whether or not the Participant enrolls);

(f)    The date the Participant is paid benefits up to his lifetime maximum benefit as set forth in the applicable Insurance Contract;

(g)    The date on which such Participant becomes enrolled in the Medical Program as a Dependent;

(h)    The date of the Participant's death; or

(i)    If participation is terminated as a result of the fraudulent submission of information or claims, the date determined by the Employer.

If the Participant's coverage ceases under subsection (d), or (f) and the Participant is eligible for a Retirement Medical Allowance and a Retirement Medical Account, the Participant's Medical Allowance will be transferred to a Retirement Medical Account. The Plan Administrator will determine the amount eligible for reimbursement of medical expenses for any mid-year changes. If a Participant's coverage ceases under subsection (g), the Participant shall be eligible to re-enroll for coverage when he or she is no longer covered as a Dependent under the Medical Program.

      2.10    Cessation of Coverage for Dependents. Subject to Section 2.12 and except as otherwise provided in the applicable Summary Plan Description or Insurance Contract, coverage for a Dependent shall cease on the earliest of:

(a)    The last day of the month following the date on which the Program is terminated or if earlier, the date the Plan is terminated;

(b)    The last day of the month following the date on which such individual ceases to be a Dependent under the provisions of the Program or the applicable Insurance Contract;

(c)    The date provided in Section 2.9 on which coverage ceases for the Participant covering such Dependent, except in the case of the Participant's death;

(d)    The date on which the Participant elects to cease coverage for the Dependent;

(e)    The date the Dependent dies;

(f)    The date the Dependent is paid benefits up to his lifetime maximum benefit as set forth in the applicable Insurance Contract;

(g)    Except as otherwise provided in the applicable Insurance Contract, coverage for a Spouse or Domestic Partner shall cease if the Spouse or Domestic Partner becomes eligible for coverage under a Company-sponsored group health plan (even if the Dependent does not enroll.)

(h)    The date on which the Program or Insurance Contract is changed to exclude Dependents; or

(i)    With respect to Benefits toward the cost of which the Participant is required to contribute, the last day of the month following the date the individual fails to make such required contributions.

2.11    Cessation of Coverage for Survivors. Subject to Section 2.12 and except as otherwise provided in the applicable Summary Plan Description or Insurance Contract, coverage for a Survivor shall cease on the earliest of:

(a)    The last day of the month following the date on which the Program is terminated under Section 8.2 or if earlier, the date the Plan is terminated;

(b)    The last day of the month following the date on which the Survivor ceases to be a Dependent under the provisions of the Program or the applicable Insurance Contract;

(c)    The date the Survivor dies;

(d)    The date the Survivor is paid benefits up to his lifetime maximum benefit, as set forth in the applicable Insurance Contract;

(e)    The date on which the Program or Insurance Contract is changed to exclude Survivors;

(f)    The date on which the Survivor becomes enrolled under a Company-sponsored group health plan or as a Dependent; or

(g)    With respect to Benefits toward the cost of which the Survivor is required to contribute, the last day of the month following the date the individual fails to make such required contributions.

If the Survivor's coverage ceases under this subsection (d) or (g) and the Participant is eligible for a Retirement Medical Account, the Participant's Retirement Medical Allowance will be transferred to a Retirement Medical Account. The Plan Administrator will determine the amount eligible for reimbursement of medical expenses of any mid-year changes.

2.12    Other Cessation of Coverage. Notwithstanding anything in the Program to the contrary, the Employer may, in its sole discretion, cause a Participant's coverage (or that of his or her Dependent) or a Survivor's coverage under the Program to terminate if such Participant (or his or her Dependent):

(a)    provides false information or makes misrepresentations in connection with a claim for Benefits;

(b)    permits someone who is not a Covered Individual to use a membership or other identification card for the purpose of wrongfully obtaining Benefits;

(c)    obtains or attempts to obtain Benefits by means of false, misleading or fraudulent information, acts or omissions;

51

(d)     fails to pay any co-payment, supplemental charge or other amount due with respect to a Benefit;

(e)     behaves in a manner disruptive, unruly, abusive or uncooperative to the extent the Program is unable to provide benefits to him or her; or

(f)     threatens the life or well-being of personnel administering the Program or of providers of services or Benefits.

**Part III**
**<u>Continuation Of Coverage</u>**

The rules regarding continuation of coverage pursuant to the requirements of Code Section 4980B are described in the Summary Plan Description.

**Part IV**
**<u>Benefits</u>**

4.1     <u>Provision of Benefits</u>.  Benefits shall be provided under the Program in accordance with the Participant's, Dependent's, Survivor's or COBRA Participant's election (or deemed election) under the Program.  Benefits will be provided pursuant to the provisions of the Plan and this Program, the provisions of the applicable Insurance Contracts, and as described in the applicable Summary Plan Descriptions, Summary of Benefits and/or Insurance Contracts. To the extent not set forth in the Program, any restrictions, limitations and additional requirements relating to a Participant's, Survivor's, or COBRA Participant's entitlement to Benefits are described in the Summary Plan Descriptions, Summary of Benefits and/or Insurance Contracts.

4.2     <u>Retirement Medical Allowance</u>.  The Participants listed in subsection (a) below are eligible for a Retirement Medical Allowance to apply toward Retirement Medical Benefits or a Retirement Medical Account. Once the Participant elects a Retirement Medical Account, he or she is not eligible for Retirement Medical Benefits. Certain Survivors of deceased Participants are also eligible for a Retirement Medical Allowance as set forth in Section 2.7.

(a)     <u>Eligibility for a Retirement Medical Allowance</u>:

(i)     Unless otherwise excluded in subsection (ii), the following individuals are eligible for a Retirement Medical Allowance:

(A)     Participants who received a Retirement Medical Allowance on the date immediately preceding the Effective Date and elected to apply it to offset the cost of Retirement Medical Benefits coverage;

(B)     Participants who had a Retirement Medical Account as of December 31, 2009;

(C)     Eligible Retirees whose last day of employment with an Employer Company is before January 1, 2008 and elect to defer their election of coverage under Section 2.4 or make no election; and

(E)     Eligible Retirees who retired from an Employer Company on or after January 1, 2002 and whose last day of employment with an Employer Company is before January 1, 2008, and elected to defer their election of coverage under Section 2.4.

52

(ii)    The following individuals are not eligible for a Retirement Medical Allowance:

(A)    Participants whose last day of employment with an Employer Company was on or after January 1, 2008 are not eligible for a Retirement Medical Allowance.

(B)    Individuals who retired from Prudential Securities, Inc. prior to January 1, 2004, or who retired after January 1, 2004 and elected the cost-sharing provisions under the former PSI Retirement Medical Plan are not eligible for a Retirement Medical Allowance.

(C)    Individuals who were former employees of Golden West Financial that became Employees as a result of the merger of Golden West Financial with an Employer Company are not eligible for a Retirement Medical Allowance.

(b)    Retirement Medical Account. The Retirement Medical Allowance of Participants eligible for a Retirement Medical Allowance will be allocated to a Retirement Medical Account established for the benefit of the Participant as a bookkeeping account if the Participant (i) elects the Retirement Medical Account, or (ii) loses Retirement Medical Benefits coverage for failure to timely pay required contributions for coverage.  If a Participant loses Retirement Medical Benefits coverage for failure to timely pay required contributions for coverage, the amount of the Retirement Medical Allowance allocated to a Retirement Medical Account established in the name of the Participant will be prorated (e.g., the Retirement Medical Allowance allocated to a Retirement Medical Account that a Participant who loses Retirement Medical Benefits coverage on March 31st will equal ¾ of the annual Retirement Medical Allowance for that year).

Participants with a Retirement Medical Account are entitled to submit claims for reimbursement of Covered Medical Expenses from their Retirement Medical Account in accordance with the following provisions:

(i)     The Retirement Medical Account is a bookkeeping account. The Employer will perform a bookkeeping allocation of an amount from its general assets equal to the Participant's Retirement Medical Allowance to a Retirement Medical Account  for the benefit of such Participant.

(ii)    A Participant has no right to specific funds and cannot receive any of the Retirement Medical Allowance as a direct taxable benefit. A Participant may request reimbursement of Covered Medical Expenses incurred during the Plan Year from the Retirement Medical Allowance allocated to the Participant's Retirement Medical Account.  A Participant's Retirement Medical Account cannot be used to pay the premiums under a medical plan, but may be used to satisfy deductibles and copayments.

(iii)   Any amount allocated to a Retirement Medical Account during the Plan Year shall be used to reimburse Covered Medical Expenses incurred within the same Plan Year and for which a request for reimbursement has been submitted in accordance with subsection (iv) below.  In the event that the Covered Medical Expenses incurred in a Plan Year and reimbursement by the

53

Retirement Medical Account is less than the amount allocated to the Retirement Medical Account, the balance shall be automatically forfeited.

(iv) Requests for reimbursement of Covered Medical Expenses incurred within the Plan Year must be postmarked no later than March 31st of the following Plan Year in order to be eligible for reimbursement. Requests for reimbursement of Covered Medical Expenses incurred within the Plan Year that are postmarked after March 31st of the following Plan Year will be denied. Covered Medical Expenses shall be deemed to be incurred at the time the services to which the expenses relate are rendered, not when the Participant, Spouse or Dependent child is billed or charged for the service.

(c) Definitions. As used in this Section 4.2, each of the following capitalized terms shall have the respective meaning given below:

(i) "Retirement Medical Allowance" means an Employer contribution toward the cost of Benefits in the following amounts based on the Participant's Years of Service:

(A) If the Participant has less than 20 Years of Service on his or her Retirement Date, the Participant's Retirement Medical Allowance is equal to his or her Years of Service multiplied by $42 (or such other amount specified in the Summary Plan Description);

(B) If the Participant has 20 or more Years of Service and is under age 65 on his or her Retirement Date, the Participant's Retirement Medical Allowance is equal to his or her Years of Service multiplied by $60 (or such other amount specified in the Summary Plan Description);

(C) If the Participant has 20 or more Years of Service and is 65 or older, on his or her Retirement Date, the Participant's Retirement Medical Allowance is equal to his or her Years of Service multiplied by $55 (or such other amount specified in the Summary Plan Description).

The amount of Retirement Allowance will be pro-rated for any partial years of retirement (e.g., a Participant with a Retirement Date of December 1 shall receive an allowance of 1/12 of the amount he or she would have received had he or she had a Retirement Date of January 1 of the same year)

(ii) "Covered Medical Expense" means an expense incurred by a Participant for medical care described in Code Section 213(d) (including without limitation amounts paid for hospital bills, doctor and dental bills, and prescribed and over-the counter drugs), provided with respect to the Participant or the Participant's legal Spouse or dependents (as defined in Code section 105(b)), but only to the extent that the Participant or other person receiving the medical care is not reimbursed (or entitled to reimbursement) for the expense through insurance or otherwise (other than from the Retirement Medical Account). Covered Medical Expenses shall include expenses incurred during a Plan Year in which the Eligible Retiree is a Participant in the Retirement Medical Account. Covered Medical Expenses do not include expenses incurred prior to the commencement of the Participant's participation in the Retirement Medical Account.

The Plan Administrator may promulgate procedures regarding the eligibility of various expenses for reimbursement as Covered Medical Expenses, and may limit reimbursements to expenses described in such procedures.

A Covered Medical Expense does not include an expense incurred for the purpose of cosmetic surgery, as defined by Code section 213(d)(9) (except as provided in subparagraph (A) thereof), any premium paid for health coverage under any plan (group or individual), expenses covered by Medicare, insurance or other medical plans described in Code section 213(d), the cost of qualified long-term care services, as defined in Code section 7702B(c), or any other expense excluded under the terms of the Summary Plan Description.

Notwithstanding the foregoing, a Covered Medical Expense shall include a non-prescription drug or medicine purchased to alleviate or treat personal injury or sickness.

4.3     Participants Not Eligible for a Retirement Medical Allowance. Participants not eligible for a Retirement Medical Allowance under Section 4.2 above may be eligible for Retirement Medical Benefits. Cost-sharing provisions for Participants, if any, are set forth in the applicable Attachments and the Employer's (or its designee's) database. The Employer reserves the right to change or cancel the amount of the Employer contribution at any time and for any reason without prior notice.

4.4     Merger and Acquisition Group Retiree. Merger and Acquisition Group Retirees are those Participants eligible for Retirement Medical Benefits as set forth in the Wachovia 2009 Retiree Health and Welfare Summary Plan Description for Merger Groups and as otherwise limited by the Employer's (or its designee's) databases. The cost-sharing provisions that apply to Merger and Acquisition Group Retirees are set forth in the Attachments or listed in the Employer's (or its designee's) databases, and are communicated to Participants in annual enrollment materials. Merger and Acquisition Group Retirees and their covered Dependents under age 65 are not eligible for the Retirement Medical Benefits provided to Participants under age 65 who are not Merger and Acquisition Group Retirees and their Dependents. Merger and Acquisition Group Retirees and their Dependents who are age 65 and over and are eligible for Benefits under the Program may participate in any Medicare Advantage plan options offered to non- Merger and Acquisition Group Retirees in the area where they live.

4.5     Decisions on Medical Care. The Program provides solely for the payment of certain medical care benefits. All decisions regarding medical care will be solely the responsibility of each Covered Individual in consultation with the health care providers selected by the individual. Each Summary Plan Description, Insurance Contract or Summary of Benefits contains rules for determining the percentage of allowable medical care expenses that will be reimbursed and whether particular treatments or medical care expenses are eligible for reimbursement. Any decision with respect to the level of medical care reimbursement, or the coverage of a particular medical care expense, may be disputed by the Covered Individual in accordance with the claims procedures set forth in Part VII. Each Covered Individual may use any source of care for medical treatment and medical coverage as selected by such individual, and neither the Program nor any Employer Company shall have any obligation for the cost or legal liability for the outcome of such care, or as a result of a decision by a Covered Individual not to seek or obtain such care, other than liability under the Program for the payment of Benefits pursuant to the applicable Summary Plan Description, Insurance Contract or Summary of Benefits.

In all cases, the healthcare network manager (and not an Employer Company or the Program) is responsible for selecting the healthcare providers that participate in the network and ensuring the quality of the network. All physicians and other healthcare providers that participate in such arrangements are independent contractors.

4.6     Life Insurance. Except as set forth in an Attachment or the Employer's (or its designee's) database, life insurance benefits for Participants, if any, are provided as set forth in the Summary Plan Description.

4.7     Limitations on Benefits. Limitations on Benefits shall be described in the Summary Plan Description.

## Part V
## Contributions

5.1     Contributions. During the initial Enrollment Period, each Eligible Retiree shall be given a Retiree Medical Enrollment Materials setting forth the required contribution for coverage. The amount of contributions required to be made by the Employer Company, Participants, COBRA Participants, Dependents, and Survivors, shall be determined in accordance with the cost sharing methodologies set forth in the applicable Attachments to this Program and the Plan Administrator's (or its designee's) database, or in accordance with the Program's internal policies and procedures as established by the Plan Administrator and communicated annually to Eligible Retirees. The Employer reserves the right through the Plan Administrator and in accordance with Section 8.1 to change these cost-sharing provisions at any time.

Different levels of contributions may be required from different Employer Companies or from different groups of Participants, COBRA Participants, Dependents and Survivors. Employer Contributions shall be paid from the Employer Company's general assets, and Participant, Survivor, Dependent, and COBRA Participant contributions shall be collected by the Employer Company by such method as may be determined by the Employer Company. Contributions shall be paid to any applicable Insurer, in accordance with the applicable Contracts, or into any Code section 501(c)(9) trust which the Employer Companies may establish to hold, manage, invest and reinvest such contributions for the payment of Program Benefits or held in general assets in accordance with Department of Labor Technical Release 92-01.

5.2     Source of Benefits. All Benefits under the Program shall be paid exclusively by an Insurer, from a trust, or by an Employer Company out of its general assets. The Employer Company shall have no duty to make any contributions except those required under the Insurance Contract or terms of the Program.

## Part VI
## Administration

6.1     Plan Administrator. The administration of this Program shall be under the supervision of the Plan Administrator, the establishment and responsibilities of which are set forth in the Plan Statement. It shall be a principal duty of the Plan Administrator to see that the Program is carried out, in accordance with its terms, for the exclusive benefit of persons entitled to participate in the Program without discrimination among them. The powers ascribed to the Plan Administrator under the Plan Statement, including without limitation the power and discretion to interpret its terms and to delegate responsibilities among themselves and to others, shall likewise apply with respect to their duties under this Program, and are incorporated herein by reference.

56

6.2     Records. The Plan Administrator shall keep or cause to be kept books and records with respect to the operations and administration of this Program.

6.3     Reliance on Determinations, etc. In administering the Program, the Plan Administrator will be entitled, to the extent permitted by law, to rely conclusively on all tables, valuations, certificates, determinations, opinions and reports which are furnished by any accountant, counsel, claims administrator providing medical utilization management services or other expert who is employed or engaged by the Plan Administrator.

6.4     Named Fiduciary. The Plan Administrator will be a "named fiduciary" for purposes of Section 402(a)(1) of ERISA with authority to control and manage the operation and administration of the Program, and will be responsible for complying with all of the reporting and disclosure requirements of Part I of Subtitle B of Title I of ERISA.

6.5     Indemnification of Administrative Personnel. The Employer shall indemnify each officer, director or Employee of the Employer for all expenses (other than amounts paid in settlement to which the Employer does not consent) reasonably incurred by him or her in connection with any action to which he or she may be a party by reason of his or her performance of administrative functions and duties under the Program, except in reaction to matters as to which he or she shall be adjudged in such action to be personally guilty of gross negligence or willful misconduct in the performance of his or her duties. The foregoing rights to indemnification shall be in addition to such other rights as the individual may enjoy as a matter of law or by reason of insurance coverage of any kind. Rights granted hereunder shall be in addition to and not in lieu of any rights to indemnification to which the individual may be entitled pursuant to the Employer's by-laws.

## Part VII
## Claims Procedures

7.1     Claims Procedure. A "claim for Benefits" is a claim for Benefits made by a Claimant (or his or her representative) in accordance with the procedures established by the Claims Administrator. Casual inquiries about Benefits or the circumstances under which Benefits might be available under the Program are not "claims for Benefits" for purposes of this Part VII.

The procedures followed by Claims Administrators and Claims Fiduciaries shall contain administrative processes and safeguards designed to ensure and to verify that Benefit claim determinations are made in accordance with governing Program documents and that, where appropriate, the Program provisions have been applied consistently with respect to similarly situated Claimants. Under such procedures, for example, each person responsible for deciding claims for Benefits and appeals shall maintain records of its proceedings in deciding such claims and appeals. The records shall be maintained in a manner that permits such persons to refer to prior decisions to ensure that, where appropriate, the Program's provisions are applied consistently with respect to similarly situated Claimants.

7.2     Denial of Claim. If a claim for Benefits under the Program is denied, the Claimant may have it reviewed in accordance with one of the following claims review procedures:

(a)     Insured Claims.

    (i)     In the event that the applicable Insurance Contract contains a claims procedure, such claims procedure shall be followed and shall be the appropriate procedure for making a claim for Benefits covered by such

Insurance Contract. Such claims procedures are incorporated by reference hereto.

(ii)   In the event that the Insurance Contract does not contain a claims procedure, the claims procedures in Section 7 of the Plan Statement shall apply to claims for such Benefits.

(b)   <u>Claims for Benefits not provided pursuant to an Insurance Contract</u>.  Except Urgent Care Claims, the Claims Administrator will make the initial determination and the first-level appeal determination of all denied claims and the Wachovia Health and Welfare Benefits Appeals Committee will make the second-level appeal determination (which is the final determination) of all first-level appeal denials.

## Part VIII
## Amendment And Termination

8.1   <u>Amendment</u>.  The Program may be amended as specified in the Plan Statement.

8.2   <u>Termination of the Program</u>.  The Program may be terminated as specified in the Plan Statement.

## Part IX
## Miscellaneous

9.1   <u>Funding Status of Program</u>.  All Benefits under the Program shall be paid exclusively by an Insurer, from a trust, or by an Employer Company out of its general assets.  The Employer Company shall have no duty to make any contributions except those required under the Contracts.

9.2   <u>Assignment</u>.  The Participant may, if permitted by the Plan Administrator, authorize the Program to pay a Participant's or Dependent's Benefit directly to the service provider or hospital that provided the Participant or Dependent with covered care and treatment.  Except as provided in the foregoing sentence, a Participant may not assign, alienate, anticipate or commute any payment with respect to Benefit which a Participant or Dependent is entitled to receive from the Program and, further, except as may be prescribed by law, no benefits shall be subject to any attachments or garnishments of or for a Participant or Dependent's debts or contracts, except for recovery of overpayments made on the Participant's or Dependent's behalf by this Program.

9.3   <u>No Guarantee of Tax Consequence</u>.  Neither the Plan Administrator nor the Employer makes any commitment or guarantee that any amounts paid to or for the benefit of a Participant under this Program will be excludable from the Participant's gross income for federal or state income tax purposes, or that any other federal or state tax treatment will apply to or be available to any Participant.  It shall be the obligation of each Participant to determine whether each payment under the Program is excludable from the Participant's gross income for federal and state income tax purposes, and to notify the Employer if the Participant has reason to believe that any such payment is not so excludable.

9.4   <u>Coordination of Benefits</u>.

(a)   <u>Coordination with Other Health Plans</u>.  The applicable coordination of benefits provisions for the Program are ser forth in the Insurance Policies and/or the Summary Plan Descriptions for the Program.

(b)     <u>Coordination With Medicare</u>.  Medicare benefits will be primary to the extent permitted under applicable law.  This Program shall be primary to Medicare only to the extent required by applicable law.

(c)     <u>Coordination with TRICARE and Governmental Programs Other than Medicare</u>. This Program shall be primary to benefits provided under TRICARE only to the extent required by applicable law.  If a Participant, COBRA Participant or Dependent is covered by a governmental program other than Medicare or TRICARE, that program will be primary, except as otherwise required by applicable law.

**Attachment 1**
**First Union Corporation**

A.1.1  Cost-Sharing Methodology.  Participants who retired from First Union Corporation on or after February 1, 1992 are eligible for a Retirement Medical Allowance as set forth in Section 4.2.  Participants who retired from First Union Corporation prior to February 1, 1992 are eligible for Retirement Medical Benefits under the cost-sharing provisions indicated in the Employer's (or its designee's) databases.  These cost-sharing provisions are subject to change at any time in accordance with the amendment and termination provisions of the Plan Statement.

A.1.2  Life Insurance.

(a)  For Participants who retire prior to age 65, the Employer will provide life insurance coverage in an amount equal to the lesser of (i) the Participant's basic life insurance coverage on the last day of the month preceding such Participant's retirement date, or (ii) $50,000. As of the first day of the month in which a Participant's 65th birthday occurs, his or her life insurance coverage shall be reduced to the lesser of $10,000 or 25% of his or her employer provided coverage on the last day of the month prior to the month in which his or her 65th birthday occurs.  This amount is the "Initial Reduced Coverage Amount".  Such Participant's coverage shall be further reduced each year thereafter by 10% of the Initial Reduced Coverage Amount until such Participant reaches age 70. At age 70, such Participant's coverage shall be fixed for the remainder of his or her life and shall be the greater of (i) 50% of the Initial Reduced Coverage Amount (subject to a maximum of $5,000), or (ii) $1,000.

(b)  For Participants who retire (i) prior to December 31, 1985, and (ii) prior to reaching age 65, the Employer will provide life insurance coverage in an amount equal to three (3) times the amount of the Participant's Employer-sponsored basic term life insurance coverage on the last day of the month preceding the Participant's retirement date.

A.1.3  Legacy First Union Disabled Employees.  Legacy First Union disabled employees who retired from First Union Corporation between January 1, 1996 and December 31, 2001 and accrued ten or more Years of Service are eligible to participate in the Program if the Legacy First Union disabled employee elected coverage under the Program in accordance with the procedures in place at that time of retirement.

**Attachment 2**
**First Fidelity Bank**

A.2.1   Cost Sharing Methodology.

(a)   Participants who were First Fidelity Bank Employees on January 1, 1996 who retire on or after February 1, 1996 but before October 2, 1998 made an irrevocable election for the cost sharing methodology in this Attachment or a Retirement Medical Allowance in Section 4.2. Participants who elected the cost-sharing provisions under Section 4.2 will receive life insurance with a face amount of $5,000 and are not eligible for a Retirement Medical Account.

The following is the cost-sharing methodology for those participants who did not elect the cost sharing methodology under Section 4.2:

(i)   If the Participant's age plus Years of Service at retirement equal or exceed 75, for each year before the Participant has reached age 65 the Participant or his or her Dependent will be required to pay an amount equal to 125% of the required participant contribution of the applicable coverage under the Wachovia Medical Program and the Participant will receive life insurance with a face value of $5,000.

(ii)   If the Participant's age plus Years of Service at retirement equal or exceed 75, for each year after the Participant has reached age 65 the Participant will be required to obtain non group MediGap coverage and the required contribution for such Participant for the cost of such coverage is $750 per year for single coverage and $1,500 per year for coverage of the Participant and his or her Spouse.

(iii)   If the Participant's age plus Years of Service at retirement does not equal or exceed 75, for each year before the Participant has reached age 65, the Participant will be required to pay 50% of the applicable gross premium cost. and the Participant will receive life insurance with a face value of $5,000.

(iv)   Effective January 1, 2002, if the Participant's age plus Years of Service at retirement does not does not equal or exceed 75, upon reaching age 65 such Participants are eligible for a Retirement Medical Allowance at age 65 to apply toward the cost of Retirement Medical Benefits. Participants described in this subsection are not eligible for a Retirement Medical Account or life insurance under the Program.

(b)   For Participants who were First Fidelity Bank employees and retired from active employment with Wachovia Corporation or a Wachovia Affiliate between July 1, 1992 and January 1, 1996, the same cost sharing methodology as set forth in Section A.2.1(a) applies. Any Participant whose age plus Years of Service does not equal or exceed 75 will not receive any life insurance under the Program.

(c)   Any Participant who was employed by First Fidelity Bank on October 1, 1998 and retired after October 2, 1998 is eligible for a Retirement Medical Allowance as set forth in Section 4.2.

(d)   Fidelcor. Participants who retired from Fidelcor are not eligible for a Retirement Medical Allowance. The following cost-sharing provisions apply to such Participants:

61

(i)     The required monthly contribution for Participants who retired from Fidelcor, Inc prior to January, 2 1989 or were employees of Fidelcor, Inc on December 21, 1988 and became employees of First Fidelity Bancorporation and who were 61 years of age or younger at the time of retirement is $25 per month for Participant only coverage for Retirement Medical Benefits or $75 per month for Participant and Dependent coverage (up to two) for Retirement Medical Benefits. If the Participant elects to cover more than two dependents, the Participant will be responsible for the amount of any additional required contributions.

(ii)    The required contribution for Participants who retired from Fidelcor, Inc prior to January 2, 1989 or were employees of Fidelcor, Inc on December 31, 1988 and became employees of First Fidelity Bancorporation and who were 62 years of age or older at the time of retirement are is $15 per month for Participant only coverage for Retirement Medical Benefits or $25.00 per month for Participant and Dependent (up to two) coverage for Retirement Medical Benefits. If the Participant elects to cover more than two Dependents, the Participant will be responsible for the amount of any additional required contributions.

(iii)   For Participants who retired from Fidelcor, Inc. prior to January 2, 1989, the Employer will provide life insurance coverage based upon the provisions of the life insurance program in effect at the time of retirement.  The amount of life insurance coverage provided to Participants who retired from Fidelcor, Inc. prior to January 2, 1989 will not be reduced after age 65.

(e)    Southeast National Bank. Participants who were Southeast National Bank employees and who retired on or before January 1, 1984 are not eligible for a Retirement Medical Allowance. The Employer contribution for such Participants toward applicable coverage under the Program shall be the amount that it would cost the Participant to obtain single coverage under a Medicare supplemental insurance plan.

**Attachment 3**
**Meridian National Bank**

A.3.1   Participants who retired from Meridian National Bank are not eligible for a Retirement Medical Allowance.

A.3.2   <u>Cost Sharing Methodology</u>.  For Participants who retired from Meridian National Bank before January 1, 1997, the following cost sharing methodology applies.

(a)     For Participants under age 65, the Employer will provide a monthly subsidy of $358.08 toward the cost of Retirement Medical Benefits and up to $358.08 toward the cost of medical coverage for each Dependent (up to a maximum of 2). Participants are responsible for the difference between the amount of the Employer contribution and the premium for the coverage they elect.

(b)     For Participants age 65 and over, the Employer will provide a monthly subsidy of up to $45.24 toward the cost of Retirement Medical Benefits and up to $45.24 toward the cost of Retirement Medical Benefits for each Dependent (up to a maximum of 2). Participants are responsible for the difference between the amount of the Employer contribution and the premium for the coverage they elect.

A.3.3   <u>Life Insurance</u>.  Participants who retired from Meridian National Bank are not eligible for life insurance coverage.

**Attachment 4**
**Corestates Bank Employees**

A.4.1   Cost Sharing Methodology.

(a)   For Participants who retired from CoreStates Bank before July 1, 1992, the following cost sharing methodology applies.

(i)   For Participants under age 65, the Employer will contribute an amount equal to the cost of the Program designated as the Flagship Plan (or, in the absence of a Flagship Plan the cost of a Flagship Rate developed) by the Employer's Group Benefits for the Participant and up to two Dependents. Participants will be responsible for the difference between the amount covered by the Employer and the premium for the coverage they elect.

(ii)   For Participants over age 65, the Employer will contribute an amount equal to the cost of the Program designated as the Flagship Plan (or, in the absence of a Flagship Plan the cost of a Flagship Rate developed) by the Employer's Group Benefits for the Participant and up to two Dependents.

(b)   For Participants who were CoreStates Bank Employees who retired on or after July 1, 1992 but before January 2, 1999 the following cost sharing methodology applies.

(i)   For Participants under age 65, the Employer will contribute an amount based on a Participant's Years of Service in accordance with the schedule below.

| MONTHLY CAPS | | | | |
|---|---|---|---|---|
| Years of Service When You Retired | You and Child(ren) | You | Your Spouse/Domestic Partner | Your Family |
| 10-14 | 300.54 | $307.67 | $151.21 | $406.00 |
| 15-19 | 355.67 | 343.21 | 170.81 | $470.00 |
| 20-24 | 410.80 | 379.96 | 189.18 | $534.08 |
| 25-29 | 465.92 | 416.71 | 207.56 | $598.25 |
| 30-34 | 521.05 | 453.46 | 225.93 | $662.25 |
| 35 or more | 576.18 | 490.22 | 244.31 | $726.33 |

(ii)   For Participants over age 65, the Employer will contribute an amount equal to the cost of the Program designated as a Flagship Plan (or, in the absence of a Flagship Program the cost of a Flagship Rate developed) by the Employer's Group Benefits, in accordance with the schedule below.

64

| Years of Service | | For Participant Employer Pays<br><br>This Percentage of Flagship Rate | For Dependents Employer Pays<br><br>This Percentage of Flagship Rate |
|---|---|---|---|
| 35+ Years | | 100% | 50% |
| 30-34 Years | | 90% | 45% |
| 25-29 Years | | 80% | 40% |
| 20-24 Years | | 70% | 35% |
| 15-19 Years | | 60% | 30% |
| 10-14 Years | | 50% | 25% |
| Less than 10 Years | | No Coverage Provided | No Coverage Provided |

Notwithstanding the foregoing, the monthly subsidy provided by the Employer for Participants over age 65 is subject to the applicable maximum amounts set forth in the chart below.

| Length of Service When You Retired | You | Your Dependent |
|---|---|---|
| 10-14 | $84.92 | $42.50 |
| 15-19 | 101.92 | 50.92 |
| 20-24 | 118.92 | 59.42 |
| 25-29 | 135.84 | 67.92 |
| 30-34 | 152.83 | 76.41 |
| 35 or more | 169.84 | 84.92 |

(c)     Participants who were CoreStates Employees and retired during the CoreStates Window Period made an irrevocable election for either the CoreStates cost sharing methodology set forth above in this Attachment or a Retirement Medical Allowance. If no election was made, the Participant automatically received a Retirement Medical Allowance. For purposes of this paragraph, the CoreStates Window Period is the period beginning January 1, 1999 and ending on December 31, 2001.

A.4.2   Life Insurance.

(a)     The Employer will provide the following life insurance coverage to (i) Participants who retired from CoreStates Bank before July 1, 1992, (ii) Participants who were Corestates Bank Employees and who retired on or after July 1, 1992, but before January 2, 1999, and (iii) CoreStates Employees who retire during the CoreStates Window Period and elected the CoreStates cost sharing methodology, at no cost to the Participant:

65

Life insurance coverage equal to 50% of the Participant's base pay at the time of retirement (the "Initial Reduced Coverage Amount"). On each anniversary of such Participant's retirement date, the amount of insurance coverage will be reduced by 10% of the Initial Reduced Coverage Amount to a minimum benefit of $2,000.

(b)     The Employer will provide the following life insurance coverage to CoreStates Employees who retire during the Corestates Window Period and elected a Retirement Medical Allowance, at no cost to the Participant:

   (i)     For Participants who retire prior to age 65, the Employer will provide life insurance coverage in an amount equal to the lesser of (A) the Participant's basic life insurance coverage on the last day of the month preceding such Participant's retirement date, or (B) $50,000.

   (ii)    As of the first day of the month in which a Participant's 65th birthday occurs, his or her life insurance coverage shall be reduced to the lesser of $10,000 or 25% of his or her employer provided coverage on the last day of the month prior to the month in which his or her 65th birthday occurs. This amount is referred to as the "Initial Reduced Coverage Amount"). Such Participant's coverage shall be further reduced by 10% of the Initial Reduced Coverage Amount each year thereafter until such Participant reaches age 70. At age 70, such Participant's coverage shall be fixed for the remainder of his or her life and shall be the greater of (A) the lesser of 50% of the Initial Reduced Coverage Amount or $5,000, or (B) $1,000.

A.4.3   <u>Grandfathered Service Credit</u>. For periods prior to January 1, 1999, a Year of Service means a year of service as defined in the CoreStates Pension Plan or outlined in the Wachovia Pension Plan for vesting purposes (including credit for prior years of service under the CoreStates Pension Plan).

**Attachment 5**
**Signet Bank**

A.5.1   Cost Sharing Methodology.

(a)   For any Participant who is under age 65 and who retired from Signet Bank prior to January 1, 1998, the Employer will provide a subsidy for medical coverage under the Program in an amount equal to the amount of the monthly contribution to a Retirement Medical Account for a Participant with 40 Years of Service.

(b)   For any Participant who is age 65 or older and who retired from Signet Bank prior to January 1, 1998, the Employer will provide a subsidy for medical coverage under the Program in an amount equal to the amount of the monthly contribution to a Retirement Medical Account for a Participant with 10 Years of Service.

(c)   Any Participant who was employed by Signet Bank on December 31, 1997 and who retired after December 31, 1997 but before October 2, 1998 may elect to be subject to the cost sharing methodology set forth in the previous paragraph or a Retirement Medical Allowance, however if such a Participant elects a Retirement Medical Allowance,  he or she is not entitled to elect a Retirement Medical Account.

(d)   Any Participant who was employed by Signet Bank on December 31, 1997 and retires after October 1, 1998 shall be eligible for a Retirement Medical Allowance.

A.5.2   Life Insurance.  Participants who retired from Signet Bank are not eligible for life insurance coverage.

**Attachment 6**
**Wheat First Securities, Inc.**

A.6.1   <u>Grandfathered Service Credit</u>.  For Employees who were employed by Wheat First
Securities, Inc., a Year of Service shall mean a Year of Service as defined in the
Wachovia Pension Plan for vesting purposes, accrued as if such employees were
participants in such plan from the date on which they would have become eligible to
participate in such plan if they were employed by Wachovia Corporation or a
Wachovia Affiliate for each hour that they were employed by Wheat First.

68

**Attachment 7**
**The Money Store, Inc.**

A.7.1   Grandfathered Service Credit.  For Participants who were employed by The Money Store, Inc. on March 31, 1999, Year of Service shall include a Year of Service based on prior service with The Money Store, Inc. or any members of its controlled group of corporations.

A.7.2   Cost-Sharing Methodology.

(a)   Participants who retired from The Money Store, Inc. between April 1, 1999 and July 1, 1999 are eligible for (i) a Retirement Medical Allowance, as set forth in Section 4.2, or (ii) Retirement Medical Benefits and the cost-sharing provisions provided in the Employer (or its designee's) databases.

(b)   Participants who retired from The Money Store, Inc.  prior to April 1, 1999 are eligible for Retirement Medical Benefits and the cost-sharing provisions provided in the Employer (or its designee's) databases.  Participants who retired from The Money Store, Inc. prior to April 1, 1999 are not eligible for the Retirement Medical Allowance.

A.7.3   Life Insurance.

(a)   For Participants who retired from The Money Store, Inc. between April 1, 1999 and July 1, 1999, the Employer will provide life insurance coverage at no cost to the Participant in an amount equal to the Participant's basic life insurance coverage on the last day of the month preceding such Participant's retirement date.

As of the first day of the month in which a Participant's 65th birthday occurs, his or her life insurance coverage shall be reduced to the lesser of (i) $10,000, or (ii) 25% of his or her employer-provided coverage on the last day of the month preceding the month in which his or her 65th birthday occurs.

Each year after the year of the Participant's 65th birthday until the Participant reaches age 70, such Participant's coverage shall be reduced by 10% of the lesser of (i) $10,000, or (ii) 25% of his or her employer-provided coverage on the last day of the month preceding the month in which his or her 65th birthday occurred.

At age 70, such Participant's coverage shall be fixed for the remainder of his or her life and shall be the greater of (i) $1,000, or (ii) the lesser of $5,000 or the amount of coverage he or she had at age 70.

(b)   All other Participants who retired from The Money Store shall not receive life insurance coverage.

**Attachment 8**
**Southeast Bank, N.A. Or Southeast Bank Of West Florida**

A.8.1   Grandfathered Service Credit.  If a former employee of either Southeast Bank, N.A. or Southeast Bank of West Florida became an Employee in connection with the purchase of certain assets of those banks by Wachovia National Bank of Florida and was an Employee on January 1, 1992, such Employee's service with those banks shall be considered service under the Program for purposes of determining Years of Service.

A.8.2   Cost-Sharing Methodology.   Participants who retired from Southeast Bank, N.A. or Southeast Bank of West Florida between February 1, 1992 and April 1, 1992 were eligible to elect between a (i) Medicare Supplement Plan, or (ii) Medicare carve-out plan.  Participants who retired from Southeast Bank, N.A. or Southeast Bank of West Florida are not eligible for a Retirement Medical Allowance.

A.8.3.   Dependent Coverage.  Dependents of Participants who retired from Southeast Bank, N.A. or Southeast Bank of West Florida are not eligible for Retirement Medical Benefits.

A.8.4.   Life Insurance.  Participants who retired from Southeast Bank, N.A. or Southeast Bank of West Florida are eligible for life insurance coverage based upon the provisions of the life insurance program in effect at the time of their retirement.  The amount of life insurance coverage will not be reduced after age 65.

70

**Attachment 9**
**Essex Agency Of Pennsylvania, Inc.**

A.9.1   Grandfathered Service Credit.  If a former employee of Essex Agency of Pennsylvania, Inc. ("Essex") became an Employee on July 1, 1996, such Employee's service with Essex in 1996 shall be considered service under the Program for purposes of determining Years of Service.

71

**Attachment 10**
**EVEREN Capital Corporation**

A.10.1 <u>Cost Sharing Methodology</u>. Any Participant who retired from EVEREN Capital Corporation prior to October 1, 1999, shall receive a subsidy in an amount equal to the cost of coverage under the EVEREN Retiree Medical Plan for 1998. Any difference between this cost and the coverage the Participant elects shall be paid by the Participant.

A.10.2 Any Participant who was employed by EVEREN Capital Corporation on September 30, 1999 who retired after October 1, 1999 but before January 1, 2002 made an irrevocable election to be subject to the cost sharing methodology set forth in A.10.1 or a Retirement Medical Account.

A.10.3 <u>Bank of New York</u>. Any Participant who was employed by the Bank of New York is eligible to receive the cost-sharing methodology set forth in A.10.1.

A.10.4 <u>Dental</u>. Any such Participant who elected the EVEREN cost-sharing methodology in this Attachment 10 is eligible to receive retiree dental coverage.

A.10.5 <u>Life Insurance</u>. Participants who retired from EVEREN Capital Corporation shall not receive life insurance coverage.

**Attachment 11**
**Bowles Hollowell Conner & Co.**

A.11.1 Grandfathered Service Credit. If a former employee of Bowles Hollowell Conner & Co. or its affiliates ("BHC") became an Employee at the time of the acquisition of BHC by an Employer Company, such Employee's service with BHC and any related entity within the meaning of Code sections 414(b), 414(c), 414(m) or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

**Attachment 12**
**Covenant**

12.1    <u>Grandfathered Service Credit</u>. If a former employee of Covenant Bancorp, Inc. or its affiliates ("Covenant") became an Employee at the time of the acquisition of Covenant by an Employer Company or an Affiliate, such Employee's service with Covenant and any related entity within the meaning of Code sections 414(b), 414(c), 414(m) or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

74

**Attachment 13**
**Mid-Atlantic and TMS Group**

A.13.1 <u>Grandfathered Service Credit</u>.  If a former employee of The Mid-Atlantic Companies, Ltd. Or TMS Group, Inc. (Mid-Atlantic or TMS) became an Employee at the time of the acquisition of Mid-Atlantic or TMS by an Employer Company, such Employee's service with Mid-Atlantic or TMS and any related entity within the meaning of Code sections 414(b), 414(c), 414(m) or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

**Attachment 14**
**Tattersall**

A.14.1 <u>Grandfathered Service Credit</u>.  If a former employee of Tattersall Advisory Group, Inc. or its affiliates ("Tattersall") became an Employee at the time of the acquisition of Tattersall by an Employer Company, such Employee's service with Tattersall and any related entity within the meaning of Code sections 414(b), 414(c), 414(m) or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

**Attachment 15**
**Forum**

A.15.1 <u>Grandfathered Service Credit</u>.  If a former employee of Forum became an Employee at the time of the acquisition of Forum by an Employer Company, such Employee's service with Forum and any related entity within the meaning of Code sections 414(b), 414(c), 414(m) or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

77

**Attachment 16**
**First Albany**

A.16.1 <u>Grandfathered Service Credit</u>.   If a former employee of First Albany became an Employee at the time of the acquisition of First Albany by an Employer Company, such Employee's service with First Albany and any related entity within the meaning of Code sections 414(b), 414(c), 414(m) or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

78

**Attachment 17**
**PIVOT**

A.17.1 <u>Grandfathered Service Credit</u>. If a former employee of PIVOT became an Employee at the time of the acquisition of PIVOT by an Employer Company, such Employee's service with PIVOT and any related entity within the meaning of Code sections 414(b), 414(c), 414(m) or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

**Attachment 18**
**Tribus**

A.18.1 Grandfathered Service Credit.  If a former employee of Tribus became an Employee at the time of the acquisition of Tribus by an Employer Company, such Employee's service with Tribus and any related entity within the meaning of Code sections 414(b), 414(c), 414(m) or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

80

**Attachment 19**
**JWGenesis**

A.19.1 <u>Grandfathered Service Credit</u>.   If a former employee of JWGenesis became an Employee at the time of the acquisition of JWGenesis by an Employer Company, such Employee's service with JWGenesis and any related entity within the meaning of Code sections 414(b), 414(c), 414(m) or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

**Attachment 20**
**(Pre-Merger)**
**Wachovia Corporation**

A.20.1 <u>Grandfathered Service Credit</u>.  For periods prior to January 1, 2002, a Year of Service means a year of service as defined in the Wachovia Pension Plan for vesting purposes (including credit for prior years of service under the Retirement Income Plan of Wachovia Corporation). A former employee of Wachovia Corporation whose employment was terminated due to a divestment or divestiture on or after September 1, 2001 and who is eligible for early retirement under the Wachovia Pension Plan shall, prior to January 1, 2005, have Years of Service for periods prior to January 1, 2002 calculated using the greater of the adjusted service under the Retirement Income Plan of Wachovia Corporation or the service under the Program.  Retirements after January 1, 2002 will not receive a minimum of 20 Years of Service.  Actual Years of Service will be determined using the above method.

Notwithstanding the preceding paragraph, Southern Bank and Trust, Georgia State Bank and Discom participants have their Years of Service calculated as of their date of hire.

A.20.2 <u>Cost Sharing Methodology</u>.

Notwithstanding any provision of the Program to the contrary, any retiree from the Retirement Income Plan of Wachovia Corporation who was rehired and became an Employee in a benefits-eligible position prior to January 1, 2002, will upon his or her second retirement be eligible for retiree medical benefits under the cost sharing structure of the Wachovia retiree medical provisions in effect at the time of such retiree's first retirement as described in this Attachment, and such retiree will not be eligible for the life insurance benefit described in Attachment 1.

(a)    For Participants who retired from Wachovia or a Georgia merged bank before January 1, 1991; retired from South Carolina National Bank before January 1, 1992; or retired from Central Fidelity Bank on or after January 1, 1993 but before January 1, 1998, or were retired from IJL at the time of the merger with Wachovia, the Employer will contribute 70% of the total cost of the medical coverage, as determined by the Employer's Group Benefits. Participants are responsible for the remaining 30% of the cost of such coverage.

(b)    For Participants who retired from Central Fidelity Bank prior to January 1, 1993, the following cost sharing methodology applies:

(i)    For non-Medicare eligible retirees, the Employer will contribute 70% of the total cost of the medical coverage, as determined by the Employer's Group Benefits. Participants are responsible for the remaining 30% of the cost of such coverage.

(ii)    For Medicare eligible retirees, the Employer will contribute 70% of the total cost of the medical coverage, as determined by the Employer's Group Benefits, or the Participant and his or her Dependents may receive the $300 deductible plan at no cost. Participants are responsible for the difference between the amount covered by the Employer and the premium for the coverage they elect.

82

(c)   For Participants who retired from Wachovia or a Georgia merged bank on or after January 1, 1991 but before January 1, 2001; retired from South Carolina National Bank on or after January 1, 1992 but before January 1, 2001; or retired from Virginia or Florida Wachovia bank mergers on or after January 1, 1998, but before January 1, 2001, the following cost sharing methodology applies:

    (i)   For non-Medicare eligible retirees, the Employer will contribute $1,680 per year ($140 per month) each for the Participant and his or her Spouse, plus the greater of $1,200 or $60 per Year of Service (a minimum of 20 Years of Service will be applied) for the Participant. Participants are responsible for the difference between the amount covered by the Employer and the premium for the coverage they elect.

    (ii)   For Medicare eligible retirees, the Employer will contribute $192 per year ($16 per month) each for the Participant and his or her Spouse, plus the greater of $1,000 or $50 per Year of Service for the Participant (a minimum of 20 Years of Service will be applied). Participants are responsible for the difference between the amount covered by the Employer and the premium for the coverage they elect.

(d)   For Participants who retired from Wachovia on or after January 1, 2001 but before January 1, 2002, the following cost sharing methodology applies:

    (i)   For non-Medicare eligible retirees, the Employer will contribute the greater of $1,200 or $60 per Year of Service (a minimum of 20 Years of Service will be applied).

    (ii)   For Medicare eligible retirees, the Employer will contribute the greater of $1,100 or $55 per Year of Service (a minimum of 20 Years of Service will be applied).

A.20.3 <u>Dental Coverage</u>.   Employees who retired from Georgia Bank and Johnson Lane prior to the merger with Wachovia will be eligible for retiree dental coverage. The cost for this coverage is determined by the Employer and will be communicated annually.

A.20.4 <u>Life Insurance</u>.   Employees who retired from South Carolina National Bank, Central Fidelity Bank, Jefferson Bankshares, Inc. and First Atlanta Bank prior to the merger with Legacy Wachovia will receive life insurance benefits based on the provisions of the Program in effect at the time of their retirement.

83

A.20.5 <u>Elections to defer Coverage on or before January 2, 2002</u>. Employees who retired from Legacy Wachovia prior to January 1, 2002, and elected to defer coverage under the Program shall be entitled to elect to participate in the Program in accordance with Section 2.4. Such Participants shall not be eligible to elect a Retirement Medical Account or eligible for a Retirement Medical Allowance as set forth in Section 4.2. Instead such Participant's cost-sharing shall be determined in accordance with Section A.20.2 of this Attachment according to the Participant's Retirement Date, the Participant's employer on the day before the Participant's last day of employment and the Participant's age when the Participant elects to participate.

**Attachment 21**
**Dilks, Benefits Resources, and**
**Bank One Corporate Trust/Structured Finance Division**

A.21.1 <u>Grandfathered Service Credit</u>.  If a former employee of Dilks, Benefits Resources, or Corporate Trust/Structured Finance became an Employee at the time of the acquisition of Dilks, Benefits Resources, or Corporate Trust/Structured Finance (as applicable) by an Employer Company, such Employee's service with Dilks, Benefits Resources, or Corporate Trust/Structured Finance (as applicable) and any related entity within the meaning of Code sections 414(b), 414(c), 414(m) or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

**Attachment 22**
**Kaplan, Cameron, Mooney and E-Risk**

A.22.1 <u>Grandfathered Service Credit</u>.  If a former employee of either J.L. Kaplan Associates, LLC ("Kaplan"), Cameron M. Harris & Company ("Cameron"), Mooney & Associates ("Mooney") or E-Risk Services, LLC ("E-Risk") became an Employee in connection with the acquisition or purchase of certain assets of those entities by Wachovia Corporation and was an Employee on January 1, 2003, such Employee's service with those entities shall be considered service under the Program for purposes of determining Years of Service.

**Attachment 23**
**Prudential Securities, Inc. ("PSI")**

A.23.1 <u>Eligibility</u>.  The following former PSI employees are eligible for Benefits under the Program effective on or after January 1, 2004 as set forth in this Attachment, if the former PSI employee enrolls in the Program pursuant to the procedures and time frames established by the Plan Administrator as communicated in the enrollment materials, and the Participant agrees to pay any required contribution for coverage:

(a)     Former PSI employees who retired from active employment with PSI prior to January 1, 2004 become Eligible Retirees on January 1, 2004 if the former PSI employee is a participant in the PSI retiree medical benefit plan on December 31, 2003; and

(b)     Former PSI Employees who were PSI employees on December 31, 2003, who retire between January 2, 2004 and December 31, 2005 and whose age plus Years of Service on his or her last day of employment is equal to or greater than 75 may make an irrevocable election for the PSI Retirement Medical Allowance or a Retirement Medical Allowance in Section 4.2.  Former PSI Employees who meet the requirements of this subsection A.23.1(b), elect to defer an election under the Program and do not make an election between the PSI Retirement Medical Allowance and the Retirement Medical Allowance will de deemed to elect the PSI Retirement Medical Allowance; and

(c)     Former PSI Employees who are enrolled in COBRA Continuation Coverage under the Medical Program on or after January 1, 2004 and who reached age 50 and completed at least five Years of Service on their last day of employment.

A.23.2 <u>Grandfathered Service Credit</u>.

(a)     If a former employee of PSI became an Employee as a result of the joint venture between Wachovia Corporation and Prudential Financial, Inc., such individual's service with PSI, and any related entity within the meaning of Code Section 414(b), 414(c), 414(m), or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

(b)     If a former employee of PSI becomes a COBRA Participant under the Medical Program as a result of the joint venture between Wachovia Corporation and Prudential Financial, Inc., such COBRA Participant's service with PSI, and any related entity within the meaning of Code Section 414(b), 414(c), 414(m), or 414(o) from his or her most recent date of hire until his or her termination of employment date shall be considered service under the Program solely for purposes of determining Years of Service.

87

A.23.3 <u>Cost Sharing.</u>

(a)    The following former PSI Employees are eligible for a PSI retirement medical allowance:

    (i)    individuals who retired from active employment with PSI between January 2, 1993 and January 1, 2004 and whose age plus Years of Service equaled seventy-five on his or her last day of employment; and

    (ii)    former PSI Employees who become Employees on January 1, 2004, who retire between January 2, 2004 and December 31, 2005, whose age plus Years of Service equal seventy-five on his or her last day of employment, and elect the PSI retirement medical allowance.

    (iii)    For purposes of this subsection (a):

        (A)    A PSI retirement medical allowance is a lifetime amount based on the Participant's Years of Service and calculated on the Participant's last day of employment according to the following formula: a credit of $500 per year for the first Year of Service to the tenth Year of Service (1-10), a credit of $1,000 per year for the eleventh Year of Service to the twentieth Year of Service (11-20), a credit of $2,000 per year for the twenty-first Year of Service to the thirtieth Year of Service (21-30) and a credit of $2,500 per Year of Service for all Years of Service greater than thirty. Example: Assume a Participant has 29 Years of Service. The credit calculation would be $5,000 +$10,000, +18,000 = $33,000. Once the Participant exhausts his or her PSI retirement medical allowance, he or she must pay the amount of any required contribution for Retirement Medical Benefits.

        (B)    The Employer will perform a bookkeeping allocation of an amount from its general assets equal to the Participant's PSI retirement medical allowance to an account for the benefit of such Participant. This account is a bookkeeping account. A Participant has no right to specific funds and cannot receive any of this allowance as a taxable benefit.

        (C)    A Participant may use his or her PSI retirement medical allowance to pay for premiums for a Wachovia sponsored Retirement Medical Benefit, a non-Wachovia sponsored medical plan, or Medicare Part B.

88

(D)      Any unused amounts of Participant's PSI retirement medical allowance remaining at the Participant's death will be made available for use by the Participant's Survivors as set forth in Section 2.7. Any amount allocated to a Participant's account that remains after the Participant's death, the death(s) of the Participant's Survivor(s) or after the Participant's Survivors are no longer eligible for coverage will automatically be forfeited to the extent that claims for reimbursement of health plan premiums filed by the Participant, and the Participant's Survivors by the March 31 following the end of the Plan Year in which such event occurs are less than the PSI retirement medical allowance. Claims incurred during any Plan Year will not be honored if they are received after the March 31 following the Plan Year in which the Participant or the Participant's Survivors are no longer eligible.

(b)      Former PSI Employees who retired prior to January 1, 1993 are eligible to receive the cost-sharing methodology in place at the time the individual retired from PSI, however, the Employer reserves the right to change the cost such Participants pay for coverage at any time.

(c)      Former PSI Employees who are eligible for Retirement Medical Benefits pursuant to Section A.23.1(c) are not eligible for any Employer provided subsidy or cost-sharing provision. Such Participants are responsible for the entire cost of coverage under any Retirement Medical Benefit they elect.

A.23.4 <u>Re-Hires</u>:   A Former PSI Employee who (i) retired prior to the joint venture between Wachovia Corporation and Prudential Financial, Inc., (ii) elected to defer the PSI Retirement Medical Allowance, (iii) is hired by the Employer, and (iv) retires between January 2, 2004 and December 31, 2005 may elect **one** of the following at the time of his or her retirement from the Employer:

(a)      Keep the PSI Retirement Medical Allowance, which will be re-calculated in accordance with the provisions of subsection A.23.3(a)(iii)(A). For purposes of the re-calculation, the former PSI Employee's service with the Employer from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service and shall be added to the former PSI Employee's Years of Service.

(b)      Elect retirement benefits offered by the Employer at the time of his or her retirement, which will be calculated by treating the former PSI Employee's service with PSI, and any related entity within the meaning of Code Section 414(b), 414(c), 414(m) or 414(o) from his or her most recent hire date as service under the Program for purposes of determining Years of Service.

89

A.23.5 <u>Life Insurance</u>.

(a)    Participants who are receiving the PSI Retirement Medical Allowance are eligible for life insurance benefits of up to $5,000. There is no cost for this Benefit.

(b)    Life insurance Benefits, if any, for former PSI Employees who retired prior to January 1, 1993, are the amounts as set forth in the Plan Administrator's (or its designee's) databases and communicated to Participants annually.

(c)    Participants eligible for Retirement Medical Benefits pursuant to Section A.23.1(c) are not eligible for life insurance Benefits.

90

**Attachment 24**
**PFPC, Inc.**

A.24.1 <u>Eligibility</u>. A former employee of PFPC, Inc. who became an Employee as a result of the acquisition of PFPC, Inc.'s retirement services business by an Employer Company on June 30, 2003, became an Eligible Employee on the later of July 1, 2003, or the date he or she became an Eligible Employee by reason of his or her employment status.

A.24.2 <u>Grandfathered Service Credit</u>. If a former employee of PFPC, Inc. became an Employee as a result of the acquisition of PFPC, Inc.'s retirement services business by an Employer Company, such Employee's service with PFPC, Inc. and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

91

**Attachment 25**
**AMI Capital, Inc.**

A.25.1 <u>Eligibility</u>. A former employee of AMI Capital, Inc. who became an Employee as a result of the acquisition of AMI Capital, Inc. by an Employer Company on November 21, 2003, becomes an Eligible Employee on the later of January 1, 2004, or the date he or she becomes an Eligible Employee by reason of his or her employment status.

A.25.2 <u>Grandfathered Service Credit</u>. If a former employee of AMI Capital, Inc. became an Employee as a result of the acquisition of AMI Capital, Inc. by an Employer Company, such Employee's service with AMI Capital, Inc. and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

92

**Attachment 26**
**Lend Lease Mortgage Capital**

A.26.1 <u>Eligibility</u>. A former employee of Lend Lease Mortgage Capital who became an Employee as a result of the acquisition of Lend Lease Mortgage Capital by an Employer Company on November 28, 2003, becomes an Eligible Employee on the later of January 1, 2004, or the date he or she becomes an Eligible Employee by reason of his or her employment status.

A.26.2 <u>Grandfathered Service Credit</u>. If a former employee of Lend Lease Mortgage Capital became an Employee as a result of the acquisition of Lend Lease Mortgage Capital by an Employer Company, such Employee's service with Lend Lease Mortgage Capital and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

**Attachment 27**
**Metropolitan West Securities LLC**

A.27.1 <u>Eligibility</u>. A former employee of Metropolitan West Securities LLC. who became an Employee as a result of the acquisition of Metropolitan West Securities LLC by an Employer Company becomes an Eligible Employee on the later of January 1, 2004, or the date he or she becomes an Eligible Employee by reason of his or her employment status.

A.27.2 <u>Grandfathered Service Credit</u>. If a former employee of Metropolitan West Securities LLC. became an Employee as a result of the acquisition of Metropolitan West Securities LLC. by an Employer Company, such Employee's service with Metropolitan West Securities LLC. and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

94

**Attachment 28**
**SouthTrust Corporation**

A.28.1 <u>Eligibility</u>.  The following former SouthTrust Corporation ("SouthTrust") employees are eligible for Benefits under the Program effective on or after January 1, 2005 as set forth in this Attachment, if the former SouthTrust employee enrolled in the Program pursuant to the procedures and time frames established by the Plan Administrator as communicated in the enrollment materials, and the Participant agreed to pay any required contribution for coverage:

(a)     Former SouthTrust employees who retired from active employment with SouthTrust prior to January 1, 2005 became Eligible Retirees on January 1, 2005 if the former SouthTrust employee was a participant in the SouthTrust Retiree Medical and Dental Program on December 31, 2004; and

(b)     Former SouthTrust Employees who were SouthTrust Corporation  Employees on December 31, 2004 who retire from active employment on or after January 2, 2005 but on or before January 1, 2007 and meet the requirements of Section 2.1(b) shall choose to make an irrevocable election between the cost sharing methodology under the former SouthTrust Retiree Medical and Dental Program (as recorded in the Plan Administrator's (or its designee's) database) or a Retirement Medical Allowance in Section 4.2.  Former SouthTrust Employees who meet the requirements of this subsection A.28.1(b), elect to defer an election under the Program and do not make an election between the cost sharing methodology under the former SouthTrust Retiree Medical and Dental Program or a Retirement Medical Allowance will de deemed to elect the Retirement Medical Allowance. Notwithstanding the foregoing, the Employer reserves the right to amend, modify or terminate the cost sharing methodology for former SouthTrust Employees at any time.

A.28.2  <u>Cost Sharing</u>.

(a)     Participants under Section A.28.1(b) above who elect the cost sharing provisions for a Retirement Medical Allowance under Section 4.2 will receive life insurance as described in the Summary Plan Description and are eligible for a Retirement Medical Allowance. Such Participants are not eligible for dental coverage.

(b)     Participants under Section A.28.1(b) above who elect the cost sharing provisions under the former SouthTrust Retiree Medical and Dental Program are not eligible for life insurance coverage and are not eligible for a Retirement Medical Allowance described in Section 4.2. Participants electing these provisions and their dependents can participate in retiree medical benefits until the Participant reaches age 65 but will remain eligible for dental coverage after the Participant turns age 65.

As of December 31, 2004, the cost sharing provisions under the former SouthTrust Retiree Medical and Dental Program were converted into rate schedules under the Wachovia Retiree Health and Welfare Benefits Program at rates which are the same or similar to the current SouthTrust rates as determined by the Employer and recorded in the Plan Administrator's (or its designee's) database.  The Employer reserves the right to increase, amend, terminate or otherwise modify these rates at any time.

A.28.3 <u>Rehire</u>.  Notwithstanding any provision of the Program to the contrary, effective January 1, 2005, any retiree who is rehired and becomes an Employee in a benefits-eligible position will upon his or her second retirement, prior to January 1, 2007, be eligible for retiree benefits in effect at the time of such retiree's first retirement as described in this Attachment.  A retiree who retires between January 1, 2007

95

and December 31, 2007 shall be eligible only for a Retirement Medical Allowance described in Section 4.2.

A.28.4 <u>Grandfathered Service Credit</u>. For Participant's who were employed by SouthTrust on December 31, 2004, Year of Service shall include a Year of Service based on prior service with SouthTrust.

A.28.5 <u>SouthTrust Retirees On or Before January 1, 2005</u>.

(a) Participants who were SouthTrust Employees and retired on or before January 1, 2005 shall be subject to the cost sharing methodology under the former SouthTrust Retiree Medical and Dental Program (as recorded in the Plan Administrator's (or its designee's) database). The provisions of Section A.28.2(b) apply to these retirees. Notwithstanding the foregoing, the Employer reserves the right to amend, modify or terminate the cost sharing methodology for former SouthTrust Employees at any time.

(b) Certain participants who became SouthTrust Employees due to an acquisition by SouthTrust before January 1, 2005 (as identified and recorded in the Plan Administrator's (or its designee's) database) shall be subject to the cost sharing methodology under the former SouthTrust Retiree Medical and Dental Program (as recorded in the Plan Administrator's (or its designee's) database). The provisions of Section A.28.2(b) shall apply to these retirees except that these retirees and their dependents shall remain eligible for retiree medical coverage after the retirees attain age 65. Notwithstanding the foregoing, the Employer reserves the right to amend, modify or terminate the cost sharing methodology for former SouthTrust Employees at any time.

**Attachment 29**
**The Bank of New York**

A.29.1 <u>Eligibility</u>.  A former employee of the Bank of New York who became an Employee as a result of the acquisition of certain assets of the Bank of New York by an Employer Company on June 1, 2004, becomes an Eligible Employee on the later of June 1, 2004, or the date he or she becomes an Eligible Employee by reason of his or her employment status.

A.29.2 <u>Grandfathered Service Credit</u>.  If a former employee of the Bank of New York became an Employee as a result of the acquisition of certain assets of the Bank of New York by an Employer Company on June 1, 2004, such Employee's service with Bank of New York and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) (and any successor thereto, and any predecessor by way of merger, stock purchase, asset acquisition, or other business combination as if such time or years of service had been with the Bank of New York (but only to the extent that the Bank of New York or its affiliates have similarly credited such Bank of New York employee with such time or years of service)) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

97

**Attachment 30**
**Prudential Insurance Company of America**

A.30.1 <u>Eligibility</u>.  A former employee of Prudential Insurance Company of America who became an Employee as a result of the acquisition of certain assets of Prudential Insurance Company of America by an Employer Company on June 17, 2004, becomes an Eligible Employee on the later of January 1, 2005, or the date he or she becomes an Eligible Employee by reason of his or her employment status.

A.30.2 <u>Grandfathered Service Credit</u>.  If a former employee of Prudential Insurance Company of America became an Employee as a result of the acquisition of certain assets of Prudential Insurance Company of America by an Employer Company on June 17, 2004, such Employee's service with Prudential Insurance Company of America and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

**Attachment 31**
**Tanager Financial Services, Inc.**

A.31.1 <u>Eligibility</u>.   A former employee of Tanager Financial Services, Inc. who became an Employee as a result of the acquisition of Tanager Financial Services, Inc. by an Employer Company on September 10, 2004, becomes an Eligible Employee on the later of January 1, 2005, or the date he or she becomes an Eligible Employee by reason of his or her employment status.

A.31.2 <u>Grandfathered Service Credit</u>.   If a former employee of Tanager Financial Services, Inc. became an Employee as a result of the acquisition of Tanager Financial Services, Inc. by an Employer Company, such Employee's service with Tanager Financial Services, Inc. and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

99

**Attachment 32**
**Ingram Brown and Associates, Inc.**
**Gerald S. Smith & Co.**

A.32.1 <u>Eligibility</u>. A former employee of Ingram Brown and Associates, Inc. and of Gerald S. Smith & Co. who became an Employee as a result of the acquisition of certain assets of Ingram Brown and Associates, Inc. and of Gerald S. Smith & Co. by an Employer Company on May 31, 2005, becomes an Eligible Employee on the later of July 1, 2005, or the date he or she becomes an Eligible Employee by reason of his or her employment status.

A.32.2 <u>Grandfathered Service Credit</u>. If a former employee of Ingram Brown and Associates, Inc. and of Gerald S. Smith & Co. became an Employee as a result of the acquisition of certain assets of Ingram Brown and Associates, Inc. and of Gerald S. Smith & Co. by an Employer Company on May 31, 2005, such Employee's service with Ingram Brown and Associates, Inc. and with Gerald S. Smith & Co. and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) (and any successor thereto, and any predecessor by way of merger, stock purchase, asset acquisition, or other business combination as if such time or years of service had been with Ingram Brown and Associates, Inc. and with Gerald S. Smith & Co. (but only to the extent that Ingram Brown and Associates, Inc. and Gerald S. Smith & Co. or its affiliates have similarly credited such Ingram Brown and Associates, Inc. and Gerald S. Smith & Co. employee with such time or years of service)) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

**Attachment 33**
**Palmer & Cay**

A.33.1 <u>Eligibility</u>. The following former Palmer and Cay employees are eligible for Benefits under the Program effective on or after January 1, 2006 as set forth in this Attachment, if the former Palmer & Cay employee enrolls in the Program pursuant to the procedures and time frames established by the Plan Administrator as communicated in the enrollment materials, and the Participant agrees to pay any required contribution for coverage: Former Palmer & Cay employees who retired from active employment with Palmer and Cay prior to January 1, 2006 become Eligible Retirees on January 1, 2006 if the former Palmer & Cay employee was a participant in the Palmer & Cay retiree medical benefit program on December 31, 2005.

A.33.2 <u>Grandfathered Service Credit</u>. If a former employee of Palmer & Cay became an Employee as a result of the acquisition of Palmer & Cay by an Employer Company, such Employee's service with Palmer & Cay and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) (and any successor thereto, and any predecessor by way of merger, stock purchase, asset acquisition, or other business combination as if such time or years of service had been with Palmer & Cay (but only to the extent that Palmer & Cay or its affiliates have similarly credited such Palmer & Cay employee with such time or years of service)) from his or her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

A.33.2 <u>Continuation Coverage</u>.

(a)    <u>Eligibility</u>: Former Palmer & Cay employees who terminated employment with Palmer & Cay prior to January 1, 2006 are eligible for the continuation coverage set forth in subsection (b) if they meet the following requirements:

     (i)    were receiving continuation coverage for former employees age 60 or older under the former Palmer & Cay medical plan as of December 31, 2005; or

     (ii)    meet the following requirements:

        (A)    were age 60 or older (but under age 65) on their last day of employment with Palmer & Cay;

        (B)    elected COBRA continuation coverage under the Palmer & Cay active medical and dental plan; and

        (C)    were enrolled in COBRA continuation coverage on the last day of the maximum COBRA continuation coverage period of 18 or 29-months.

(b)    Former Palmer & Cay employees who meet the eligibility requirements in subsection (a) are eligible to continue medical and dental coverage under this Plan after the 18 or 29-month COBRA continuation period until the earliest of the following dates:

     (i)    The date the former Palmer & Cay employee reaches age 65;

     (ii)    The date the former Palmer & Cay employee is covered under another group health plan;

     (iii)    The date the former Palmer & Cay employee fails to timely pay any required contribution in accordance with the time frames established by the Plan Administrator;

     (iv)    The date of the former Palmer & Cay employee's death;

     (v)    The date the former Palmer & Cay employee's participation is terminated; and

101

(vi)    The date the Program or the Plan is terminated or amended to exclude participation of former Palmer & Cay employees covered under this section.

(c)    Spouse Eligibility. Spouses of former Palmer & Cay employees are eligible for the continuation coverage described in subsection (b) if they:

   (i)    were receiving continuation coverage for Spouses age 60 or older under the former Palmer & Cay medical plan as of December 31, 2005; or

   (ii)    meet the following requirements:

      (A)    Were age 60 or older on the former Palmer & Cay employee's last day of employment with Palmer & Cay;

      (B)    elected COBRA continuation coverage under the Palmer & Cay medical and dental plan or elected COBRA continuation coverage; and

      (C)    were enrolled in COBRA continuation coverage on the last day of the maximum COBRA continuation coverage period of 18 or 29-months.

Non-Spouse Dependents are only eligible for COBRA coverage as communicated by the COBRA Administrator.

(d)    Cessation of Spousal Coverage: Coverage for Spouses of former Palmer & Cay employees eligible under subsection (c) shall end on the earliest of the following dates:

   (i)    The date the Spouse reaches age 65;

   (ii)    The date the Spouse is covered under another group health plan;

   (iii)    The date the Spouse fails to timely pay any required contribution in accordance with the time frames established by the Plan Administrator;

   (iv)    The date of the Spouse's death;

   (v)    The date the Spouse's participation in the Plan is terminated; and

   (vi)    The date the Program or the Plan is terminated or amended to exclude participation of Spouses of former Palmer & Cay employees under this section.

(e)    Election. Former Palmer & Cay employees and Spouses who are eligible to elect continuation coverage under this section must elect such coverage in accordance with the enrollment procedures and within the time frames established by the Plan Administrator.

(f)    Cost of Coverage: The cost of continuation coverage will be established by the Plan Administrator, in its sole discretion.

**Attachment 34**
**Union Bank**

A.34.1 <u>Grandfathered Service Credit</u>. If a former employee of Union Bank of California, N.A., Union Bank International or Union Bank of California Services LTDA (collectively "Union Bank") became an Employee as a result of the acquisition of certain assets of Union Bank by an Employer Company, such Employee's service with Union Bank and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) (and any successor thereto, and any predecessor by way of merger, stock purchase, asset acquisition, or other business combination as if such time of years of service has been with Union Bank, but only to the extent that Union Bank or its affiliates have similarly credited such Union Bank employee with such time or years of service) from his of her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

103

**Attachment 35**
**American Property Financing**

A.35.1 <u>Grandfathered Service Credit</u>. If a former employee of American Property Financing, Inc. ("APF") became an Employee as a result of the merger of APF with an Employer Company, such Employee's service with APF and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) (and any successor thereto, and any predecessor by way of merger, stock purchase, asset acquisition, or other business combination as if such time of years of service has been with APF, but only to the extent that APF or its affiliates have similarly credited such APF employee with such time or years of service) from his of her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

**Attachment 36**
**Westcorp**

  A.36.1 <u>Grandfathered Service Credit</u>.  If a former employee of Westcorp became an Employee as a result of the acquisition of Westcorp by an Employer Company, such Employee's service with Westcorp and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) (and any successor thereto, and any predecessor by way of merger, stock purchase, asset acquisition, or other business combination as if such time of years of service has been with Westcorp, but only to the extent that Westcorp or its affiliates have similarly credited such Westcorp employee with such time or years of service) from his of her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

**Attachment 37**
**AmNet**

A.37.1 <u>Grandfathered Service Credit</u>.  If a former employee of AmNet Mortgage, Inc. ("AmNet") became an Employee as a result of the acquisition of AmNet by an Employer Company, such Employee's service with AmNet and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) (and any successor thereto, and any predecessor by way of merger, stock purchase, asset acquisition, or other business combination as if such time of years of service has been with AmNet, but only to the extent that AmNet or its affiliates have similarly credited such AmNet employee with such time or years of service) from his of her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

**Attachment 38**
**Metropolitan West Capital Management LLC**

A.38.1 <u>Grandfathered Service Credit</u>. If a former employee of Metropolitan West Capital Management, LLC or Metropolitan West Financial LLC (collectively "Met West") became an Employee as a result of the acquisition of an interest in Met West by an Employer Company, such Employee's service with Met West and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) (and any successor thereto, and any predecessor by way of merger, stock purchase, asset acquisition, or other business combination as if such time of years of service has been with Met West, but only to the extent that Met West or its affiliates have similarly credited such Met West employee with such time or years of service) from his of her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

**Attachment 39**
**Golden West Financial**

A.39.1 <u>Grandfathered Service Credit</u>.  If a former employee of Golden West Financial became an Employee as a result of the merger of Golden West Financial with an Employer Company, such Employee's service with Golden West Financial and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) (and any successor thereto, and any predecessor by way of merger, stock purchase, asset acquisition, or other business combination as if such time of years of service has been with Golden West Financial, but only to the extent that Golden West Financial or its affiliates have similarly credited such Golden West Financial employee with such time or years of service) from his of her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

A.39.2 <u>Retirement Medical Allowance</u>.  Individuals who were former employees of Golden West Financial that became Employees as a result of the merger of Golden West Financial with an Employer are not eligible for the Retirement Medical Allowance.

**Attachment 40**
**A.G. Edwards**

A.40.1 <u>Medical Coverage</u>.  With the exception of individuals who are participants in the A. G. Edwards Long-Term Disability Plan on June 30, 2008, former employees of A.G. Edwards, Inc. or any of its affiliates who retire from employment with an Employer Company between August 1, 2008 and December 31, 2009, are eligible for Retirement Medical Benefits coverage if the requirements of Section 2.1(b) of the Program are met.  Individuals who are participants in the A.G. Edwards Long-Term Disability Plan on June 30, 2008,  return to active employment as Eligible Employees on or after July 1, 2008 and meet the requirements of Section 2.1(b) of the Program are eligible for Retirement Medical Benefits coverage if they retire on or before December 31, 2009.

A.40.2 <u>Life Insurance Coverage</u>.  With the exception of individuals who are participants in the A. G. Edwards Long-Term Disability Plan on June 30, 2008, former employees of A.G. Edwards, Inc. or any of its affiliates who retire from employment with an Employer Company between August 1, 2008 and December 31, 2009, are eligible for Wachovia retiree life insurance coverage as set forth in the Wachovia 2009 Retiree Health and Welfare Summary Plan Description if the requirements of Section 2.1(b) of the Program are met.  Individuals who are participants in the A.G. Edwards Long-Term Disability Plan on June 30, 2008, return to active employment as Eligible Employees on or after July 1, 2008 and meet the requirements of Section 2.1(b) of the Program are eligible for Wachovia retiree life insurance coverage as set forth in the Wachovia 2009 Retiree Health and Welfare Summary Plan Description if they retire on or before December 31, 2008.

A.40.3 <u>Grandfathered Service Credit</u>.  If a former employee of A.G. Edwards, Inc. or any of its affiliates became an Eligible Employee as a result of the acquisition of A.G. Edwards by an Employer Company, such Eligible Employee's service with A.G. Edwards and any related entity within the meaning of Code Sections 414(b), 414(c), 414(m), or 414(o) (and any successor thereto, and any predecessor by way of merger, stock purchase, asset acquisition, or other business combination as if such time of years of service has been with A.G. Edwards, but only to the extent that A.G. Edwards or its affiliates have similarly credited such A.G. Edwards employee with such time or years of service) from his of her most recent date of hire shall be considered service under the Program for purposes of determining Years of Service.

A.40.4 <u>Retirement Medical Allowance</u>.  Individuals who were former employees of A.G. Edwards, Inc. or any of its affiliates that became Employees as a result of the acquisition of A.G. Edwards by an Employer Company are not eligible for the Retirement Medical Allowance (or any other cost sharing provisions of the Program).

A.40.5 <u>Participants in the A.G. Edwards Early Retiree Medical Program</u>.

(a)      Individuals who (1) were former employees of A.G. Edwards, Inc. or any of its affiliates whose last day worked was on or before June 30, 2008, (2) elected coverage under the A.G. Edwards Early Retiree Medical Program, and (3) are age 64 or younger on July 1, 2008 ("Early Retiree Medical Program Participants") are eligible to enroll for Retirement Medical Benefits coverage available to retirees under age 65.  Retirement Medical Benefits coverage is only available to Early Retiree Medical Program Participants who enrolled by the deadlines established by the Plan Administrator and communicated to the Early Retiree Medical Program Participants.  Coverage for Early Retiree Medical Program Participants who enroll in a Retirement Medical Benefits by the applicable deadline is effective July 1, 2008 and will end on the last day of the month in which the Early Retiree Medical Program Participant reaches age 65 (or earlier as described in Sections 2.9 and 2.12).  Early Retiree Medical

109

Program Participants have a one-time opportunity to enroll in a Retirement Medical Benefits. Early Retiree Medical Program Participants cannot defer an election to enroll in a Retirement Medical Benefits. Early Retiree Medical Program Participants are not eligible for retiree life insurance coverage.

(b)      A Spouse/Domestic Partner covered under the A.G. Edwards Early Retiree Medical Program on or before June 30, 2008 is eligible for Retirement Medical Benefits coverage if he or she (1) is enrolled for coverage by the applicable deadline, (2) is age 64 or younger on July 1, 2008, and (3) meets all other eligibility requirements of the Retirement Medical Benefits elected. Coverage for the Spouse/Domestic Partner of Early Retiree Medical Program Participants who are enrolled in a Retirement Medical Benefits by the applicable deadline is effective July 1, 2008 and will end on the last day of the month in which the earlier of the following occurs: (1) the Early Retiree Medical Program Participant reaches age 65, or (2) the Spouse/Domestic Partner reaches age 65 (or earlier as described in Sections 2.10 and 2.12). A Spouse/Domestic Partner who is not covered under the A.G. Edwards Early Retiree Medical Program as of June 30, 2008 is not eligible for coverage under Retirement Medical Benefits.

(c)      A Dependent child covered under the A.G. Edwards Early Retiree Medical Plan on or before June 30, 2008 is eligible for Retirement Medical Benefits coverage if he or she (1) is enrolled for coverage by the applicable deadline, and (2) meets all other eligibility requirements of the Retirement Medical Benefits elected. Coverage for a Dependent child of an Early Retiree Medical Program Participant who is enrolled in a Retirement Medical Benefits by the applicable deadline is effective July 1, 2008 and will end on the last day of the month in which the Early Retiree Medical Program Participant reaches age 65 (or earlier as described in Sections 2.10 and 2.12). A Dependent child who is not covered under the A.G. Edwards Early Retiree Medical Program as of June 30, 2008 is not eligible for Retirement Medical Benefits coverage.

**Attachment 41**
**Heritage Insurance Group and G.E. Capital**

A.41.1. <u>Grandfathered Service Credit</u>. If a former employee of Heritage Capital Group, Inc. or G. E. Capital Insurance Group Agency, Inc. became an Eligible Employee as a result of the stock purchase agreement dated September 27, 2007 by and among Heritage Insurance Group Inc., G.E. Capital Insurance Group Agency, Inc. and Wachovia Corporation and General Electric Capital Corporation, such Eligible Employee's service recognized by Heritage Capital Group, Inc. and/or G. E. Capital Insurance Group Agency, Inc. shall be considered service for purposes of determining "Years of Service".

**Attachment 42**
**Hewitt Associates**

  A.42.1.<u>Service Credit</u>. Employees of Hewitt Associates ("Hewitt") who were employees of Wachovia Corporation immediately before employment with Hewitt that were re-hired by the Employer or a Employer Company to perform work that was previously outsourced to Hewitt ("Wachovia Transferred Employees") and certain employees of Hewitt hired by the Employer or a Employer Company to perform work that was previously outsourced to Hewitt ("Hewitt Transferred Employees") shall receive service credit for service with Hewitt for purposes of determining "Years of Service" provided that he or she (1) either was (a) working at Hewitt on the Wachovia Corporation account immediately before his or her hire date, or (b) working at Hewitt on the Wachovia Corporation account within the 12 months preceding his or her hire date, (2) accepted a position with the Employer or a Employer Company to perform work that was previously outsourced to Hewitt, and (3) is hired by the Employer or a Employer Company on or after April 15, 2008 and prior to March 31, 2009.

**Attachment 43**
**Odyssey Energy Services, LLC**

A.43.1. <u>Grandfathered Service Credit</u>. If a "Former Odyssey Leased Employee" becomes an Eligible Employee on January 1, 2009, his or her prior service with Accord Human Resources, Inc. ("Accord") while providing services as a leased employee to Odyssey Energy Services, LLC (and then to its successor Wachovia Commodities Holdings, LLC) shall be considered service for purposes of determining "Years of Service". For purposes of this Attachment 43, a "Former Odyssey Leased Employee" is defined as any former employee of Accord who (1) was leased to Odyssey Energy Services, LLC and continued to be leased to its successor Wachovia Commodities Holdings, LLC up through and including December 31, 2008, and (2) has accepted an offer of employment from Wachovia Commodities, LLC with such employment commencing on January 1, 2009.

**Attachment 44**
**Comerica Bank**

A.44.1. <u>Grandfathered Service Credit</u>. If a "Former Comerica Employee" becomes an Eligible Employee on June 20, 2009, his or her prior service with Comerica Bank ("Comerica") shall be considered service for purposes of determining "Years of Service". For purposes of this Attachment 44, a "Former Comerica Employee" is defined as any former employee of Comerica who: (1) is an Accepting Employee (as defined under the Purchase and Assumption Agreement Between Comerica Bank, as Seller, and Wachovia Bank, N.A., as Purchaser Dates April 24, 2009), (2) has accepted an offer of employment from Wachovia Bank, N.A., and (3) whose employment with Wachovia Bank, N.A. commences on June 20,2009.

**EXHIBIT C**
**Merger of the Wachovia Corporation Health and Welfare Plan**
**for Certain Limited Purposes**

C-1  Intent:  Pursuant to the resolutions executed by the Wachovia Merger Committee, effective on January 1, 2010, the Wachovia Corporation Health and Welfare Plan is merged into the Wells Fargo & Company Health Plan for the following limited purposes:

a. The Wells Fargo & Company Health Plan shall assume responsibility for any claims for expenses (i) incurred in 2008 or 2009 that are eligible for coverage under the terms of the Wachovia Corporation Health and Welfare Plan in effect at the time the expenses were incurred; and (ii) that have not already been reimbursed under the terms of the Wachovia Corporation Health and Welfare Plan.  Such claims shall be referred to as "Wachovia Claims".

b.  The Administrator of the Wells Fargo & Company Health Plan (or its designee) shall administer Wachovia Claims pursuant to the terms of the Wachovia Corporation Health and Welfare Plan in effect as of the date the expense was incurred.

c. Any assets of the Wachovia Corporation Health and Welfare Plan held in the Wachovia Corporation Health and Welfare Plan Trust shall be used to offset liabilities under the Wells Fargo & Company Health Plan (including prior liabilities of the Wachovia Corporation Health and Welfare Plan).

**AMENDMENT 2010-1**
**TO THE**
**WELLS FARGO & COMPANY**
**HEALTH PLAN**

WHEREAS, Wells Fargo & Company ("Wells Fargo") maintains the Wells Fargo & Company Health Plan, amended and restated effective January 1, 2010, (the "Plan") for the benefit of certain employees;

WHEREAS, Wells Fargo desires to amend the Plan to comply with the Health Insurance Portability and Accountability Act of 1996, Public Law 104-191 ("HIPAA"), Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Parts §160 and 164, subparts A and E (the "Privacy Rule"), Standards for Security of Electronic Protected Health Information at 45 C.F.R. Parts 160 and 164, subparts A and C (the "Security Rule"), and Health Information Technology for Economic and Clinical Health Act and any accompanying regulations ("HITECH");

WHEREAS, Section 8.1 of the Plan authorizes the Director of Human Resources or the Senior Director of Compensation and Benefits to amend the Plan to comply with changes in applicable laws or regulations; and

WHEREAS, Wells Fargo now wishes to amend the Plan.

NOW, THEREFORE, unless otherwise indicated, the Plan is hereby amended effective February 7, 2010 as follows:

Section 4.4 of the Plan shall be deleted in its entirety and replaced with the following new Section 4.4:

**4.4 HIPAA Privacy and Security.** The provisions of this section 4.4 subject to the Privacy Rule became effective on April 14, 2003, the provisions subject to the Security Rule became effective on April 21, 2005, and the provisions subject to the HITECH Act become effective February 17, 2010.

(a) **Definitions.** For purposes of this section 4.4, the following terms shall have the meaning set forth below:

(1) <u>Business Associate</u>. Business Associate shall be defined as the term "business associate" in 45 C.F.R. §160.103.

(2) <u>EPHI.</u> EPHI shall have the same meaning as assigned the term "electronic protected health information" in 45 C.F.R. §164.103.

(3) <u>HIPAA.</u> HIPAA shall be defined as the Health Insurance Portability and Accountability Act of 1996. HIPAA regulations are contained in the Privacy Rule and Security Rule.

(4) <u>HITECH Act</u>. HITECH Act means the Health Information Technology for Economic and Clinical Health Act and any accompanying regulations.

1

**(5)** <u>Individual</u>. Individual means the person who is the subject of the health information created, received or maintained by the Plan or the Plan Sponsor. Individual will also include that person's Personal Representative as defined by 45 C.F.R. §164.502(g)(1).

**(6)** <u>Plan Sponsor</u>. Plan Sponsor is Wells Fargo & Company or its designee.

**(7)** <u>Privacy Rule</u>. The Privacy Rule shall mean the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Parts §160 and 164, subparts A and E.

**(8)** <u>Protected Health Information/PHI</u>. Protected Health Information /PHI shall be defined as Protected Health Information according to 45 C.F.R. §160.103. For purposes of this section 4.4, PHI shall include EPHI.

**(9)** "<u>Security Incident</u>" means an incident as defined in 45 C.F.R. §164.304.

**(10)** <u>Security Rule</u>. The Security Rule shall mean the Standards for Security of Electronic Protected Health Information at 45 C.F.R. Parts 160 and 164, subparts A and C.

**(b)** **Use and Disclosure of Protected Health Information.**

- The Plan will use PHI to the extent of and in accordance with the uses and disclosures permitted by HIPAA, including, but not limited to, health care treatment, payment for health care, health care operations and as required by law. The Wells Fargo & Company privacy and security policies and procedure will list the specific uses and disclosures of PHI that will be made by the Plan.

- The Plan will disclose PHI to the Plan Sponsor only upon receipt of written certification from the Plan Sponsor that (i) the Plan Statement has been amended to incorporate the provisions in this section 4.4; and (ii) the Plan Sponsor agrees to implement the provisions in section 4.4(c).

- The Plan may disclose summary health information to the Plan Sponsor if the Plan Sponsor requests summary health information for the purpose of obtaining premium bids for coverage under the Plan, or modifying, amending, or terminating the Plan.

**(c)** **Conditions Imposed on Plan Sponsor.** .Disclosure of PHI by the Plan to the Plan Sponsor shall only be permitted upon receipt of a written certification from the Plan Sponsor that the Plan Sponsor agrees to:

- Not use or further disclose the information other than as permitted or required by the Plan or as required by law;

2

- Ensure that any agents, including subcontractors and Business Associates, to whom it provides PHI received from the Plan agree to the same restrictions and conditions that apply to the Plan Sponsor with respect to PHI received or created on behalf of the Plan and ensure that such individuals agree to implement reasonable and appropriate security measures to protect EPHI;

- Not use or disclose the information for employment-related actions and decisions;

- Not to use or disclose an Individual's PHI in connection with any other benefit or employee benefit plan of the Plan Sponsor unless authorized by the Individual;

- Report to the Plan any use or disclosure of the information that is inconsistent with the uses or disclosures provided for in this section 4.4 of which it becomes aware;

- Make available PHI in accordance with 45 C.F.R. §164.524 and the HITECH Act, if and when applicable;

- Make available PHI for amendment and incorporate any amendments to PHI in accordance with 45 C.F.R. §164.526;

- Make available the information required to provide an accounting of disclosures in accordance with 45 C.F.R. §164.528 and the HITECH Act, if and when applicable;

- Make its internal practices, books, and records relating to the use and disclosure of PHI received from the Plan available to the Secretary of Health and Human Services for purposes of determining compliance by the Plan with the Privacy Rule;

- If feasible, return or destroy all PHI received from the Plan that the Plan Sponsor still maintains in any form and retain no copies of such PHI when no longer needed for the purpose for which disclosure was made. If such return or destruction is not feasible, limit further uses and disclosures to those purposes that make the return or destruction of the information infeasible; and

- Ensure that the adequate separation supported by reasonable and appropriate security measures is implemented between the Plan and Plan Sponsor, as required in 45 C.F.R.; §164.504(f)(2)(iii).

**(d)** **Business Associates.** The Plan may also disclose or authorize disclosure of PHI to Business Associates of the Plan provided there is an executed agreement between the Plan and the Business Associate whereby the Business Associate agrees to maintain the privacy and security of the PHI as described in the Privacy Rule, the Security Rule and the HITECH Act. Notwithstanding any other provision of this Plan Statement to the contrary, all services performed by a Business

3

Associate for the Plan in accordance with the applicable service agreement shall be deemed to be performed on behalf of the Plan and subject to the administrative simplification provisions of HIPAA contained in 45 C.F.R. parts 160 through 164, except services that relate to eligibility and enrollment in the Plan. If a Business Associate of the Plan performs any services that relate to eligibility and enrollment to the Plan, these services shall be deemed to be performed on behalf of the Employer in its capacity as Plan Sponsor and not on behalf of the Plan.

   **(e)** **Firewalls.** As a condition precedent to the use and/or disclosure of PHI as set forth in paragraph (b) above, firewalls have been set up to maintain the confidentiality of PHI.

   **(1)** In accordance with the Privacy Rules, only certain classes of employees of the Plan Sponsor are authorized to have access to PHI. The classes of employees who have access to PHI from the Plan are listed in the Privacy Notice, which is incorporated into and made a part of this section 4.4. The employees who have access to PHI listed in the Privacy Notice may only use and disclose PHI for Plan administration functions that the Plan Sponsor performs for the Plan and/or as required or permitted by law.

   **(2)** Any and all uses and/or disclosures of PHI by these classes of employees are subject to a minimum necessary rule, as defined in the HITECH Act and any further guidance issued under the HITECH Act, whereby the amount of information that is used or disclosed should be the minimum necessary to accomplish the purpose taking into consideration practical and technological limitations. The only exception to this rule shall occur when the use or disclosure of the information is authorized or mandatory under law.

   **(3)** The Plan and Plan Sponsor shall utilize certain safeguards (administrative, technical, and physical) to ensure that PHI is protected from those who are not authorized to use and/or disclose PHI.

   **(f)** **Compliance.**

   **(1)** The designated Privacy Official and Security Official shall be appointed by resolution executed by the Director of Compensation and Benefits.

   **(2)** The Privacy Official will be responsible for the Plan's compliance with the Privacy Rule and the HITECH ACT. The Privacy Official may contract with or otherwise utilize the services of attorneys, accountants, brokers, consultants, or other third party experts as the Privacy Official deems necessary or advisable. In addition, and notwithstanding any provision of this Plan to the contrary, the Privacy Official shall have the authority to and be responsible for:

- Accepting and verifying the accuracy and completeness of any certification provided by the Plan Sponsor under this section 4.4;

- Transmitting the certification to any third parties as may be necessary to permit them to disclose PHI to the Plan Sponsor;

- Establishing and implementing formal policies and procedures designed to ensure the Plan complies with the Privacy Rule;

4

- Distribution of a HIPAA Privacy Notice in such form as determined by the Privacy Official from time to time, as well as the policies and procedures for addressing and documenting complaints (including possible sanctions);

- Establishing and overseeing proper training of the Plan, or Plan Sponsor personnel who will have access to PHI; and

- Any other duty or responsibility that the Privacy Official, in his or her sole capacity, deems necessary or appropriate to comply with the Privacy Rule and the purposes of this section 4.4.

**(3)** The Security Official will be responsible for the Plan's compliance with the Security Rule and the HITECH ACT. The Security Official may contract with or otherwise utilize the services of attorneys, accountants, brokers, consultants, or other third party experts as the Security Official deems necessary or advisable. In addition, and notwithstanding any provision of this Plan to the contrary, the Security Official shall have the authority to and be responsible for:

- Accepting and verifying the accuracy and completeness of any certification provided by the Plan Sponsor under this section 4.4;

- Transmitting the certification to any third parties as may be necessary to permit them to disclose EPHI to the Plan Sponsor;

- Establishing and implementing formal policies and procedures with respect to EPHI that are designed to ensure the Plan complies with the Security Rule;

- Establishing and overseeing proper training of the Plan, or Plan Sponsor personnel who will have access to PHI and EPHI;

- Any other duty or responsibility that the Security Official, in his or her sole capacity, deems necessary or appropriate to comply with the Security Rule and the purposes of this section 4.4.

**(4)** The Plan Sponsor shall provide a mechanism for resolving issues of noncompliance, including disciplinary sanctions for personnel who do not comply with the provisions of this section 4.4. The process for filing a complaint against the Plan or an employee of the Plan Sponsor for noncompliance is described in the Privacy Notice distributed by the Plan Administrator, which is hereby incorporated into and made a part of this section 4.4.

- To the extent possible, the Plan shall take appropriate action to mitigate known harmful affects of inappropriate use or disclosure of PHI.

- Complainants shall not be subject to intimidation, threats, coercion or retaliation as a result of filing a complaint.

- No Individual will be required to waive his/her rights under HIPAA as a condition of treatment, payment, enrollment in a health plan or eligibility for benefits.

**(g)      EPHI Certification.** With respect to any EPHI (other than enrollment/disenrollment information and Summary Health Information, as defined in 45 C.F.R. §164.504(a), which are not subject to these restrictions) created, received, maintained or transmitted by Plan Sponsor and/or any employee listed in the Privacy Notice from or on behalf of the Plan, Plan Sponsor agrees to the following requirements and limitations:

- Subcontractors and Agents. Plan Sponsor will ensure that any agents, including independent contractors and subcontractors, to whom EHPI is provided from the Plan, agree to implement reasonable and appropriate security measures to protect the EPHI,

- Safeguards.   Plan Sponsor will implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of EPHI that the Plan Sponsor creates, receives, maintains or transmits on behalf of the Plan.

- Duty to Report Violations.  Plan Sponsor will report to the Plan any Security Incident, of which it becomes aware, except that, for purposes of this reporting requirement, "Security Incident" shall not include inconsequential incidents that occur on a daily basis such as scans or "pings" that are not allowed past the Plan Sponsor's firewall.

- Adequate Separation.  Plan Sponsor will ensure that the adequate separation supported by reasonable and appropriate security measures is implemented between the Plan, Plan Sponsor and employees listed in the Privacy Notice required in 45 C.F.R.; §164.504(f)(2)(iii).

**(h)      Organized Health Care Arrangement.** The Plan Administrator intends the Plan to form part of an Organized Health Care Arrangement along with any other benefit under a covered health plan (under 45 C.F.R. § 160.103) provided by the Plan Sponsor.

**(i)      Hybrid Entity Designation.** The Plan Administrator intends the Plan to be a Hybrid Entity in accordance with 45 C.F.R. § 164.504(b) and only those benefits that would be a covered health plan under 45 C.F.R. § 160.103 (if set forth as a separate plan) will constitute the health care components of the Plan. Any benefit offered by the Plan that would not be a covered health plan under 45 C.F.R. §160.103 if provided through a separate plan is a non-health care component of the Hybrid Entity and is not subject to the Privacy Rule.

**(j)      Interpretation and Limited Applicability.** This section 4.4 serves the sole purpose of complying with the requirements of HIPAA and shall be interpreted and construed in a manner to effectuate this purpose. Neither this section 4.4 nor the duties, powers, responsibilities, and obligations listed herein shall be taken into account in determining the amount or nature of the benefits provided to any person covered under this Plan, nor shall they inure to the benefit of any third parties. To the extent that any of the provisions of this section 4.4 are no longer required by HIPAA, they shall be deemed deleted and shall have no further force or effect.

6

**IN WITNESS WHEREOF,** and as evidence of the adoption of the amendment set forth herein, Hope A. Hardison has executed this Amendment 2010-1 to the Wells Fargo & Company Health Plan, this ⎯17⎯ day of February, 2010.

WELLS FARGO & COMPANY,

Hope Hardison
EVP  2/17/10

7