UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

WEST PALM BEACH DIVISION
CASE NO.:  9:12-cv-80937 KAM

YOVANY GONZALEZ,

   Plaintiff,

vs.

WELLS FARGO BANK, N.A.,
f/k/a WACHOVIA BANK, N.A.,
WELLS FARGO & COMPANY,
WELLS FARGO & COMPANY DEPENDENT
TERM LIFE PLAN, WELLS FARGO & COMPANY
HEALTH PLAN, UNITED HEALTHCARE,
UNITED HEALTHGROUP, INC.,
UNITED HEALTHCARE SERVICES, INC., and
MEDCO HEALTH SOLUTIONS, INC.,

   Defendants.
_____/

## AMENDED COMPLAINT

Plaintiff, Yovany Gonzalez ("Gonzalez"), hereby sues Defendants, Wells Fargo Bank, N.A. f/k/a Wachovia Bank, N.A., Wells Fargo & Company (collectively "Wells Fargo"), the Wells Fargo & Company Dependent Term Life Plan (the "Life Plan"), the Wells Fargo & Company Health Plan (the "Health Plan"), UnitedHealthcare, UnitedHealth Group, Inc., and United HealthCare Services, Inc. (collectively "UHC"), Medco Health Solutions, Inc. ("Medco"), and states:

**Parties/Venue/Jurisdiction**

1. This is a claim for damages in excess of Fifteen Thousand Dollars ($15,000.00), as well as equitable relief.

2. Gonzalez is a resident of Palm Beach County, Florida.

3. Wells Fargo Bank, N.A., is a national banking association with authorized offices throughout Florida, including in Palm Beach County. It is a subsidiary of Wells Fargo & Company. The Life Plan and Health Plan were benefit plans that Wells Fargo offered to eligible employees.

4. UnitedHealthcare is a division or subsidiary of UnitedHealth Group, Inc., and an affiliate of United HealthCare Services, Inc. UHC provided insurance verification for medical services under the UnitedHealtcare Consumer Directed Health Plan in which Gonzalez participated. Medco provided insurance verification for prescription drug services under the plan.

5. Gonzalez was hired by Wachovia Bank, N.A. ("Wachovia"). Beginning in 2008, and including the time when he was terminated and when the causes of action stated herein accrued, Wachovia was being acquired by Wells Fargo and was known as "Wachovia, a Wells Fargo Company." Since that time, the acquisition of Wachovia has been completed and its banking operations are now known as "Wells Fargo Bank, N.A."

6. Venue is proper in Palm Beach County, because Wells Fargo has an agent or other representative in this County and the causes of action accrued in this County.

**Background Allegations**

7. Gonzalez was hired by Wachovia in 2007 as a Mortgage Consultant. He worked at a branch located in Palm Beach County.

8. Wachovia offered Gonzalez the opportunity to obtain health insurance and life insurance for his entire family. He chose to do so. Gonzalez elected to purchase, among other things, (a) health insurance for himself, his wife Susan, and his children, and (b) life insurance on

the lives of himself, his wife, and each of his children. On the children's policies, Gonzalez was named as beneficiary. The premiums for the health insurance and life insurance were taken out of his paychecks.

9. In December 2008, Gonzalez's then four-year-old daughter, Mackenzie, was diagnosed with cancer.

10. Mackenzie's treatment required Gonzalez to miss work and to relocate geographically for periods of time. Gonzalez's wife, and Mackenzie's mother, Susan Gonzalez, was disabled and unable to be the primary caregiver for Mackenzie.

11. When Gonzalez first requested leave under the Family Medical Leave Act ("FMLA"), his manager refused, saying that Wachovia "didn't participate" in that program. The manager threatened to fire Gonzalez if he took leave.

12. Gonzalez was required to retain counsel to vindicate his FMLA rights. Wachovia ultimately granted Gonzalez FMLA leave.

13. Gonzalez requested that he be permitted to work in other bank locations. Initially, his request was denied, but eventually Wachovia agreed.

14. During Mackenzie's treatment, Gonzalez worked irregular hours, generally less than full time, and in several different locations.

15. During this time period, Wachovia changed the manner in which Gonzalez was compensated from salary to hourly pay.

16. In late 2009, Wachovia falsely accused Gonzalez of having been overpaid by more than $9,000.00. It sent letters demanding the return of this "overpayment." Wachovia also exercised its claimed "right to offset" by taking approximately $1,500.00 from Gonzalez's deposit account without his prior knowledge or consent.

17. Gonzalez was again required to retain counsel to assist him. He eventually demonstrated to Wachovia that he had not been overpaid. Wachovia did not return the funds that it had taken from Gonzalez's account, but it dropped any demand for additional payment.

18. On many occasions, Gonzalez was unable to record time when he was working, with bank approval, from a remote location, and/or when he was focused on taking care of Mackenzie

19. In addition, during this timeframe, Wells Fargo assumed control of the operations as part of the Wachovia acquisition.

20. Wells Fargo personnel came to Gonzalez and told him that, instead of using intermittent FMLA leave, he should just quit and go on unpaid leave until Mackenzie's medical situation was resolved. Gonzalez refused to quit.

21. Wells Fargo then asked Gonzalez to agree that he would not take any more leave. Gonzalez responded that he could not agree.

22. Wells Fargo assigned Gonzalez to a downtown West Palm Beach location that was inconvenient and relatively inactive. Wells Fargo personnel began telling Gonzalez that he needed to be more productive in generating sales. Gonzalez asked to be relocated to one of the many branches closer to his house, but Wells Fargo declined his request.

23. Gonzalez's Branch Manager, Shaskia Rodriguez, told him to be careful, because Wells Fargo was looking for reasons to get rid of him.

24. After the Wachovia acquisition, Wells Fargo had changed the bank's time entry system. One of the features of the new system was that employees could not enter time for work performed during previous time periods without the assistance of a supervisor.

25.   Gonzalez requested the assistance of his supervisor, Ms. Rodriguez, to help him input time.

26.   Gonzalez made clear that he was not able to precisely account, down to the minute, for all time worked.  Ms. Rodriguez told him that everything was fine, and that he should provide his best recollection of the hours.  She then input the time for him.

27.   In July 2010, Gonzalez learned that Mackenzie needed surgery to remove a tumor.  The surgery was viewed as the best hope for a cure.  The surgery was being arranged for August 2010 at Memorial Sloan-Kettering Cancer Center in New York.

28.   In mid-July 2010, Gonzalez's wife, Susan Gonzalez, was contacted by representatives of Wells Fargo and UHC, who asked numerous questions about Mackenzie's surgery and long-term care.  Several references were made to the costs of her treatment.

29.   In late July 2010, Ms. Rodriguez left on vacation.

30.   In late July 2010, shortly after the phone calls regarding Mackenzie's surgery and long-term care, and while Ms. Rodriguez was on vacation, Gonzalez received a telephone call from a woman who identified herself as being with Wells Fargo's Security Department.  She stated that she was investigating whether Gonzalez had falsified his timesheet.  She accused Gonzalez of committing fraud and stealing from the company.

31.   Gonzalez pointed out that the timesheet in question was one that Ms. Rodriguez completed for him.

32.   Nonetheless, on August 3, 2010, Gonzalez was told that he was being terminated for falsification of time records.  He was not asked any questions about the allegations or given any chance to explain the circumstances.  Instead, Gonzalez was handed a previously-prepared termination letter, a copy of which is attached as Exhibit A.  Gonzalez was also handed, and

5

asked to sign (without time to review, much less confer with counsel), a Departure Agreement and Release of Claims, already signed by a representative of Wells Fargo, which would have released all potential claims of employment discrimination. A copy of the Departure Agreement and Release of Claims is attached as Exhibit B.

33. The Departure Agreement and Release of Claims signed by Wells Fargo provided: "You will receive additional information regarding continuation or conversion of certain benefits in which you participate…." Gonzalez specifically requested of Wells Fargo Human Resource representatives, during this meeting, that he be given information about his benefits. This request was reitereated on several occasions. Gonzalez also made clear to Wells Fargo, on numerous occasions, that he wanted to keep in place whatever benefits he had.

34. Under the terms of his health insurance policy, Gonzalez remained covered through the end of August 2010. Nonetheless, immediately after Gonzalez's termination, UHC would not verify to Mackenzie's medical providers that Gonzalez had insurance. As a consequence of the inability to verify insurance, Mackenzie missed scheduled doctor's visits, chemotherapy and radiation treatments, and prescription drug refills. In the immediate wake of Gonzalez's termination, Mackenzie received only emergency care. The lack of proper medical care had an impact on Mackenzie's cancer treatment. By October 2010, the cancer had metastasized to her liver.

35. Wells Fargo fired Gonzalez just days before the family was travelling to New York to meet with the Sloan-Kettering doctor and schedule Mackenzie's surgery. But, when they got to New York, the Gonzalezes were forced to wait for hours while Sloan-Kettering attempted to verify insurance. Sloan-Kettering never scheduled Mackenzie's surgery.

36. During his employment at Wachovia, Gonzalez had obtained his FINRA Series 6 and Series 63 securities licenses, as well as a Florida 2-15 license. These licenses allowed Gonzalez to act as a registered securities broker.

37. On August 24, 2010, Gonzalez was mailed a copy of the Form U5 Uniform Termination Notice for Securities Industry Registration prepared by Wells Fargo, and dated August 23, 2010, which lists the reason for termination as "DISCHARGED BY WACHOVIA BANK, NA FOR CONDUCT UNRELATED TO THE BUSINESS OF WELLS FARGO ADVISORS. SPECIFICALLY, ENTERED INACCURATE TIME INFORMATION INTO THE FIRM'S TIME MANAGEMENT SYSTEM." The cover letter to Gonzalez explained that he had two years from his date of termination in order to become securities registered with another Broker Dealer, or else he would have to re-qualify for his securities licenses by exam. A copy of the cover letter and enclosed Form U5 is attached as Exhibit C.

38. Mackenzie died of cancer on March 2, 2011, at age six.

39. A few days later, Gonzalez called Wells Fargo to notify the bank of Mackenzie's death and inquire about obtaining the life insurance proceeds.

40. Wells Fargo informed Gonzalez that he needed to call the insurer, Minnesota Life Insurance Company. But when he called, the Minnesota Life representative stated that the policy had been cancelled for lack of payment.

41. Gonzalez then called back to Wells Fargo and related the information he had received from Minnesota Life. On April 7, 2011 – more than one month after Mackenzie's death and more than eight months after his termination – Gonzalez received a document from Wells Fargo entitled "Life Insurance, Long Term Care and Accidental Death and Dismemberment," a copy of which is attached as Exhibit D. This is a document that Wells Fargo had promised to

7

send at the time of his termination.  The document notified Gonzalez that "you may be eligible to continue your Life Insurance," but that he was required to contact Minnesota Life "within 31 days of your coverage end date," which by then had long since passed.

42.     A Minnesota Life representative subsequently stated that Wells Fargo was supposed to contact Gonzalez about the life insurance conversion rights.

43.     Managerial-level employees of Wells Fargo told Gonzalez that they would like to bring him back to work, but they could not, because his termination letter stated that he was "not eligible for rehire."

44.     Gonzalez was unable to find another job until July 2011.

45.     Gonzalez was later hired by Chase Bank as a banker.  He asked representatives at Chase whether the bank would sponsor him, so that he could once again be registered to sell securities.  Chase declined, based on the grounds for termination listed by Wachovia on the Form U5.  Gonzalez is earning less at Chase than he would with a securities registration.  And he is now in a position of needing to re-take the examinations if he is to ever regain his securities licenses.

46.     On August 3, 2011, Gonzalez's counsel delivered a Technical Assistance Questionnaire ("TAQ") to the Florida Commission on Human Relations (the "Commission"). The TAQ stated:

> I believe my employer terminated my employment because I requested various accommodations to assist with [my daughter's] treatment.  In addition, I believe my employer terminated my employment because the treatments and medical expenses may have cost the company a considerable amount of money because the amounts paid by insurance was several millions of dollars.
>
> ….
>
> Although I was offered several schedule accommodations, I believe I was terminated ultimately because I was becoming a burden to the company as a result

of taking time off, scheduling changes, and the cost to the company of my daughter's medical expenses.

These allegations were repeated in an Employment Charge of Discrimination.

47. The Commission accepted the TAQ as constituting a valid complaint that named the employer and described the violation. The Commission has consistently treated August 3, 2011 as the date of filing. For example, the Commission's "180 day letter," issued February 6, 2012, expressly states: "Filing Date: 8/3/2011." *See* Exhibit E.

48. In its response, Wells Fargo contended that the charge of discrimination was untimely.

49. During its investigation, the Commission interviewed a Wells Fargo representative who admitted that (i) employees were watching Gonzalez and reporting back to her about his activities, and (ii) Branch Manager Rodriguez was surprised by the allegation of falsification.

50. Other Wells Fargo employees told Gonzalez that they were "in the same boat" as Gonzalez with regard to having issues with the new time entry system, that they had occasional inaccuracies, and that Ms. Rodriguez helped them with time entry. But these other employees did not have co-workers watching them and reporting to management, had not been accused of falsification of time records, and were not terminated by the company.

51. On April 11, 2012, the Commission issued a formal "Determination: Cause," having concluded that "reasonable cause exists to believe that an unlawful employment practice occurred." A copy of the Determination: Cause is attached as Exhibit F.

52. The Determination: Cause expressly noted that "the timeliness and all jurisdictional requirements have been met."

53. Gonzalez has satisfied all conditions precedent to suit.

54. Gonzalez has retained the undersigned law firm and agreed to pay a reasonable fee for services rendered.

### Count I – Discrimination in Violation of the Florida Civil Rights Act
### (v. Wells Fargo)

55. Gonzalez realleges paragraphs 1 through 54.

56. Wells Fargo terminated Gonzalez to avoid the need to further accommodate him in light of his daughter's illness, to avoid any disruptions or distractions occasioned by his caretaker responsibilities, and to avoid incurring additional expense associated with her treatment.

57. Wells Fargo's stated justification for the termination – that Gonzalez had falsified his timesheets – was a mere pretext.

58. By terminating Gonzalez because of his daughter's disability, Wells Fargo engaged in associational disability discrimination, in violation of the Florida Civil Rights Act.

59. Gonzalez filed a complaint with the Commission within 365 days of the violation, naming the employer and describing the violation.

60. The Commission determined that there was reasonable cause to believe that a discriminatory practice occurred.

61. As a direct and proximate result of Wells Fargo's associational disability discrimination, Gonzalez has suffered damages including, but not limited to, lost wages, mental anguish, loss of dignity, and other intangible injuries.

WHEREFORE, Gonzalez asks that this Court enter judgment against Wells Fargo for compensatory damages, pre-judgment interest, punitive damages, attorneys' fees, and costs, issue an order prohibiting the discriminatory practice and providing affirmative relief from the

effects of the practice, including back pay, front pay, and reinstatement, and award such further relief as may be just.

### Count II – FMLA Retaliation
### (v. Wells Fargo)

62. Gonzalez realleges paragraphs 1 through 54.

63. Gonzalez took intermittent FMLA leave.

64. He suffered an adverse employment decision.

65. The adverse decision was causally related to his leave.

66. Wells Fargo acted willfully in retaliating against Gonzalez for exercising his rights under FMLA, in violation of Title 29, United States Code, Sections 2615 and 2617.

67. As a direct and proximate result of Wells Fargo's conduct, Gonzalez has suffered damages.

WHEREFORE, Gonzalez asks that this Court enter judgment against Wells Fargo for compensatory damages including wages, salary, employment benefits, anticipated bonuses, and other compensation denied or lost by reason of Wells Fargo's conduct, pre-judgment interest, liquidated damages equal to the amount of compensatory damages plus interest, and such equitable relief as may be appropriate, including reinstatement, attorneys' fees, and costs, and such further relief as may be just.

### Count III – Interference with Protected Rights Under ERISA
### (v. Wells Fargo)

68. Gonzalez realleges paragraphs 1 through 54.

69. Wells Fargo contends that the health insurance plan under which Gonzalez and his family received coverage was established under, and controlled by, the Employee Retirement Income Security Act ("ERISA"), Title 29, United States Code, Sections 1001-1461.

70. Gonzalez and his family had participated, and were expected to further participate, in a statutorily protected activity, i.e., the use of health insurance benefits.

71. An adverse employment action was taken against Gonzalez.

72. A causal connection exists between the two. Wells Fargo terminated Gonzalez, in part, to evade benefit payments, in violation of Title 29, United States Code, Sections 1132 and 1140.

73. Wells Fargo made a conscious decision to interfere with Gonzalez's attainment of benefits.

74. As a direct and proximate result of Wells Fargo's conduct, Gonzalez has suffered damages.

WHEREFORE, Gonzalez asks that this Court enter judgment against Wells Fargo for loss of compensation, retroactive benefits, additional economic and non-economic damages, back pay, front pay, reinstatement, pre-judgment interest, attorneys' fees, costs, any and all other remedies allowable by ERISA, and such further relief as may be just.

### Count IV – Defamation
### (v. Wells Fargo)

75. Gonzalez realleges paragraphs 1 through 54.

76. Gonzalez is a private figure.

77. Wells Fargo filed the Form U5 with the regulatory body FINRA, which constitutes publication.

78. Wells Fargo has filed a Form U5 that (a) states that Gonzalez was discharged, rather than permitted to resign or otherwise terminated, and (b) accuses Gonzalez of theft, a crime of dishonesty, by claiming that he entered inaccurate time. The Form U5 amounts to a direct attack on Gonzalez's personal and professional character.

79. The Form U5 is false.

80. The Form U5 is defamatory per se.

81. The Form U5 would tend to prejudice Gonzalez in the eyes of the community.

82. Wells Fargo's report that Gonzalez was terminated for entering inaccurate time information into the firm's time management system, without any reasonable belief in the truth of the report, was not made in good faith and reflects express malice.

83. More than five days before filing this suit, Gonzalez demanded that Wells Fargo retract its Form U5, but Wells Fargo has refused to do so.

84. The false allegation of misconduct in the Form U5 has caused Gonzalez injury in his business relations, as it has prevented him from being registered to sell securities through another broker-dealer.

85. As a direct and proximate result of Wells Fargo's filing a defamatory Form U5, Gonzalez has suffered damages including damage to his reputation, personal humiliation, and mental anguish and suffering, and lost income.

WHEREFORE, Gonzalez asks that this Court enter judgment against Wells Fargo for compensatory damages, punitive damages, pre-judgment interest, and costs, direct Wells Fargo to withdraw and/or expunge the defamatory Form U5, and award such further relief as may be just.

**Count V – Failure to Provide Notice and Breach of Fiduciary Duty
Regarding Life Insurance Benefits
(v. Wells Fargo and Dependent Life Plan)**

86. Gonzalez realleges paragraphs 1 through 54 and 69.

87. Wells Fargo contends that the life insurance plan under which Gonzalez and his family received coverage was established under, and controlled by, the Employee Retirement Income Security Act ("ERISA"), Title 29, United States Code, Sections 1001-1461.

88. Wells Fargo alleges that it was the Plan Administrator of its employee welfare benefit plan, and it is identified as such in what has been presented as the Benefits Book for 2010.

89. Wells Fargo was therefore a plan fiduciary who owed a fiduciary duty to Gonzalez.

90. Pursuant to the Consolidated Omnibus Budget Reconciliation Act ("COBRA"), upon Gonzalez's termination, Wells Fargo was statutorily required to provide notice to Gonzalez and his family, as qualified beneficiaries, of their rights to continuation coverage.

91. Wells Fargo failed to timely notify Gonzalez of his life insurance conversion rights, in violation of Title 29, United States Code, Sections 1166 and 1167.

92. Wells Fargo breached its fiduciary duty to Gonzalez, in violation of Title 29, United States Code, Section 1132, by failing to provide information regarding Gonzalez's life insurance conversion rights until long after the 31-day conversion period had passed, despite its written representation on the day of Gonzalez's termination, his repeated requests for information, Gonzalez's repeated statements that he wanted to keep all benefits that he had, and Wells Fargo's knowledge that, under the circumstances, Gonzalez had a particular need for the information.

93. As a direct and proximate result of Wells Fargo's conduct, Gonzalez has suffered harm, including the loss of the death benefit on the policy insuring Mackenzie and the loss of insurance coverage for the rest of the family.

WHEREFORE, Gonzalez asks that this Court enter judgment against Wells Fargo and the Life Plan for compensatory damages, statutory penalties, pre-judgment interest, attorneys' fees, and costs, direct Wells Fargo to arrange for the reinstatement of all life insurance policies that were in place when Gonzalez was terminated or the procurement of replacement policies with equivalent or superior benefits, order Wells Fargo to obtain and deliver to Gonzalez a life insurance certificate for the death benefit on the policy covering Mackenzie plus interest since the date of her death, and/or pay him the death benefit plus interest, and award such further relief as may be just.

### Count VI – Failure to Provide Notice and Breach of Fiduciary Duty Regarding Health Insurance Benefits (v. Wells Fargo and Health Care Plan)

94. Gonzalez realleges paragraphs 1 through 54, 69, 88, and 89.

95. Wells Fargo failed to timely notify Gonzalez of his rights to continuation coverage under the health insurance plan, in violation of Title 29, United States Code, Sections 1166 and 1167.

96. Wells Fargo breached its fiduciary duty to Gonzalez, in violation of Title 29, United States Code, Section 1132, by failing to timely provide information regarding Gonzalez's health insurance continuation coverage rights, despite its written representation on the day of Gonzalez's termination, his repeated requests, and its knowledge that, under the circumstances, Gonzalez had a particular need for the information.

97. As a direct and proximate result of Wells Fargo's conduct, Gonzalez has suffered harm, including the need to invest time and effort to obtain the information and increased medical expenses.

WHEREFORE, Gonzalez asks that this Court enter judgment against Wells Fargo and the Health Plan for compensatory damages, statutory penalties, pre-judgment interest, attorneys' fees, and costs, direct Wells Fargo to arrange for the reimbursement of, and/or for the Health Plan to reimburse, all medical expenses incurred due to the delay in obtaining information regarding continuation coverage rights, and award such further relief as may be just.

### Count VII – Conversion
### (v. Wells Fargo)

98. Gonzalez realleges paragraphs 1 through 54.

99. Wells Fargo converted to its own use funds that were the property of Gonzalez of the value of approximately $1,500.00.

WHEREFORE, Gonzalez demands judgment for compensatory damages, punitive damages, pre-judgment interest, and costs against Wells Fargo.

### Count VIII – Negligence
### (v. UHC and Medco)

100. Gonzalez realleges paragraphs 1 through 54.

101. UHC and Medco are identified in the Wells Fargo Benefits Book for 2010 as the pre-service claim contacts for medical and prescription drug services, respectively.

102. UHC and Medco each owed a duty to reasonably cooperate and to not hinder Gonzalez's ability to obtain health insurance benefits.

103. Upon Gonzalez's termination, the health insurance that he had obtained for himself and his family remained effective until the end of the August 2010.

104. Yet, medical providers contacting UHC, and pharmacies contacting Medco, after the termination were unable to verify insurance for Mackenzie. As a result, Mackenzie did not receive necessary care.

105. As a direct and proximate result of UHC's negligent failure to verify insurance coverage, Gonzalez suffered damages, including loss of the medical and prescription drug services that should have been provided.

WHEREFORE, Gonzales demands judgment for damages, pre-judgment interest, costs, and such further relief as may be just.

### Demand for Jury Trial

Gonzalez hereby demands trial by jury of all issues so triable.

I HEREBY CERTIFY that on the 11th day of December, 2012, a true and correct copy of the foregoing has been electronically filed with the Clerk of Court by CM/ECF. I further certify that the foregoing is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

    /S/ JACK SCAROLA
JACK SCAROLA
Florida Bar No.: 169440
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Phone: (561) 686-6300
Fax:    (561) 383-9465
Attorneys for Plaintiff Gonzalez

**COUNSEL LIST**

Steven A. Siegel
Fisher & Phillips LLP
450 East Las Olas Boulevard
Suite 800
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4800
Facsimile: (954) 525-8739
ssiegel@laborlawyers.com